Case No. 25-10679

# In the United States Court of Appeals
# For the Fifth Circuit

JEFFREY W. CARPENTER,

*Plaintiff–Appellee,*

v.

TWIN CITY FIRE INSURANCE COMPANY,

*Defendant–Appellant.*

On Appeal from the United States District Court
for the Northern District of Texas (No. 3:23-CV-769)

## APPELLANT'S BRIEF

CHAMBERLAIN, HRDLICKA, WHITE,
WILLIAMS & AUGHTRY, P.C.

STEVEN J. KNIGHT
Texas Bar No. 24012975
steven.knight@chamberlainlaw.com
CHRISTINE KIRCHNER
Texas Bar No. 00784403
christine.kirchner@chamberlainlaw.com
1200 Smith Street, Suite 1400
Houston, Texas 77002
(713) 658-1818

*Counsel for Defendant–Appellant*

ORAL ARGUMENT REQUESTED

Case No. 25-10679

# In the United States Court of Appeals
# For the Fifth Circuit

JEFFREY W. CARPENTER,

*Plaintiff–Appellee,*

v.

TWIN CITY FIRE INSURANCE COMPANY,

*Defendant–Appellant.*

On Appeal from the United States District Court
for the Northern District of Texas (No. 3:23-CV-769)

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case.

**Plaintiff – Appellee:**

Jeffrey W. Carpenter

**Defendant – Appellant:**

Twin City Fire Insurance Company

**Counsel for Plaintiff–Appellee:**

Amy Gibson
David L. Wiley
GIBSON WILEY PLLC
1500 Jackson Street
Dallas, Texas 75292

**Counsel for Defendant–Appellee:**

Steven J. Knight
Christine Kirchner
CHAMBERLAIN, HRDLICKA, WHITE,
WILLIAMS & AUGHTRY, P.C.
1200 Smith Street, Suite 1400
Houston, Texas 77002

Michael W. Johnston
JOHNSTON LEGAL GROUP, P.C.
4200 Airport Freeway
Fort Worth, Texas 76117

_/s/ Steven J. Knight_
STEVEN J. KNIGHT
_Attorney of Record for Defendant-Appellant_

## STATEMENT REGARDING ORAL ARGUMENT

This is an appeal of the district court's determination that an employment practices liability insurance policy provides indemnity coverage for an employer's breach of an oral agreement to pay an employee's bonus compensation upon the sale of the company's assets and the severance of his employment. The underlying lawsuit does not allege any claims for harassment, discrimination, or wrongful termination. Rather, it is an ordinary breach of contract lawsuit for actual damages. Oral argument will assist the Court in understanding the scope of coverage and why the unambiguous policy affords no indemnity coverage for the insured's basic contractual payroll obligations.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ....................................................... ii

STATEMENT REGARDING ORAL ARGUMENT ............................................. iv

TABLE OF CONTENTS ............................................................................................ v

TABLE OF AUTHORITIES ................................................................................... vi

JURISDICTIONAL STATEMENT ....................................................................... ix

STATEMENT OF THE ISSUES ............................................................................. x

STATEMENT OF THE CASE .................................................................................. 1

SUMMARY OF THE ARGUMENT ...................................................................... 17

ARGUMENT .......................................................................................................... 22

    I.    Carpenter's claim against Southwest for his unpaid severance bonus is outside the scope of coverage because the Policy's definition of "Loss" in the grant of coverage expressly states that it shall not include "salaries, wages, and bonuses." ..................... 22

    II.    Carpenter's claim against Southwest for his unpaid severance bonus is outside the scope of coverage because the Policy expressly excludes coverage for severance payments. ........................ 38

    III.    Twin City should not be liable for duplicative post-judgment interest. ...................................................................................... 47

CONCLUSION ....................................................................................................... 49

CERTIFICATE OF SERVICE ............................................................................... 50

CERTIFICATE OF COMPLIANCE ...................................................................... 50

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Allison v. Citgo Petroleum, Corp*,
   151 F.3d 402 (5th Cir. 1998) ...............................................................25

*Am. Physicians Ins. Exch. v. Garcia*,
   876 S.W.2d 842 (Tex.1994).................................................................2

*AMAX, Inc. v. Fletcher*,
   305 S.E.2d 601 (1983) .......................................................................44

*Baker v. Masco Builder Cabinet Group*,
   912 F.Supp.2d 814 (D.S.D. 2012) ......................................................44

*Balandran v. Safeco Ins. Co. of Am.*,
   972 S.W.2d 738 (Tex. 1998) ..............................................................21

*Catalanotto v. Meador Oldsmobile LLC*,
   No. 02-10-00044-CV, 2011 WL 754413 (Tex. App.—Fort Worth
   March 3, 2011, no pet.).......................................................................42

*Century Surety Company v. Siedel*,
   893 F.3d 328 (5th Cir. 2018) ..............................................................20

*Childers v. Pumping Systems, Inc.*,
   968 F.2d 565 (5th Cir.1992) ...............................................................21

*Claybrook v. Sunoco GP LLC*,
   No: 1:18-CV-00029-TAV-CHS, 2023 WL 2207113 (E.D. Tenn.
   Feb. 23, 2023) ....................................................................................43

*Claybrook v. Sunoco GP, LLC*,
   No: 1:18-CV-29-TAV-CHS, 2023 WL 2664740 (E.D. Tenn.
   March 28, 2023)..................................................................................43

*Coker v. Coker*,
   650 S.W.2d 391 (Tex. 1983) ..............................................................21

*D.E.W., Inc. v. Local*,
   93, 957 F.2d 196 (5th Cir. 1992) ........................................................22

*Dailey v. Cordis Corp.*,
  No. 3:12-cv-518-0, 2013 WL 1245560 (N.D. Tex. March 26,
  2013) ................................................................................................37

*In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab.
  Litig.*,
  888 F.3d 753 (5th Cir. 2018) .............................................................35

*Drake v. Option One Mortgage Corp.*,
  No. SACV-09-01450-CIC(RNBx), 2010 WL 11464891 (C.D. Cal.
  April 15, 2010).................................................................................44

*Farmers Automobile Insurance Association v. St. Paul Mercury
  Insurance Company*,
  482 F.3d 976 (7th Cir. 2007) .............................................................36

*Fiess v. State Farm Lloyds*,
  202 S.W.3d 744 (Tex. 2006) ..............................................................22

*Forbau v. Aetna Life Ins. Co.*,
  876 S.W.2d 132 (Tex. 1994) ..............................................................27

*Ford Motor Co. v. Tex. Dep't of Transp.*,
  264 F.3d 493 (5th Cir. 2001) .............................................................20

*G.A. Stowers Furniture Co. v. American Indemnity, Co.*,
  15 S.W.2d 544 (Tex. 1929)...........................................................*passim*

*Gilyard v. Bank of America Corp.*,
  No. 3:09-cv-944-J-20TEM, 2011 WL 13295442 (M.D. Fla. April
  14, 2025) ..........................................................................................26

*Goldman v. White Rose Distributing Company*,
  936 S.W.2d 393 (Tex. App.—Fort Worth 1997), *vacated pursuant
  to settlement*, 949 S.W.2d 707 (Tex. 1997) .......................................42

*Hankins v. DataPlex*,
  77 F.3d 477 (5th Cir. 1995) ...............................................................26

*Heidgerd v. Olin Corp.*,
  906 F.2d 903 (2d Cir. 1990) ..............................................................44

*Horton v. Lawrence Cnty. Bd. of Educ.*,
   449 F.2d 793 (5th Cir. 1971) .............................................................5, 23

*Jackson v. Host International, Inc.*,
   426 Fed. Appx. 215 (5th Cir. 2011)........................................................26

*Jennings v. SSM Health Care St. Louis*,
   355 S.W.3d 526 (Mo. Ct. App. 2011) .....................................................44

*Kittansett Club v. Philadelphia Indem. Ins. Co.*,
   No. CIV.A. 11-11385-DJC, 2012 WL 3947954 (D. Mass. Sept. 10,
   2012) .......................................................................................................36

*Kostrzewski v. U.S. Steel Supply, Inc.*,
   No. 87-5098, 1987 WL 14672 (E.D. Penn. Nov. 3, 1987)..................44

*Martindale Lumber Co. v. Bituminous Cas. Corp.*,
   625 F.2d 618 (5th Cir. 1980) ..................................................................33

*MCI Tel. Corp. v. Tex. Utils. Elec. Co.*,
   995 S.W.2d 647 (Tex. 1999) ...................................................................20

*Merritt Hawkins & Associates, LLC v. Gresham*,
   861 F.3d 143 (5th Cir. 2017) ..................................................................20

*Miller v. Raytheon Co.*,
   716 F.3d 138 (5th Cir. 2013) .............................................................23, 25

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pennsylvania v. McMurray*,
   342 Fed. Appx. 956 (5th Cir. 2009).......................................21, 22, 35

*Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*,
   907 S.W.2d 517 (Tex. 1995) ...................................................................21

*Nautilus Ins. Co. v. Country Oaks Apartments Ltd.*,
   566 F.3d 452 (5th Cir. 2009) ..................................................................21

*Nero v. Industrial Molding Corp.*,
   167 F.3d 921 (5th Cir. 1999) ..................................................................31

*New York Life Ins. Co. v. Travelers Ins. Co.*,
   92 F.3d 336 (5th Cir.1996) .....................................................................22

*Oida Risk Retention Group, Inv. v. Williams*,
579 F.3d 469 (5th Cir. 2009) ................................................................20

*OneBeacon Insurant Company v. T. Wade Welch & Associates*,
No. H-11-3061, 2015 WL 926515 (S.D. Tex. March 4, 2015) .........48

*Pac. Ins. Co., Ltd. v. Eaton Vance Mgmt.*,
369 F.3d 584 (1st Cir. 2004) ...............................................................36

*Pettway v. ACIPCO*,
494 F.2d 211 (5th Cir. 1978) ...............................................................26

*Potashnik v. Carpenter*,
No. 05-19-00238-CV, 2020 WL 5056558 (Tex. App.—Dallas
Aug. 27, 2020, pet. denied) ............................................................3, 13

*Reilly v. Rangers Mgmt., Inc.*,
727 S.W.2d 527 (Tex. 1987) ...............................................................37

*REO Indus., Inc. v. Natural Gas Pipeline Co. of America*,
932 F.2d 447 (5th Cir.1991) ...............................................................22

*Sellers v. Delgado Cnty. Coll.*,
839 F.2d 1132 (5th Cir. 1988) ............................................................24

*Stanley Stores, Inc. v. Chavana*,
909 S.W.2d 554 (Tex. App.—Corpus Christi 1995, writ denied) ......23

*Stout v. Smithfield Bioenergy*,
LLC, No. 3:10-CV-1185-M, 2010 WL 5487843 (N.D. Tex. Dec.
30, 2010) ..............................................................................................42

*Tex. Farmers Ins. Co. v. Murphy*,
996 S.W.2d 873 (Tex. 1999) ...............................................................20

*Thorne v. City of El Segundo*,
802 F.2d 1131 (9th Cir. 1986) ............................................................26

*U.S. Metals, Inc. v. Liberty Mut. Grp.*,
490 S.W.3d 20 (Tex. 2015) .................................................................21

*United States v. Quality Stores, Inc.*,
572 U.S. 141 (2024) .............................................................................39

ix

*Waste Corp. of America, Inc. v. Genesis Ins. Co.*,
    382 F. Supp. 2d 1349 (S.D. Fl. 2005), *aff'd,* 209 Fed. Appx. 899
    (11th Cir. Dec. 6, 2006) ...................................................................36

*West v. Nabors Drilling USA, Inc.*,
    330 F.3d 379 (5th Cir. 2003) ...........................................................25

**Statutes**

42 U.S.C.A § 2000e-5(g)(1) ...............................................................24

42 U.S.C.A. § 2000e-16(d) ..................................................................24

28 U.S.C. § 1961(a) .............................................................................48

42 U.S.C.A. §12117(a) ........................................................................24

29 U.S.C.A. § 626(b) ...........................................................................24

29 U.S.C.A. §§ 206(d)(3), 216(b), (c) .................................................24

8 U.S.C.A §§ 1981, 1983, 1985, § 9:55..............................................24

29 U.S.C.A. §794(a)(a)(1) ...................................................................24

Tᴇx. Lᴀʙ. Cᴏᴅᴇ Aɴɴ. § 21.258(b)(1) ...................................................24

**Other Authorities**

Fed. R. Civ. P. 56(c)............................................................................20

Fed. R. Civ. P. 12(b)(1).......................................................................14

Fed. R. Civ. P. 39(c)............................................................................25

Tex. Const., Art. 5, § 3–c.....................................................................35

Tᴇx. Pʀᴀᴄ. Gᴜɪᴅᴇ Eᴍᴘʟᴏʏᴍᴇɴᴛ Pʀᴀᴄᴛɪᴄᴇs § 9:51.............................5, 23

Tᴇx. Pʀᴀᴄ. Gᴜɪᴅᴇ Eᴍᴘʟᴏʏᴍᴇɴᴛ Pʀᴀᴄᴛɪᴄᴇs § 9:52................................23

Tex. R. App. P. 58.1.............................................................................35

# JURISDICTIONAL STATEMENT

On March 9, 2023, Jeffrey Carpenter sued Twin City Fire Insurance Company in state court, alleging Twin City breached its purported duty to settle an underlying breach of contract lawsuit he filed against his former employer, Twin City's insured. ROA.25-10679.15. Twin City removed the case to federal court pursuant to 12 U.S.C. § 1332 (Diversity of Citizenship) and 28 U.S.C. § 1441(a) (Removal of Civil Actions). ROA.25-10679.9. On March 4, 2024, and April 22, 2025, the district court entered its memorandum opinions and orders denying Twin City's motion for summary judgment and granting Carpenter's cross motion for summary judgment. ROA.25-10679.3512 (Memorandum Opinion and Order); ROA.25-10679.5476 (Memorandum Opinion and Order). On May 27, 2025, the court entered its final judgment, which disposed of all parties and claims. ROA.25-10679.5527. On May 29, 2025, Twin City filed its notice of appeal. ROA.25-10679.5530. This Court has jurisdiction to consider Twin City's appeal pursuant to 28 U.S.C. § 1391 (Final Decisions District Courts).

## STATEMENT OF THE ISSUES

1.    Carpenter's claim against Southwest for his unpaid severance bonus is outside the scope of coverage because the Policy's definition of "Loss" in the grant of coverage expressly states that it shall not include "salaries, wages, and bonuses."

2.    Carpenter's claim against Southwest for his unpaid severance bonus is outside the scope of coverage because the Policy expressly excludes coverage for severance payments.

3.    Twin City should not be liable for duplicative post-judgment interest.

# STATEMENT OF THE CASE

## *Introduction*

This case is about whether an employer in the process of winding down its business can breach its contractual agreement to pay an employee extra compensation due upon the severance of his employment, and then foist its payment obligation onto its insurance carrier. The court's decision below is in error because the insurance policy in question does not cover claims for salaries, wages, or bonuses unless they are awarded as a component of a back pay award (not applicable here) and further excludes claims for severance payments.

Employment practices liability insurance policies ("EPLI") were never intended to cover employers' payroll obligations whether it be for salary, bonus, or severance payments. To hold otherwise would allow any employer to offer employees year-end bonuses, refuse to pay them, and then, when sued for breach of that promise, claim its insurer must satisfy it. Moreover, any suggestion that the terms "back pay" or "severance payments" somehow renders the policy ambiguous ignores fundamental tenets of contract interpretation—courts are required to apply the plain and commonly understood meaning in the context of the insuring agreement as a whole. This, the district court failed to do.

Here, Jeffrey Carpenter filed a state court lawsuit against his former employer, Southwest Housing Management, its owners, and related entities ("Insured" or

1

"Southwest"), for breach of an oral agreement to pay him bonus compensation upon the sale of the company's assets and the resulting severance of his employment. ROA.25-10679.5290. Pursuant to an EPLI policy, Twin City agreed to pay its Insured's defense costs in that lawsuit, but reserved its right to deny indemnity coverage since the policy does not provide coverage for any claim for salaries, wages, or bonuses, and further excludes coverage for any claim for severance payments. *See* ROA.25-10679.5303.

Before trial and with reference to *G.A. Stowers Furniture Co. v. American Indemnity, Co*., 15 S.W.2d 544 (Tex. 1929), Carpenter offered to settle his lawsuit against the Insured in exchange for Twin City's payment of the policy's remaining limits.[1] ROA.25-10679.5353. Consistent with the policy's plain language and coverage limitations, Twin City declined Carpenter's settlement demand, and the case proceeded to trial. *See* ROA.25-10679.5357. Carpenter ultimately prevailed at trial, and the court entered a final judgment against the Insured for actual damages, pre- and post-judgment interest, and attorneys' fees. ROA.25-10679.5360 (Verdict); ROA.25-10679.5385 (Final Judgment). The judgment withstood the Insured's

---

[1]    Under the *Stowers* case, a liability insurer which does not accept a policy-limits demand may be liable to its insured for a judgment in excess of policy limits, provided the insured can prove the following elements of its *Stowers* claim: "(1) *the claim against the insured is within the scope of coverage*, (2) the settlement  demand was within the policy limits, and (3) the terms of the demand are such that an ordinarily prudent insurer would accept it, considering the likelihood and degree of the insured's potential exposure to an excess judgment." *See Am. Physicians Ins. Exch. v. Garcia*, 876 S.W.2d 842, 849 (Tex.1994) (emphasis added).

appeal, which Twin City funded, resulting in the exhaustion of the policy limit.[2] *See Potashnik v. Carpenter*, No. 05-19-00238-CV, 2020 WL 5056558 (Tex. App.—Dallas Aug. 27, 2020, pet. denied).

Although the Insured never asserted a *Stowers* claim against Twin City, Carpenter obtained ownership of that claim pursuant to a state-court "turnover order" and then sued Twin City in the instant lawsuit for payment of the underlying judgment. ROA.25-10679.15 (Original Petition); *see also* ROA.25-10679.9 (Notice of Removal). On cross motions for summary judgment, ROA.25-10679.400; ROA.25-10679.3551, the district court determined the policy's coverage limitations are "ambiguous" and that Twin City is liable to Carpenter for the underlying judgment. ROA.25-10679.3512 (Memorandum Opinion and Order); ROA.25-10679.5476 (Memorandum Opinion and Order).

The parties reached a stipulation as to the non-coverage related elements of Carpenter's *Stowers* claim, *see* n.1 *supra*, and the court entered a final and appealable judgment against Twin City. ROA.25-10679.3533 (Stipulation); ROA.25-10679.5527 (Final Judgment). Because the district court's ruling distorts—rather than applies and enforces—the policy's plain language and governing law, this Court should reverse and render judgment in Twin City's favor.

---

[2]     Under the Policy, the payment of "**Defense Costs**," which include the cost of appeals, erode the available limits. *See* ROA.25-10679.5210; ROA.25-10679.5213.

### *The Policy*

Twin City issued a Private Choice Encore Policy ("Policy") to Jeffrey Carpenter's former employer, Southwest. ROA.25-10679.5200. The Policy includes an "**Employment Practices Liability Coverage Part**" under which Twin City agreed to pay "**Loss** . . . resulting from an **Employment Practices Claim** . . . for an **Employment Practices Wrongful Act** by the Insureds." ROA.25-10679.5221 (bold terms in original). Bold terms in the Policy have distinct contractual definitions.

The Policy defines "**Employment Practices Claim**" as including a "civil proceeding commenced by the service of a complaint or similar pleading." ROA.25-10679.5221. The Policy defines "**Employment Practices Wrongful Act**" "as

a **Wrongful Act**[3] involving any:

(1)    wrongful dismissal, discharge or termination of employment (including constructive dismissal, discharge or termination), wrongful failure or refusal to employ or promote, wrongful discipline or demotion, failure to grant tenure, negligent employment evaluation, or wrongful deprivation of career opportunity;

(2)    sexual or other workplace harassment, including quid pro quo and hostile work environment;

(3)    employment discrimination, including discrimination based upon age, gender, race, color, national origin, religion, creed, marital status, sexual orientation or preference, pregnancy,

---

3    The Policy defines "**Wrongful Act**" as "any actual or alleged . . . error, misstatement, misleading statement, act, omission, neglect or breach of duty." ROA.25-10679.5224.

4

> disability, HIV or other health status, Vietnam Era Veteran or other military status, or other protected status established under federal, state or local law;

> (4)    invasion of privacy, employment-related defamation (including libel and slander) or any employment related misrepresentation;

> (5)    **Retaliation**;

> (6)    breach of any oral, written, or implied employment contract, including, without limitation, any obligation arising out of any personnel manual, employee handbook, or policy statement; or

> (7)    violation of the Family and Medical Leave Act.

ROA.25-10679.5222 (bold terms in original).

The Policy defines "**Loss**" as: "[T]he amount that the Insureds are legally obligated to pay as a result of a **Claim**,[4] including, without limitation, **Defense Costs**, damages, settlements, judgments, and pre- and post-judgment interest." ROA.25-10679.5223 (bold terms in original). Importantly, the Policy makes clear in the grant of coverage that "**Loss** *shall not* include . . . salaries, wages, or bonuses, except as a component of a front or back pay award."[5] ROA.25-10679.5223 (bold

---

[4]    The Policy defines "**Claim**" as any "**Employment Practices Claim**." ROA.25-10679.5221 (bold terms in original).

[5]    The common and ordinary meaning of back pay is "those lost wages and benefits that accrue from the date of a wrongful termination through trial." TEX. PRAC. GUIDE EMPLOYMENT PRACTICES § 9:51; *see also Horton v. Lawrence Cnty. Bd. of Educ.*, 449 F.2d 793, 795 (5th Cir. 1971) ("Back pay is normally an integral part of the equitable remedy of reinstatement used by the federal courts to restore aggrieved litigants to the positions they should have occupied had it not been for the unlawful deprivation of their constitutional rights.").

term in original, italics added). Consequently, if the insured were to become liable to an employee for actual damages for breaching its contractual obligation to pay the employee's salary, wage, or bonus, the Policy would not cover the judgment since those matters fall outside the Policy's definitions of "**Loss**."

In addition to this definition of "**Loss**," the Policy enumerates numerous coverage exclusions. ROA.25-10679.5224-5225. Relevant here is the severance payments exclusion, which, consistent with the definition of "**Loss**," states: "Other than **Defense Costs**, the Insurer *shall not* pay **Loss** [*i.e.*, "damages" and "judgments"] for any **Claim** . . . for employment termination severance payments, provided that this exclusion shall not apply to the extent that such payments are negotiated with and consented to by the Insurer as part of a settlement." ROA.25-10679.5225 (bold terms in original, italics added).

### *Carpenter's Claim*

Carpenter is a former Manager and President of Southwest Housing Management, which Brian Potashnik and Cheryl Potashnik (now Cheryl Geiser) owned. ROA.25-10679.4425. When the Potashniks announced their intention to sell their company's assets and sever ties with all company employees amid mounting legal problems, they, Carpenter, and Keith Jones (the CFO) developed a severance bonus program to incentivize certain employees to remain employed with the company until it sold its assets and severed their employment. *See* ROA.25-

6

10679.4074-4076 (Jones describing the severance bonus program). It is undisputed that any employee who remained with the company through the asset sale and the severance of their employment would continue to be paid their regular salary. *See* ROA.25-10679.4066; *see also* ROA.25-10679.4170-4071.

At the time the company developed the severance bonus program, it was a certainty that all employees' employment with the company would be severed even if the purchasing entity were to offer them new employment with that organization after the sale. *See* ROA.25-1067.5395-5396; *see also* ROA.25-10679.4074. As for Carpenter, he knew up front that the possibility of the new purchasing entity offering him a position was highly unlikely. *See* ROA.25-10679.5457 (Carpenter describing, that "it became reasonably clear that I would not be retained after closing of that transaction.").

According to Carpenter, given the inevitable severance of his employment, he was able to leverage his prior service to the company to negotiate an agreement that contained a lucrative severance bonus package in the amount of 3% of the proceeds from the sale of the company's assets (subject to certain adjustments). *See* ROA.25-10679.5457. However, when the Potashniks severed his employment after selling the company's assets for $36,000,000, *see* ROA.25-10679.4202, Jones sent him a draft separation agreement that documented a severance bonus package that was substantially less than the 3% formula. ROA.25-10679.5441-5442 (Carpenter

7

describing that the separation package he received did not conform to the 3% deal he negotiated with the Potashniks).

Unwilling to accept the reduced package, Carpenter modified the separation agreement to include the material terms he alleged the Potashniks conveyed orally. *See* ROA.25-10679.5457 ("Accordingly, I have taken the liberty of reworking and attach the draft separation agreement that you provided to incorporate those other elements."). The separation agreement Carpenter presented to the Potashniks documents, among other things, the severance of his employment, how to calculate the 3% severance formula, and his release of "any claims, matters or actions related to Employee's . . . termination and separation from Company." ROA.25-10679.5461, ¶¶ 2, 5, 8.[6] The Potashniks, who denied that they ever promised Carpenter the 3% severance figure, declined to execute Carpenter's version of the separation agreement. Thereafter, Carpenter sued.

### The Underlying Lawsuit

Carpenter sued Southwest in state court for breach of contract, claiming it repudiated the oral agreement to pay him the 3% figure. ROA.25-10679.522. Carpenter also alleged Southwest breached his written employment contract by

---

[6] Additional consideration included Carpenter's release of all tort claims as well as statutory employment claims, such as claims under the Age Discrimination in Employment Act of 1967, the Americans with Disabilities Act of 1990, the Rehabilitation Act of 1973, *etc*. ROA.25-10679.5461, ¶ 8.

withholding annual bonuses. Additionally, Carpenter, who was paid his ordinary salary until Southwest terminated his employment, *see* ROA.25-10679.4170-4071, claimed he should be awarded additional compensation under a *quantum meruit* theory. ROA.25-10679.522 (Original Petition); ROA.25-1067.5309 (Second Amended Petition); ROA.25-10679.5329 (Third Amended Petition).

Carpenter's lawsuit met the Policy's definition of "**Employment Practices Claim**" because it was a "civil proceeding commenced by the service of a complaint or similar pleading." It also met the definition of "**Employment Practices Wrongful Act**" because it involved an alleged "breach of any oral, written, or implied employment contract." Accordingly, Twin City met its duty to defend by paying its Insureds' "**Defense Costs**." *See* ROA.25-10679.535. However, Twin City reserved its right to deny indemnity coverage because the Policy affords no indemnity coverage for claims for salaries, wages, bonuses, or severance payments. *See* ROA.25-10679.535; *see also* ROA.25-10679.5223 (definition of "**Loss**"); ROA.25-10679.5225 (severance payments exclusion).

In response to Carpenter's lawsuit, Southwest did not deny it agreed to pay Carpenter *a* discretionary severance bonus package upon the sale of the company's assets and the severance of his employment. *See* ROA.25-1067.4049-4050. It only disputed that it promised to pay him 3% of the sale proceeds under the severance program and that he was additionally owed the annual bonuses pursuant to his

9

written employment agreement.

Eventually, after his attorneys obtained a copy of the Policy, Carpenter offered to settle his lawsuit against Southwest for Twin City's payment of the remaining Policy limits with reference to "*Stowers*." ROA.25-1067.5353. Twin City declined the demand because Carpenter's claim is not within the scope of coverage, rendering *Stowers* inapplicable. ROA.25-10679.5357; *see also* n.1 *supra*. Carpenter's lawsuit against his former employer then proceeded to trial.

### The Trial and Verdict

Most of the trial boiled down to a "he said, she said" dispute over whether the Potashniks made a legally enforceable oral promise to pay Carpenter a severance bonus package in the amount of 3% of the sale proceeds upon selling the company's assets and severing his employment. Carpenter maintained that the Potashniks promised the 3% figure. *See* ROA.25-10679.5457. The Potashniks only disputed promising him a definitive amount. *See* ROA.25-1067.4049-4050 (Cheryl Geiser testifying the company promised to pay Carpenter "if there was money left at the end of the sale.").

Notably, at various intervals during the trial, Carpenter's attorney questioned the witnesses about what to call the severance bonus program, encouraging witnesses to leave out the word "severance" in a transparent attempt to circumvent the policy's severance payments exclusion. In response, all the witnesses, including

Carpenter, confirmed it was an ordinary severance bonus program, with the severance bonus money becoming due to qualifying employees upon the sale of the company's assets and the severance of their employment.

➢ Jones—the architect of the program—confirmed, "I called it a severance," and the phrase "stay bonus program" is "a term [Carpenter's attorney] has injected." ROA.25-10679.5404-5405.

➢ Geiser—the co-owner of the company in charge of approving severance payments—testified, "They were severance payments." ROA.25-10679.5413.

➢ Brian Potashnik—the other co-owner of the company—testified, "The only thing that would have been paid to anybody over and above what their employment agreement called for would have been a severance. And I think Mr. Jones made that clear. I know that Ms. Geiser made that clear. And I hope that I am, in my testimony, doing the same." ROA.25-10679.5422.

➢ Carpenter—the co-architect of the program with Jones—testified that the money he claims is owed is the "same thing" as what Jones testified to be severance pay. ROA.25-10679.5438-5439. Carpenter also testified that the "severance package or severance agreement" that he received upon the termination of his employment failed to comply with the 3% figure that was the subject of his oral agreement. ROA.25-10679.5441.

At one point during the trial, Carpenter's attorney switched from calling the

11

program a "stay bonus" program to calling it a "stay-to-get-severance program." ROA.25-10679.5406. Then, during closing arguments, she conceded that anytime she referred to a "stay bonus," she was referring to the company's severance program because "it all means the same thing." ROA.25-10679.5447. She also reiterated that "Keith Jones said that he and Jeff Carpenter were both part of the stay program, which is the equivalent to the severance program." ROA.25-10679.5449; *see also* ROA.25-10679.5395 (Carpenter's attorney acknowledging that what she sometimes referred to as "stay bonuses" were "paid as severance because upon the sale . . . the three entity defendants weren't employing anyone anymore.").

The primary fact issue to be decided at trial was whether the Potashniks promised to pay Carpenter a severance bonus in the amount of 3% of the sale proceeds, conditioned on his staying with the company through the asset sale and the severance of employment. Carpenter said they did. The Potashniks said they didn't. Ultimately, the jury sided with Carpenter on that issue.

Having determined that Southwest breached its oral agreement to pay Carpenter the 3% figure, it awarded him actual damages for breach of the oral agreement in the amount of $928,020.76. ROA.25-10679.5369-5373 (Questions 4-7). Additionally, the jury decided that Carpenter was not owed any "annual bonuses" pursuant to his written employment contract, *see* ROA.25-10679.5365-5367 (Questions 1-3), and that he performed no other "compensable work" for which he

12

was not previously compensated. ROA.25-10679.5374-5377 (Questions 8-11). All that he did was agree to remain a Southwest employee to help maintain continuity until its owners sold its assets and severed his employment.

At the conclusion of the trial, the court accepted the jury's verdict and entered a final judgment against Southwest for actual damages in connection with the jury's answers to questions 4-7, as well as pre- and post-judgment interest and attorneys' fees. ROA.25-10679.5385-5391. Later, the court of appeals affirmed the judgment. *See Potashnik v. Carpenter*, No. 05-19-00238-CV, 2020 WL 5056558 (Tex. App.— Dallas Aug. 27, 2020, pet. denied).

Significantly, the verdict and final judgment do not characterize Carpenter's recovery as a "back pay" award—the common and ordinary meaning of which is an equitable award to rectify unfair and/or disparate pay in certain employment disputes involving such things as discrimination, harassment, and wrongful termination. *See* n.5 *supra*. Nor does the court of appeals' opinion even mention that equitable remedy as there was no need. Carpenter, who never claimed he was the victim of anything other than his former employer breaching its contractual obligation to pay his severance bonus, obtained a final judgment on his ordinary breach of contract claim. His recovery for contract damages was in law, not in equity.

13

***The Current Lawsuit***

Carpenter sued Twin City, claiming ownership of any claim Southwest may have had against Twin City under *Stowers* for not accepting the pre-trial settlement demand.[7] ROA.25-10679.15. Southwest, the recipient of $36,000,000 in sale proceeds, never disputed Twin City's position that the Policy does not cover its contractual severance program.

After removing the lawsuit to federal court, ROA.25-10679.9, Twin City filed a motion for summary judgment arguing that Carpenter's *Stowers* claim must fail as a matter of law because his claim against Southwest was not within the scope of coverage. ROA.25-10679.400. First, in the grant of coverage, the Policy's definition of "**Loss**" does not cover claims for salaries, wages, or bonuses unless awarded as "a component" of a "back pay" award—an equitable remedy not presented here. ROA.25-10679.414-423. Second, the Policy excludes coverage for claims "for employment termination severance payments," regardless of whether the employer conditions the payment on the employee fulfilling a particular length of service before severing the employee's employment. ROA.25-10679.412-414. After additional briefing, *see* ROA.25-10679.3011 (Carpenter's Response); ROA.25-

---

[7] Carpenter also sought "injunctive relief" and an award of "punitive damages" against Twin City, but the district court dismissed those claims with prejudice under Rule 12(b)(1) of the Federal Rules of Civil Procedure. *See* ROA.25-10679.3512.

14

10679.3075 (Twin City's Reply), the court entered its memorandum opinion and order, denying Twin City's motion and finding the Policy's coverage limitations "ambiguous." *See* ROA.25-10679.3512.

With respect to the grant of coverage and the definition of "**Loss**," the court determined, without citing any legal authority, that "back pay" could be interpreted as including any payment due for work performed and "Carpenter can show that he performed the requested work by staying at the company until the sale occurred to help with the transition." ROA.25-10679.3520. With respect to the severance payments exclusion, the court determined that, because Carpenter had to perform a condition precedent to be entitled to the severance payment—*i.e.*, stay with the company until it severed his employment—the exclusion does not apply. *See* ROA.25-10679.3517. Again, without citing any authority, the court determined that "the end of the employment, and not any other condition, is what prompts a severance payment." ROA.25-10679.3517.

Twin City's primary defense to Carpenter's *Stowers* claim was that his claim against Southwest is not within the scope of coverage for the reasons Twin City articulated in its motion for summary judgment and pleadings. *See* ROA.25-10679.400 (MSJ); ROA.25-10679.3075 (Reply); ROA.25-10679.387 (Second Amended Answer). Accordingly, to preserve the parties' and judicial resources, Twin City did not contest the *Stowers* elements *other than* the requirement that he

15

prove that the claim was within the scope of coverage. *See* ROA.25-10679.3533; *see also* n.1 *supra*. Subsequently, Carpenter filed a cross motion for summary judgment on the disputed coverage element of his *Stowers* claim. ROA.25-10679.3551.

In his cross motion, Carpenter argued that the Policy's "**Loss**"-carveout for "salaries, wages, or bonuses" is not applicable because the judgment could be construed as an equitable "back pay" award. *See* ROA.25-10679.3576-3582. He also argued that the Policy's severance payments exclusion does not apply because the oral agreement was for him to "stay" until Southwest's owners sold the company's assets and severed his employment. *See* ROA.25-10679.3583-3587. Twin City responded to Carpenter's motion, raising consistent coverage positions it previously presented. *See* ROA.25-10679.5156-5192.

The court granted Carpenter's cross motion, offering similar rationales as it did when it denied Twin City's motion. ROA.25-10679.5476. With respect to the definition of "**Loss**," the court again declared that the verdict could be construed as a "back pay" award since Southwest conditioned Carpenter's entitlement to the severance payment on him remaining with the Company until it sold its assets and severed his employment. *See* ROA.25-10679.5483. With respect to the severance payments exclusion, the court again maintained that "the end of the employment, and not any other condition, is what prompts a severance payment." ROA.25-10679.5480.

16

After the court granted Carpenter's motion, Carpenter presented the court with a proposed final judgment that awarded him all the amounts from the state court judgment (*i.e.*, actual damages, pre- and post-judgment interest, and attorneys' fees), plus additional federal interest to accrue on the total award, including the still-accruing post-judgment interest. ROA.25-10679.5489. Twin City opposed Carpenter's proposed judgment because, even if his claim was within the scope of coverage (it isn't), under *Stowers*, Twin City would be liable for, at most, the amounts included in the state court judgment. *See* ROA.25-10679.5491. The district court sided with Carpenter and entered a final judgment against Twin City for all amounts awarded in the state court judgment plus the duplicative federal post-judgment interest. *See* ROA.25-10679.5523 (Order); ROA.25-10679.5527 (Final Judgment).

Twin City timely filed its notice of appeal. ROA.25-10679.5532.

## SUMMARY OF THE ARGUMENT

This case involves cross motions for summary judgment on questions of law—is Carpenter's judgment against Southwest for breach of its agreement to pay him 3% of the proceeds of the sale of the company's assets upon the severance of his employment due to the sale within the scope of coverage? The district court determined that the Policy is ambiguous, resulting in it denying Twin City's motion for summary judgment and granting Carpenter's cross motion. This Court should

reverse and render judgment in Twin City's favor. Under the Policy's plain and unambiguous provisions, Twin City does not insure Southwest's contractual obligation to pay its employee's severance bonus.

First, the Policy's grant of coverage only provides indemnity coverage for "**Loss**," which, as the Policy clearly and unambiguously states, "shall not include salaries, wages, or bonuses except as a component of a front or back pay award." Here, Carpenter sued Southwest for an unpaid severance bonus pursuant to an oral agreement with Southwest and prevailed in his suit. That bonus compensation does not fall within the definition of "**Loss**" and thus is not within the scope of coverage, rendering Carpenter's *Stowers* claim without merit.

The district court, however, held that the bonus could be viewed as a component of back pay, because the undefined term "back pay" is an ambiguous phrase. That is reversible error, as the term "back pay," in the context of an employment practices liability policy, is not ambiguous. The common and ordinary meaning of "back pay" in the employment context is an equitable award to a claimant for wages or other compensation that the individual would have earned but for an employment practices wrongful act, such as discrimination or wrongful termination, that prevented the individual from working in (and being fairly compensated for) a position for which they were qualified.

Carpenter did not sue Southwest for any of these things or allege that

18

Southwest at any point engaged in misconduct that prevented him from doing the job for which he was qualified. To the contrary, he sued to enforce an oral agreement for bonus compensation due at the expected termination of his employment, following completion of his job. His recovery was in law, not in equity. By ignoring the common and ordinary meaning of "back pay" and by rendering the explicit carve-out of "salaries, wages, or bonuses" from the definition of "**Loss**" in the Policy's grant of coverage superfluous, the district court's reading violates fundamental tenets of contract interpretation under Texas law.

Second, the Policy explicitly excludes indemnity coverage for severance payments. Carpenter himself acknowledges that the oral agreement with Southwest provided for payment of the bonus upon the severance of his employment, provided he remained with the company until it sold its assets and severed his employment. That is a severance payment.

Every relevant witness testified under oath that the payment that was the subject of Carpenter's oral agreement and his breach of contact claim was pursuant to Southwest's severance program, which it used to encourage employees to temporarily remain employed by the company at their regular salaries until the company could be sold. The performance of this condition precedent—remaining with the company until its assets were sold and their employment terminated—does not morph the promised obligation to make a severance payment into the payment

of something else. The district court's contrary conclusion reads language into the exclusion and otherwise fails to effectuate its plain and unambiguous language.

This Court should reverse the judgment in Carpenter's favor and render Judgment for Twin City.

## STANDARDS OF REVIEW

The Court reviews "grants and denials of summary judgment *de novo*." *Century Surety Company v. Siedel*, 893 F.3d 328, 332 (5th Cir. 2018). "Summary judgment is proper when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id*. (cleaned up); *see also* Fed. R. Civ. P. 56(c). "On cross-motions for summary judgment, [the Court] review[s] each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Ford Motor Co. v. Tex. Dep't of Transp.,* 264 F.3d 493, 498 (5th Cir. 2001). Additionally, on cross motions, the Court may reverse and render judgment in favor of the appellant. *See Oida Risk Retention Group, Inv. v. Williams*, 579 F.3d 469, 471 (5th Cir. 2009)

Also reviewed *de novo* are questions of law, including contract interpretation. *See Merritt Hawkins & Associates, LLC v. Gresham*, 861 F.3d 143, 154 (5th Cir. 2017) (citing *MCI Tel. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 651 (Tex. 1999)). Under Texas law, which applies in this diversity case, courts are to interpret contracts according to the rules of contract construction. *Tex. Farmers Ins.*

20

*Co. v. Murphy*, 996 S.W.2d 873, 879 (Tex. 1999). Insurance policies are controlled by the same rules of construction that apply to contracts generally. *Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 740–41 (Tex. 1998).

If policy language is worded so that it can be given a definite or certain legal meaning, courts construe it as a matter of law. *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995); *cf Coker v. Coker,* 650 S.W.2d 391, 393 (Tex. 1983) ("In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument."); *Nautilus Ins. Co. v. Country Oaks Apartments Ltd.*, 566 F.3d 452, 455 (5th Cir. 2009) ("Where the language of a contract is clear, a court's inquiry should begin and end with the policy's language.").

The contract must be considered as a whole to give each part effect and avoid rendering any portion inoperative. *Balandran*, 972 S.W.2d at 741. In construing an insurance policy, the court begins with the plain text, and undefined words must be given their plain, ordinary, and generally accepted meanings absent some indication of a different intent. *U.S. Metals, Inc. v. Liberty Mut. Grp.*, 490 S.W.3d 20, 23 (Tex. 2015); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pennsylvania v. McMurray*, 342 Fed. Appx. 956, 958 (5th Cir. 2009).

"If an agreement is worded so that this Court can ascertain a certain or definite meaning, it is not ambiguous." *Childers v. Pumping Systems, Inc.,* 968 F.2d 565, 569

(5th Cir.1992). Moreover, "[a] contract is not ambiguous merely because the parties disagree upon the correct interpretation or upon whether it is reasonably open to just one interpretation." *D.E.W., Inc. v. Local*, 93, 957 F.2d 196, 199 (5th Cir. 1992) (citing *REO Indus., Inc. v. Natural Gas Pipeline Co. of America,* 932 F.2d 447, 453 (5th Cir.1991)). Ambiguity must be evident from the policy itself; it cannot be created by external evidence of intent. *Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 747 (Tex. 2006). "The fact of conflicting interpretations by parties in litigation does not prove ambiguity. . . It may only be evidence of zealous advocacy." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pennsylvania*, 342 Fed. Appx. at 958.

## ARGUMENT

**I.    Carpenter's claim against Southwest for his unpaid severance bonus is outside the scope of coverage because the Policy's definition of "Loss" in the grant of coverage expressly states that it shall not include "salaries, wages, and bonuses."**

Contrary to this testimony at trial, Carpenter now maintains that the promised severance bonus payment was merely a "stay bonus" that Southwest promised him for maintaining his position at the company until its owners sold its assets and severed his employment. But even if characterized as such, Carpenter cannot meet his burden of proof that the bonus is covered under the Policy.[8] The Policy's grant

---

[8]    Under Texas law, the insured bears the ultimate burden to prove that the Policy's grant of coverage includes his alleged claim. *New York Life Ins. Co. v. Travelers Ins. Co.,* 92 F.3d 336, 338 (5th Cir.1996).

of coverage for certain "**Loss**" clearly and unambiguously states: "**Loss** *shall not* include . . . salaries, wages, *or bonuses*, except as a component of a front or back pay award." ROA.25-10679.5223 (emphasis added). The essential question presented in this appeal is whether the severance bonus money Southwest promised to pay Carpenter was a "component" of a "back pay" award. Unquestionably, it was not.

Applying the common and ordinary meaning of the phrase, "back pay" is an equitable remedy to compensate an employee for money he or she would have earned but for the employer's wrongful act. Most commonly, this includes claims for "lost wages and benefits that accrue from the date of a wrongful termination through trial." TEX. PRAC. GUIDE EMPLOYMENT PRACTICES § 9:51; *see also Horton*, 449 F.2d at 795 ("Back pay is normally an integral part of the *equitable remedy* of reinstatement used by the federal courts to restore aggrieved litigants to the positions they should have occupied had it not been for the unlawful deprivation of their constitutional rights.") (emphasis added); *Stanley Stores, Inc. v. Chavana*, 909 S.W.2d 554, 563 (Tex. App.—Corpus Christi 1995, writ denied) ("The trial court has discretion to award back pay as *equitable relief* in an age discrimination lawsuit") (emphasis added). As this Court has articulated, "[t]he purpose of back pay is to 'make whole the injured party by placing that individual in the position he or she would have been in but for the discrimination.'" *Miller v. Raytheon Co.*, 716

23

F.3d 138, 146 (5th Cir. 2013) (quoting *Sellers v. Delgado Cnty. Coll.*, 839 F.2d 1132, 1136 (5th Cir. 1988)).

"Back pay" is available in equity under numerous wrongful termination and anti-discrimination statutes. *See* TEX. PRAC. GUIDE EMPLOYMENT PRACTICES § 9:52 (citing Tile VII, 42 U.S.C.A. §§ 2000e5(g)(1), 2000e-16(d); ADEA, 29 U.S.C.A. § 626(b); ADA, 42 U.S.C.A. §12117(a), referring to remedies in 42 U.S.C.A § 2000e-5(g)(1); Rehabilitation Act, 29 U.S.C.A. § 794(a)(a)(1), referring to remedies in 42 U.S.C.A. §§ 2000e5(g)(1), 2000e16(d); EPA, 29 U.S.C.A. §§ 206(d)(3), 216(b), (c); IRCA, 8 U.S.C.A §§ 1981, 1983, 1985, § 9:55; Texas Commission on Human Rights Act, TEX. LAB. CODE ANN. § 21.258(b)(1)); *see also* Barbara L. Johnson, *Damages in Employment Law Cases*, 2017 ALI-CLE Course Materials ("Back pay is available under Title VII, the ADA, the ADEA, the EPA, the Rehabilitation Act, the USERRA, and Sections 1981 and 1983. Once the plaintiff establishes that unlawful discrimination caused her loss, she is entitled to back pay.").

Unsurprisingly, a search for "back pay" within the Fifth Circuit Pattern Jury Instructions (Civil Cases) published in 2020 (a comprehensive piece developed by well-respected federal court judges throughout the Circuit) reveals that the phrase is mentioned 17 times—each time in the context of discrimination/wrongful termination claims.[9] Per the Pattern Jury Instructions, if a district court permits a jury

---

[9]    https://www.lb5.uscourts.gov/juryinstructions/Fifth/2020civil.pdf

to render an advisory opinion on the amount of a back pay award, then the following jury instruction applies:[10]

> Back pay includes the amounts the evidence shows Plaintiff [name] would have earned had [he/she] [remained an employee of Defendant [name]] [been promoted] [not been demoted] [other applicable circumstance]. These amounts include wages or salary and such benefits as life and health insurance, stock options, and contributions to retirement. You must subtract the amounts of earnings and benefits Defendant [name] received during the period in question.

This instruction is consistent with the definition of "back pay" from the Texas Pattern Jury Charges. "'Back pay,'" the PJC instructs, "is that amount of wages and employment benefits that *Paul Payne* would have earned if *he* had not been subjected to *his* employer's unlawful conduct less any wages, unemployment compensation benefits or worker's compensation benefits *he* received in the interim." TEXAS PATTERN JURY CHARGES 115.30.

As noted, the purpose of a "back pay" award is to make the employee affected by wrongful termination and discrimination whole. *Miller*, 716 F.3d at 146. Consequently, where available, "back pay" is typically awarded over a period of

---

[10]    As this Court maintains: "Because back pay is an equitable remedy, the district court need not empanel an advisory jury but can decide the back pay issue itself absent the parties' agreement to the correct amount." *West v. Nabors Drilling USA, Inc.,* 330 F.3d 379, 394–95 (5th Cir. 2003). "Nevertheless, a district court may empanel an advisory jury on such issues in accordance with Rule 39(c) of the Federal Rules of Civil Procedure." *Allison v. Citgo Petroleum, Corp*, 151 F.3d 402, 423 n.19 (5th Cir. 1998).

25

time—the back pay period—that begins to run from the date of the wrongful conduct and continues until the date of entry of judgment against the employer. *See Thorne v. City of El Segundo*, 802 F.2d 1131, 1136 (9th Cir. 1986). This is important because if the back pay period includes the period of time when the employee would have been paid an annual bonus or some other financial benefits but for the wrongful termination, the bonus can be awarded as a *component* of the back pay award.

That was the issue in *Jackson v. Host International, Inc.*, 426 Fed. Appx. 215 (5th Cir. 2011), where the employee sued his employer for age discrimination after being terminated. *Id*. at 217. The employee prevailed and recovered a $227,500 back pay award, a component of which was "bonuses of 35% of his annual salary each year for the two and a half years between the termination of his employment and trial."[11] *Id*. at 217, 223; *see also Hankins v. DataPlex*, 77 F.3d 477 (5th Cir. 1995) (affirming a back pay award in an age discrimination case that included a $50,000 bonus as a component of the back pay award); *Pettway v. ACIPCO*, 494 F.2d 211, 263 (5th Cir. 1978) (recognizing, in an employment discrimination case, that "the ingredients of back pay should include more than 'straight salary.' Interest, overtime, shift differentials, and fringe benefits such as vacation and sick pay are among the items which should be included in back pay."); *Gilyard v. Bank of America Corp.*,

---

[11]    The employer argued on appeal that there was insufficient evidence that the employee would have been paid the bonuses but for the termination, but the court found that issue unpreserved for appellate review. *Id*. at 223.

No. 3:09-cv-944-J-20TEM, 2011 WL 13295442, *2 (M.D. Fla. April 14, 2025) (denying, in an employment discrimination case, the defendant's motion to "preclude Plaintiff from recovering allegedly lost bonuses as a component of back pay in the event of a finding of liability.").

Here, the Policy extends coverage for an insured's "**Employment Practices Wrongful Act**"—a defined phrase that prominently includes claims for wrongful termination, wrongful failure to promote, wrongful demotion, wrongful deprivation of a career opportunity, sexual harassment, and employment discrimination. ROA.25-10679.5222. And while the definition of "**Employment Practices Wrongful Act**" includes reference to breach of contract (listing such things as personnel manuals and handbooks), the Policy's grant of coverage makes it abundantly clear that it does not include the insured's obligations to pay "salaries, wages or bonuses" arising from its contractual agreements with its employees. *See* ROA.25-10679.5223 ("**Loss** shall not include . . . salaries, wages, or bonuses, except as a component of a front or back pay award."). It is against this backdrop that this employment practices liability policy must be construed. *See Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133–34 (Tex. 1994) (In construing insurance policies, "[t]his court is bound to read all parts of a contract together to ascertain the agreement of the parties. The contract must be considered as a whole.").

When an employee sues his or her employer for wrongful termination,

27

discrimination, and the like, the employee may recover wages and bonuses he or she was unable to earn due to the employer's wrongful conduct. If the employee prevails and is awarded "back pay" that includes an unpaid bonus, the bonus portion of the award would fit the Policy's definition of "**Loss**" because it would be a "component" of a "back pay" award. But in the context of a non-discrimination and non-wrongful termination case like Carpenter's claim, when an employee sues for actual damages for breach of a compensation agreement, the claim is one for actual contract damages, as stated in the state court judgment, not equitable "back pay."

This is a simple case of failing to pay a contractual amount owed. Indeed, Carpenter does not allege that he was wrongfully terminated, discriminated against, harassed, or anything similar. He claims he was induced by the promise of a severance package *not* to terminate his own employment until his employer severed his employment because of the asset sale—a promise that ultimately went unfulfilled. Carpenter, who undisputedly was paid his ordinary salary for the duration of this employment with Southwest, claimed quite simply that he was denied a promised severance bonus payment upon the termination of his employment. His was an ordinary legal claim for contract damages.

That explains why the trial court in the underlying lawsuit did not submit, and the parties did not request, a jury question or instruction providing guidance about an equitable award of "back pay." It submitted an ordinary breach of contract

question and an ordinary actual damages question. "Back pay" is not mentioned in the court's jury charge. It is not mentioned in the final judgment. It is not mentioned in the court of appeals' opinion. Because the underlying lawsuit has nothing to do with an equitable "back pay" award, Carpenter's attempt to shove an intentional breach of a severance payment into the "back pay" exception to the Policy's unambiguous definition of "**Loss**" fails.

The district court glossed over all this and determined that Carpenter was awarded "back pay" because "he performed the requested work by staying at the company until the sale occurred to help with the transition." ROA.25-10679.3520; *see also* ROA.25-10679.5482-5483. The court accepted Carpenter's position that certain dictionary definitions refer to "back pay" colloquially as "owed but unpaid compensation for past performance." The Court should reject Carpenter's argument for several reasons.

First, and perhaps most importantly, Carpenter's novel argument, if accepted, would place all ordinary breach of contract claims for salaries, wages, and bonuses within the Policy's scope of coverage *despite* being expressly removed from the Policy's definition of "**Loss**." Put differently, if Carpenter's contract claim for the unpaid severance bonus is covered as a "component" of a "back pay" award, the "**Loss**" carveout for bonus payments would be rendered meaningless, which violates fundamental tenets contract interpretation under Texas law. *See Tesoro Ref. & Mktg.*

29

*Co., L.L.C.*, 833 F.3d at 474 ("We must construe [a] policy such that no provision is rendered meaningless."); *Am. Mfrs. Mut. Ins. Co.*, 124 S.W.3d at 157 ("When construing [a] policy's language, we must give effect to all contractual provisions so that none will be rendered meaningless."). Attempting to address this conundrum, Carpenter offered—but the district court did not address—a series of hypothetical examples he claims supports his view that certain claims for salaries, wages, and bonuses can still be excluded. *See* ROA.25-10679.3578-3582. But a careful review of each example only underscores the futility of his argument.

In his first example, employee Jill filed a complaint with the Equal Employment Opportunity Commission, accusing her employer of engaging in a pattern and practice of discrimination (unequal pay). ROA.25-10679.3578. The case settled, with the employer agreeing to monetary relief—$8.4 million to rectify the discrimination-fueled pay gap. It also agreed to non-monetary relief—hiring additional personnel for training, monitoring, and reporting to prevent discrimination. According to Carpenter, the $8.4 settlement is covered as "back pay" but the requirement to hire additional personnel is not because their wages are not a component of a back pay award. Carpenter is correct that the $8.4 million may be covered as "back pay" since it, unlike the underlying judgment here, is an equitable award to resolve a charge of discrimination. He is also correct that the non-monetary relief is not covered—but not for the reasons he gives. It is not covered because the

Policy's definition of "**Loss**" removes non-monetary relief from the grant of coverage. ROA.25-10679.5223

In his second example, wrongfully terminated Jack paid Mitt $125,000 to help him find replacement employment after he was wrongfully terminated. ROA.25-10679.3579. Jack then sued his employer for wrongful termination and recovered $500,000, which he would have been able to earn but for the wrongful termination, plus the money he paid to Mitt to mitigate his damages. According to Carpenter, the $500,000 is covered as "back pay" but the $125,000 is not since Mitt's salary is not a component of a "back pay" award. Carpenter is correct that the $500,000 is likely covered as "back pay" since it, unlike the underlying judgment for actual breach of contract damages here, is an equitable award for the wrongful termination. The money paid to Mitt may also be covered since the definition of "**Loss**" includes "damages" resulting from a "**Claim**." Once Jack paid Mitt to mitigate his damages, the payment may have become part of Jack's claimed damages (not an employee's contractual claim for unpaid wages) resulting from the wrongful termination. *See Nero v. Industrial Molding Corp.*, 167 F.3d 921, 930 (5th Cir. 1999) (holding out-of-pocket expenses "for the cost of finding another job and relocating his family" "are in the nature of consequential damages").

In his third example, Julia sent a demand letter to her employer threatening a statutory claim for wrongful termination. ROA.25-10679.3579-3580. The employer

agreed to reinstate Julia's position but had to hire a temporary employee to fill it until Julia was available to return to work. According to Carpenter, "The policy excludes wages that will be paid to the temporary worker, because those wages are not a component of a back pay or front pay." ROA.25-10679.3580. Like his other examples, no employee claimant asserted a claim for an unpaid salary, wages, or bonus. The only claim asserted was by Julia, who sought non-monetary relief (the reinstatement of her position), which is beyond the Policy's definition of "**Loss**."

In his fourth example, Josh filed a charge of discrimination with the EEOC because his employer would not provide a sign language interpreter. ROA.25-10679.3580. The case settled with the employer agreeing to hire a sign language interpreter. According to Carpenter, "The policy excludes the interpreter salary, because it is not a component of a back pay or front pay." ROA.25-10679.3580. Once again, no employee claimant asserted a claim for an unpaid salary, wage, or bonuses. The only claim asserted was by Josh, who sought non-monetary relief (an accommodation) which is excluded from the Policy's definition of "**Loss**."

In his fifth example, Jane was constructively discharged because of her employer's sexual harassment. ROA.25-10679.3581. She sued her employer and recovered $237,000 "in back pay for what Jane would have earned in the past if the employer had not constructively discharged her," as well as $35,000 she paid to a bodyguard for protection. According to Carpenter, the $237,000 is covered as "back

32

pay" but the $35,000 is not since the bodyguard payment is not component of a "back pay" award. Carpenter is likely correct that the $237,000 is covered as "back pay" since it, unlike the underlying judgment here, is an equitable award for discrimination and constructive discharge. The money Jane paid the bodyguard may also be covered since the definition of "**Loss**" includes "damages" resulting from a "Claim." Once Jane paid the bodyguard, the payment may have become part of her claimed damages (not an employee's claim for unpaid wages) resulting from the employer's harassment and vandalism.

None of Carpenter's examples demonstrates a situation where the Policy grant's language carving out of the definition of "**Loss**" claims for salaries, wages, and bonuses is given effect. Under his construction of the Policy, this fundamental no-coverage language is rendered meaningless, underscoring the futility of his argument. *Martindale Lumber Co. v. Bituminous Cas. Corp.*, 625 F.2d 618, 623 (5th Cir. 1980) ("[A]n insurance policy is construed in its entirety so as to effectuate the intention of the parties, and in particular the courts do not interpret any provision so as to render other insuring provisions ineffective or meaningless."). Moreover, and tellingly, each of his examples that involve an actual "back pay" award involve compensation for wrongful termination, discrimination, and harassment. Carpenter thus tacitly concedes that "back pay" is not a remedy for an employer's intentional breach of a promise to pay a particular wage or bonus.

33

Second, the jury expressly found that Carpenter did not "perform compensable work staying on as long as needed to help make the asset sale happen." ROA.25-10679.5374. Carpenter, who continued to draw his ordinary salary, performed no additional work; all that he did was agree to remain employed with the company performing his management duties as assigned and that his ultimate separation from Southwest would be when Southwest, not Carpenter, chooses. To entice Carpenter to stay on as a Southwest employee for as long as it suited Southwest, the Potashniks promised to pay him a severance bonus that became due after he performed the condition precedent—staying with the company until the sale and the severance of his employment.

Third, Carpenter's dictionary definitions are consistent with Twin City's position that "back pay" is a remedy for such things as past discrimination. For example, if an employee is unpaid or underpaid due to such things as discrimination, he or she may be entitled to an equitable "back pay" award to compensate for past work performed. But that concept does not morph an ordinary breach of contract claim seeking actual damages in the employment setting into "back pay," which is inherently an equitable remedy.

Indeed, to Twin City's knowledge, no Texas court has ever characterized ordinary contract damages as "back pay"; nor has this Court. Certainly, Carpenter and the district court have cited no such case. So, what he is really asking this Court

to do is change or expand Texas law where neither the Texas Supreme Court nor the Texas Legislature have done so. He asks for this change, not to advance any broader public policy purpose; only to force Twin City, which never contracted with him, to pay that which it expressly declined to insure when it contracted with Southwest. This Court should decline Carpenter's invitation to change Texas law. *In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*, 888 F.3d 753, 781 (5th Cir. 2018) ("[A] federal court exceeds the bounds of its legitimacy in fashioning novel causes of action not yet recognized by the state courts."). It should, instead, apply the common and ordinary meaning of "back pay" and reverse and render judgment in Twin City's favor.[12]

Fourth, construing the Policy as covering Carpenter's claimed severance bonus would incentivize employers to breach their payment obligations—the classic uninsurable moral hazard. Indeed, courts should not strain to find an ambiguity based on "zealous advocacy," *see Nat'l Union Fire Ins. Co. of Pittsburgh, Pennsylvania*, 342 Fed. Appx. at 958, any more than courts should construe insurance policies in a manner that creates a moral hazard. As one court explained in the analogous context of an overtime pay dispute:

---

[12]    At a minimum, because the issue presented would appear to be a matter of first impression under Texas law, if the Court does not reverse and render judgment in Twin City's favor, it should certify the question for resolution by the Texas Supreme Court. *See* Tex. Const., Art. 5, § 3–c; *see also* Tex. R. App. P. 58.1.

> Insurance against a violation of an overtime law, whether federal or state, would enable the employer to refuse to pay overtime and then invoke coverage so that the cost of the overtime would come to rest on to the insurance company. The employer would have violated the overtime law with impunity, unjustly enriching itself by the difference between the overtime wage for the hours in question and the straight wage. No insurance company would knowingly write a policy that would enable the insured to trigger coverage any time it wanted a windfall.

*Farmers Automobile Insurance Association v. St. Paul Mercury Insurance Company*, 482 F.3d 976, 978–79 (7th Cir. 2007); *see also Waste Corp. of America, Inc. v. Genesis Ins. Co.*, 382 F. Supp. 2d 1349, 1354–55 (S.D. Fl. 2005), *aff'd,* 209 Fed. Appx. 899 (11th Cir. Dec. 6, 2006) ("Allowing an insured to control whether it will be covered for its act of breaching a contract places the insured in the unique posture of voluntarily choosing to do some act for which he knows an insurance company will compensate him even if he chooses wrongly. Who wouldn't buy insurance if he could decide whether to perform or decline to perform some act which would give him coverage for that action? Such a premise eliminates all risk to a potential insured."); *Kittansett Club v. Philadelphia Indem. Ins. Co.*, No. CIV.A. 11-11385-DJC, 2012 WL 3947954, at *6 (D. Mass. Sept. 10, 2012) ("allowing insureds to shift costs to their insurers merely by breaching existing obligations would create perverse incentives.") (citing *Pac. Ins. Co., Ltd. v. Eaton Vance Mgmt.*, 369 F.3d 584, 593 (1st Cir. 2004)). The same rationale applies here.

36

For example, an insured could pay $33,000 in premiums for an EPLI policy providing $1 million in aggregate coverage; hire a workforce, promising to pay them a combined $1 million in compensation; breach its promise after accepting labor valued at $1 million; and turn the resulting liability over to Twin City, deriving a $967,000 windfall. Or, to apply the facts of this case, an insured could promise its employee to pay a lucrative severance bonus upon selling the company's assets and severing the employee's employment, pocket $36,000,000 from the asset sale, stiff the employee, and turn the resulting liability to its insurer which expressly declined to insurer the company's contractual payment obligation.

The Policy's definition of "**Loss**" in the grant of coverage, the severance payments exclusion addressed *infra*, not to mention basic standards of contract interpretation, preclude such an unreasonable and untenable outcome. *See Dailey v. Cordis Corp.*, No. 3:12-cv-518-0, 2013 WL 1245560, *4 (N.D. Tex. March 26, 2013) (Under Texas law, "the Court should not construe a contract provision in a manner that is unreasonable or absurd."); *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987) (courts should avoid, when possible, construction that is unreasonable, inequitable, and oppressive).

For all these reasons, the underlying judgment for the contractual severance bonus allowance that became due upon the severance of Carpenter's employment with Southwest is not within the Policy's grant of coverage. Carpenter has not met,

and cannot meet, his burden to prove his claim is within the scope of coverage. This Court should reverse the judgment and render judgment in Twin City's favor.

**II.    Carpenter's claim against Southwest for his unpaid severance bonus is outside the scope of coverage because the Policy expressly excludes coverage for severance payments.**

The Policy clearly and unambiguously excludes any claims for severance payments. It states, "Other than **Defense Costs**, the Insurer *shall not* pay **Loss** for *any* Claim . . . for employment termination severance payments." ROA.25-10679.5283 (bold terms in original, italics added). As noted previously, all witnesses testified that the money for which Carpenter filed his lawsuit was due upon the sale of the company's assets and the severance of his employment. It was, consequently, an employment severance payment, which the Policy excludes from coverage.

Merrian-Webster's Dictionary defines "severance pay" as "an allowance usually based on length of service that is payable to an employee on termination of employment."[13] Consistently, Black's Law Dictionary defines "severance pay" as "Money (apart from back wages or salary) that an employer pays to a dismissed employee."[14] Courts likewise broadly construe the phrase as generally referring to "payments . . . made in consideration for employment—for a service performed by

---

[13]      *Severance Pay,* MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/severance.

[14]      *Severance Pay*, BLACK'S LAW DICTIONARY (12th ed. 2024).

an employee for the person employing him."). *United States v. Quality Stores, Inc.*, 572 U.S. 141, 146 (2024) (cleaned up).

Here, it is undisputed that Carpenter's employment was with Southwest. It is undisputed that the jury determined the Potashniks, on Southwest's behalf, promised to pay Carpenter an additional allowance if he remained a company employee until they severed his employment. It is undisputed that Carpenter remained employed with the company and drew his regularly salary until the Potashniks severed his employment. It is undisputed that the allowance became due at that time, but the Potashniks refused to pay after pocketing the $36,000,000 sale proceeds. Clearly and unambiguously, the severance payments exclusion removes Carpenter's claim from the scope of coverage.

To be sure, the evidence in the underlying trial established that Southwest promised Carpenter a severance based on a percentage of the proceeds from the projected future sale. Indeed, Jones, the architect of severance program, testified that it was a severance pay program. ROA.25-10679.5404-5405. Geiser, the co-owner of the company, testified that the payments were severance payments. ROA.25-10679.5413. Potashnik, the co-owner of the company, testified that the payments were severance payments. ROA.25-1067.5422. Carpenter, who worked with Jones to develop the severance program, testified that the payments were intended as severance pay. ROA.25-10679.5438-5439; *see also* ROA.25-10679.5431 (referring

39

to the "severance package or severance agreement.").

Likewise, Carpenter's attorney conceded that the program was a "stay-to-get-severance program." ROA.25-10679.5406. She further conceded that the severance packages were to be "paid as severance because upon the sale . . . the three entity defendants weren't employing anyone anymore." ROA.25-10679.5395 Any time she referred to a "stay bonus," she emphasized, she was referring to the severance program because "it all means the same thing." ROA.25-10679.5447. In her words, "Keith Jones said that he and Jeff Carpenter were both part of the stay program, which is the equivalent to the severance program." ROA.25-10679.5449.

By Carpenter's and his attorney's own admissions throughout the trial, Carpenter agreed, as a condition precedent to any entitlement to the severance payment, to extend the length of his employment with Southwest through the date on which its owners sold the company's assets and severed his employment. In exchange, Southwest promised to pay him an allowance that became due after the severance of his employment. Carpenter, who never bargained with Twin City, has no conceivable ability to shift the burden of his former employer's contractual obligation to fund a severance package to Twin City. The severance payments exclusion clearly and unambiguously removes Carpenter's claim from the scope of coverage. The fact that Carpenter had to perform a condition precedent to recover the severance payment—temporarily remain an employee for continuity purposes—

40

does not change its character.

In its memorandum and opinion, the district court recognized that "[t]he sale would result in the termination of Carpenter's position" and that "his employer promised to give him a percentage of the profits . . . if he would stay on in his position until the sale closed to help with the transition." ROA.25-10679.3512-3513. Yet, the court determined, without citing any legal authority, that the severance payments exclusion was inapplicable because "the end of employment, and not any other condition, is what prompts a severance payment." ROA.25-1067.3517; *see also* ROA.25-10679.5480 (same).

However, an employer placing a condition on the employee's entitlement to a severance package—such as continued service for an agreed-upon temporary duration—does not change the nature and character of the payment. The Potashniks wanted to sell the company's assets and sever all ties with company employees. They desired continuity to lure a buyer. To maintain continuity, they incentivized company employees to stay rather than resign, thus enabling *them* to control when severance occurs.

If the employees performed the condition precedent, they would be entitled to receive their severance package. Nothing in the Policy suggests that the employer conditioning the severance payment on the performance of a condition precedent renders the severance payments exclusion inapplicable. Moreover, as cases in Texas

41

and from around the country recognize, this form of severance bonus program is *commonplace*, particularly when the offering company is planning for a transition of ownership or some other interruption in the business.

➤ *Catalanotto v. Meador Oldsmobile LLC*, No. 02-10-00044-CV, 2011 WL 754413, at *2 (Tex. App.—Fort Worth March 3, 2011, no pet.): "For those of you that continue working at Meador Olds performing your assigned duties until such date as determined by the General Manager that your services are no longer needed, you will receive severance pay according to the following formula."

➤ *Stout v. Smithfield Bioenergy*, LLC, No. 3:10-CV-1185-M, 2010 WL 5487843, at *1 (N.D. Tex. Dec. 30, 2010): "Plaintiffs are seven Texas residents who are former employees of Defendant Smithfield BioEnergy, LLC. In anticipation of the pending sale of Smithfield to Beacon Energy Corp., Mark Farrer, Smithfield's General Manager, sent a memorandum to Smithfield's employees informing them of the sale. The memorandum referenced a post-sale severance package for Smithfield employees and encouraged them to stay productive. By May 10, 2010, Beacon Energy had terminated all of the Plaintiffs. None received a severance package."

➤ *Goldman v. White Rose Distributing Company*, 936 S.W.2d 393, 395 (Tex. App.—Fort Worth 1997), *vacated pursuant to settlement*, 949 S.W.2d 707

(Tex. 1997): "In 1988, Ronald and White's attorney, Gordon Appleman, began negotiating the sale of White Rose's assets to another company, Tarrant Distributing Company. Ronald requested a 'severance package' for all employees, including a $500,000 severance bonus for himself, allegedly so that White Rose's management team would stay on until the sale occurred. The board of directors approved a $350,000 severance bonus for Ronald to be made on the day of the sale."

➤ *Claybrook v. Sunoco GP LLC*, No: 1:18-CV-00029-TAV-CHS, 2023 WL 2207113, at *14 (E.D. Tenn. Feb. 23, 2023) (Magistrate Report and Recommendations following an Arbitration): "In August of 2017, Sunoco announced that it was selling numerous stores in the southeastern part of the country to 7-Eleven in mid-October 2017. In order to incentivize Sunoco employees to stay with Sunoco until the sale, Sunoco promised all employees who were to be affected by the sale that if they stayed with Sunoco until the sale, they would receive a severance package."[15]

---

[15]    *Claybrook* further illustrates the legal distinction between an equitable "back pay" award and a legal remedy for an unpaid severance payment. In that case, after Claybrook's employment with Sunoco terminated, Claybrook was offered a job by a company called Axalta, which offered her benefits, including under the Family Medical Leave Act. *Id.* at *2. Claybrook accused Sunoco of defaming her to Axalta, causing the job offer to be rescinded. *Id.* She then accepted employment at a company called Quantum, which did not offer her the same benefits. *Id.* at *4. While at Quantum, she requested FMLA time off to care for her dying mother, but Quantum refused. Claybrook was forced resign, foregoing wages for a period that ended when she was able to re-enter the workforce. Claybrook sued Sunoco to recover the severance package she was promised, as well money she had to forego as earning due Sunoco's wrongful conduct that caused her to

These cases—and many others—all demonstrate that businesses regularly use severance programs to incentivize employees to not "jump ship" upon the announcement that the company is to be sold.[16] This motivation for offering to pay severance—maintaining a steady workforce until the employer severs ties—does not morph the contractual severance payment from employer to employee into something insurable. It enables the company to control the timing of the ultimate separation from the company, even if the employee is awarded new employment with the purchasing entity. In this context—inevitable severance—characterizing the

---

involuntarily leave Quantum. She prevailed on both claims, recovering severance pay for the former and "back pay" for the latter. *See id.* at *14. *See also Claybrook v. Sunoco GP, LLC*, No: 1:18-CV-29-TAV-CHS, 2023 WL 2664740 (E.D. Tenn. March 28, 2023) (overruling objections to both aspects of Claybrook's recovery). This further demonstrates that the recovery of severance pay bonus is not "back pay" under any stretch of the imagination.

[16]    *See, e.g., Baker v. Masco Builder Cabinet Group*, 912 F.Supp.2d 814, 818 (D.S.D. 2012) ("We will pay severance as we have in all other plant closures in accordance with what has already been announced. If employees remain until released, they will receive the following . . ."); *Jennings v. SSM Health Care St. Louis*, 355 S.W.3d 526, 529 (Mo. Ct. App. 2011) ("SSM promised severances to all those physicians in attendance in exchange for their continued employment at St. Joseph's during the transition period."); *Drake v. Option One Mortgage Corp.*, No. SACV-09-01450-CIC(RNBx), 2010 WL 11464891, at *4 (C.D. Cal. April 15, 2010) ("Here, Plaintiffs allege that H&R Block promised to pay severance benefits to Plaintiffs under the Standard Severance Package in exchange for Plaintiffs' continued employment."); *Heidgerd v. Olin Corp.*, 906 F.2d 903, 905-06 (2d Cir. 1990) ("Under this special policy, salaried employees such as Heidgerd were to be offered severance benefits at a rate higher than the normal benefits if they remained with the Company at least through the period of uncertainty. . ."); *Kostrzewski v. U.S. Steel Supply, Inc.*, No. 87-5098, 1987 WL 14672, *1 (E.D. Penn. Nov. 3, 1987) ("[T]he Division's District Manager promised that those employees who agreed to stay on and provide additional assistance would receive full separation and termination benefits, including full severance pay in accordance with U.S. Steel and USX policies when the division was idled."); *AMAX, Inc. v. Fletcher*, 305 S.E.2d 601, 789 (1983) ("In order to stabilize the situation and prevent a loss of its personnel prior to the sale, certain Amax officials assured various ARRS staff members, including the plaintiff, that if they would stay on the job until the sale was consummated, they would receive severance pay . . .").

payment as a payment "to stay" until the employer performs the severance is the same thing as paying the employee for the employer's right to control the timing of the separation. *See* ROA.25-10679.5447 ("it all means the same thing."). In either case, the allowance is due when the employment relationship ends, rendering it a payment for employment termination severance.

The district court gave these cases scant attention at best. *See* ROA.25-10679.3519 ("none of these courts mandate that every agreement of this kind be termed as a severance agreement."). But this case involves an undefined phrase for which the common and ordinary meaning must be applied. In addition to the dictionary definitions cited previously, these cases all illustrate that, in practice, the plain and ordinary meaning of severance payments means and refers precisely to the program Southwest adopted.

In failing to apply this common and ordinary meaning, neither the district court nor Carpenter cited any authority that a condition precedent to an employee's entitlement to receive a severance package, such as remaining an employee for a temporary period, morphs the payment into something other than severance. And certainly, semantics such as "stay bonus" or "stay-to-get-severance," should not undermine the contract's plain purpose—to exclude from coverage the insured's contractual payroll obligations outside the spheres of equity.

The district court's other rationales do not withstand scrutiny either.

45

According to the court, Carpenter's 3% figure due upon the sale of the company's assets and the resulting severance of his employment was not a severance payment because it was not immediately known whether the purchasing entity would offer him a position. *See* ROA.25-10679.3518-3519; *see also* ROA.25-10679.5481. But whether the purchasing entity offered him a position or not does not change the fact that *Southwest—his employer—*would no longer employ him (or any other employee) because of the sale. *See* ROA.25-10679.5395 (Carpenter's attorney explaining that, due to the asset sale, "the three entity defendants weren't employing anyone anymore.").

Carpenter's contrary argument and the district court's holding not only ignores the plain and ordinary meaning of severance payments, but it is also unreasonable and, if accepted, would incentivize employers to breach common contractual compensation agreements, violating the moral hazard principle discussed previously. Moreover, although the Policy defines "**Employment Practices Wrongful Act**" as including a "**Wrongful Act**" involving a breach of any . . . contract . . . including . . . any obligation arising out of any personnel manual, employee handbook, or policy statement," the Policy's grant of coverage ("**Loss**"-carveout) and exclusionary provisions (termination severance payments) make it clear that Twin City "shall not" pay any "**Loss**" in connection with the Insureds payroll obligations, including the contractual obligation to pay severance payments.

By doing so, Twin City and Southwest avoided the very moral hazard Carpenter seeks to impose.

The Potashniks offered severance packages to maintain a steady workforce so they could sell the company's assets and sever their company's ties with its employees, ultimately realizing $36,000,000 in from the sale. Having successfully done so, they, not Twin City, became contractually liable for funding the severance packages they negotiated. Any contrary ruling would incentivize employers like Southwest to breach their ordinary contractual payment obligations. By applying the Policy's plain and ordinary meaning, the Court avoids incentivizing insureds to breach their obligations to compensate their employees in accordance with their contractual obligations.

The underlying judgment for Carpenter's severance allowance that became due when his employment with Southwest ended is not covered. The Potashniks' promised to pay Carpenter an employment severance bonus if he completed a particular term, a condition precedent he performed. Therefore, Carpenter's claim is excluded, and his *Stowers* claim fails as a matter of law. This Court should, accordingly, reverse and render judgment in Twin City's favor.

## III.   Twin City should not be liable for duplicative post-judgment interest.

Lastly, the state court judgment against Southwest in the underlying case includes, among other things, the principal damage award, as well as pre- and post-

47

judgment interest accruing at 5.25% per annum. ROA.25-10679.5528. In finding

Twin City liable for that judgment under *Stowers*, the district court entered a final

judgment that includes all amounts awarded in the state court judgment as well as

federal post-judgment interest accruing on that entire award, including the state

court post-judgment interest. ROA.25-10679.5389.

The district court relied principally on *OneBeacon Insurant Company v. T.

Wade Welch & Associates*, No. H-11-3061, 2015 WL 926515 (S.D. Tex. March 4,

2015), which reached a similar conclusion in a *Stowers* lawsuit. *See* ROA.25-

10679.5523. The *OneBeacon* court recognized, however, that the issue of whether

a successful *Stowers* plaintiff is entitled to duplicative post-judgment interest is "an

issue of first impression." *Id*. at *3. It appears that no courts, other than the court

below, has cited *OneBeacon* for this proposition.

Twin City recognizes that a post-judgment interest award is required under 28

U.S.C. § 1961(a), as the district court explained. ROA.25-10679.5523. However,

as a matter of first impression for this Court, Twin City requests the Court to analyze

whether a federal court judgment that holds an insurer liable under *Stowers* for a

state court judgment that already includes a post-judgment interest award (at a rate

higher than the federal rate) satisfied the purpose of § 1961. After all, if Southwest

had been the party to successfully advance the *Stowers* lawsuit against Twin City,

a federal court judgment that simply requires Twin City to fully satisfy the

48

underlying state court judgment would make Southwest whole, which satisfies the policy rationale behind *Stowers*.

## CONCLUSION

Twin City respectfully requests the Court to reverse the summary judgment awarded to Carpenter on his cross-motion for summary judgment and render judgment in Twin City's favor on its motion for summary judgment. Twin City additionally request all relief stated in its foregoing Appellant's Brief and all additional relief to which it may be entitled at law or in equity.

Respectfully submitted,

CHAMBERLAIN, HRDLICKA, WHITE,
WILLIAMS & AUGHTRY

By:   */s/ Steven J. Knight*
STEVEN J. KNIGHT
Texas Bar No. 24012975
steven.knight@chamberlainlaw.com
CHRISTIN KIRCHNER
Texas Bar No. 00784403
christine.kirchner@chamberlainlaw.com
1200 Smith Street, Suite 1400
Houston, Texas 77002
(713) 658-1818

*Counsel for Appellants*

49

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing has been forwarded to counsel of record by electronic service on October 16, 2025.

*/s/ Steven J. Knight*
STEVEN J. KNIGHT

## CERTIFICATE OF COMPLIANCE

I certify this document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 11,582 words. I further that this motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman, with the exception of footnotes, which have been prepared in a 12-point font.

*/s/ Steven J. Knight*
STEVEN J. KNIGHT