Case No. 25-10679

# In the
# United States Court of Appeals
# for the Fifth Circuit

JEFFREY W. CARPENTER,
*Plaintiff – Appellee,*

v.

TWIN CITY FIRE INSURANCE COMPANY,
*Defendant – Appellant,*

On Appeal from the United States District Court
for the Northern District of Texas, Dallas Division
Civil Action No. 3:23-cv-00769

## BRIEF OF APPELLEE
## JEFFREY W. CARPENTER

Amy E. Gibson
amy@gwfirm.com
David L. Wiley
david@gwfirm.com

GIBSON WILEY PLLC
1500 Jackson Street #109
Dallas, Texas 75201-4923
[Tel.] (214) 522-2121
[Fax]  (214) 522-2126

COUNSEL FOR PLAINTIFF-APPELLEE

Case No. 25-10679

# In the
# United States Court of Appeals
# for the Fifth Circuit

---

JEFFREY W. CARPENTER,
*Plaintiff – Appellee,*

v.

TWIN CITY FIRE INSURANCE COMPANY,
*Defendant – Appellant,*

---

On Appeal from the United States District Court
for the Northern District of Texas, Dallas Division
Civil Action No. 3:23-cv-00769

---

## CERTIFICATE OF INTERESTED PERSONS

---

The undersigned counsel of record certifies that the following listed persons and entities, as described in the fourth sentence of Fifth Circuit Rule 28.2.1, have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

**Defendant/Appellant**

Twin City Fire Insurance Company

**Counsel for Defendant/Appellant**

Steven J. Knight
Christine Kirchner
Chris M. Lemons
Amy J. Foreman
CHAMBERLAIN, HRDLICKA, WHITE,
WILLIAMS & AUGHTRY, P.C.
1200 Smith Street, Suite 1400
Houston, Texas 77002
[Tel.] (713) 658-1818

Michael W. Johnston
JOHNSTON LEGAL GROUP P.C.
1616 Wabash Avenue
Fort Worth, Texas 76107-6598
[Tel.] (817) 820-0825

**Defendants in Underlying Lawsuit**

Southwest Housing Development
Company, Inc.

Southwest Management Corpora-
tion a/k/a and d/b/a Southwest
Management Company, Inc.

Affordable Housing Construction,
Inc.

Brian Potashnik

Cheryl Potashnik

**Current or Prior Counsel for
Defendant(s) in Underlying Lawsuit**

Sim Israeloff
R. Michael Northrup
COWLES & THOMPSON, P.C.
901 Main Street, Suite 3900
Dallas, Texas 75202
[Tel.] (214) 672-2000

Lawrence J. Friedman
Michael D. Donohue
Jason H. Friedman
FRIEDMAN & FEIGER, L.L.P.
17304 Preston Road, Suite 300
Dallas, Texas 75252
[Tel.] (972) 788-1400

Ryan Hale, formerly with
HAWKINS, PARNELL
THACKSTON & YOUNG, LLP
Highland Park Place
4514 Cole Avenue, Suite 500
Dallas, Texas 75205
[Tel.] (214) 780-5100

Robert B. Gilbreath
HAWKINS, PARNELL
THACKSTON & YOUNG, LLP
6301 Gaston Avenue, Suite 1434
Dallas, Texas 75214
[Tel.] (214) 780-5100

**Plaintiff/Appellee**

    Jeffrey W. Carpenter

**Current Counsel for
Plaintiff/Appellee**

    Amy E. Gibson
    David L. Wiley
    GIBSON WILEY PLLC
    1500 Jackson Street #109
    Dallas, Texas 75201-4923
    [Tel.] (214) 522-2121

**Former Counsel for
Plaintiff/Appellee**

    Brian P. Sanford
    THE SANFORD FIRM
    2711 Hibernia Street
    Dallas, Texas 75204
    [Tel.] (214) 717-6653

    Douglas D. Haloftis
    Amanda H. DonCarlos
    both formerly with
    GARDERE WYNNE SEWELL L.L.P.
    now known as
    FOLEY & LARDNER LLP
    2021 McKinney Avenue, Suite 1600
    Dallas, Texas 75201
    [Tel.] (214) 999-3000

    Rogge Dunn
    Gregory M. Clift
    both formerly with
    CLOUSE DUNN KHOSHBIN LLP
    which subsequently split into
    ROGGE DUNN GROUP, P.C.
    500 N. Akard Street, Suite 1900
    Dallas, Texas 75201
    [Tel.] (214) 888-5000
    and CLOUSE BROWN PLLC
    4245 North Central Expressway,
    Suite 350
    Dallas, Texas 75205
    [Tel.] (214) 698-5100

*s/ Amy Gibson*

    _____

    Amy E. Gibson

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is unnecessary. This appeal involves the application of well-established principles of insurance contract interpretation to two policy exclusions that the district court correctly found inapplicable. This appeal also involves correct application of mandatory statutory post-judgment interest on the *Stowers* damages to which Twin City stipulated.

# TABLE OF CONTENTS

| Title | Page(s) |
|---|---|

CAPTION ............................................................................................. 1

CERTIFICATE OF INTERESTED PERSONS ............................................ 2

STATEMENT REGARDING ORAL ARGUMENT ....................................... 5

TABLE OF CONTENTS ......................................................................... 6

TABLE OF AUTHORITIES ..................................................................... 9

ISSUES PRESENTED ........................................................................... 14

STATEMENT OF THE CASE ................................................................. 14

   I. Employment practices liability insurance covers what many other types of insurance do not. ....................................................................... 14

   II. The EPLI policy at issue expressly covers oral agreements ........................ 15

   III. Pay-to-stay agreements are normal and used to prevent employee exodus. ........................................................................... 17

   IV. Conclusive findings in the underlying state-court lawsuit. ........................ 18

     A.  The jury finds existence of pay-to-stay agreement. .................................. 18

     B.  The jury finds defendants failed to comply with pay-to-stay agreement. 19

     C.  The jury finds owed compensation. ......................................................20

     D.  All appeals resolve in Carpenter's favor. ............................................... 21

   V. Carpenter files a *Stowers* lawsuit against Twin City and wins. ...................22

SUMMARY OF THE ARGUMENT ........................................................... 23

STANDARD OF REVIEW ............................................................ 24

ARGUMENT ........................................................................... 25

I.   Applicable Texas law favors insurance coverage. ....................................... 25

II.  The jury findings in the prior case are conclusive. ..................................... 26

III. The *employment termination severance payments* exclusion is inapplicable. . 27

   A. Twin City ignores the conclusive jury findings. ....................................... 27

   B. The policy leaves the phrase *severance payment* undefined. ...................... 30

   C. The ordinary meaning of *severance payment* has three usual conditions. . 30

   D. Jury findings are contrary to ordinary meaning of *severance payment*. ..... 31

   E. The modifier *employment termination* requires termination as a condition. ............................................................... 33

   F. Twin City misstates the import of the cases it cites. ............................... 34

   G. The *employment termination severance payments* exclusion is inapplicable. ............................................................... 35

IV.  The exclusion for *salaries, wages, or bonuses, except as a component of a front or back pay award* is inapplicable. ................................. 35

   A. The policy leaves the phrase *back pay* undefined. ................................... 35

   B. The ordinary meaning of *back pay* is just owed but unpaid compensation. ............................................................... 36

   C. The meaning of *back pay* does not vary by the violation of law it remedies. ............................................................... 37

D. Twin City's interpretation would eviscerate oral agreement coverage.  . 39

E.  The exclusion and exception have meaning—they are not coterminous.40

   1.   example: wages for new consent decree training are excluded. ............ 40

   2.   example: salary paid another to help mitigation is excluded. ............... 41

   3.   example: paying temporary workers to meet legal duties is excluded...42

   4.   example: paying interpreters as disability accommodations
      is excluded.............................................................................. 43

   5.   example: some wages paid are not back pay and so, excluded. ............ 44

   6.   conclusion: these examples show meaning in the
      exclusion and exception. ........................................................ 45

F.  The jury finds owed but unpaid compensation. ...................................... 46

G. Twin City arguments would eviscerate oral agreement coverage.  ......... 47

H. The *back pay award* exception to the exclusion fits. ................................ 48

V.  The district court correctly applies interest.............................................. 48

VI. Carpenter objects to certain kinds of statements, labeling, and spin.........50

CONCLUSION ............................................................................................... 53

SIGNATURE.................................................................................................. 54

CERTIFICATE OF SERVICE ................................................................................ 55

CERTIFICATE OF COMPLIANCE ........................................................................ 56

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Arthur J. Gallagher & Co. v. Dieterich*,
   270 S.W.3d 695 (Tex. App.—Dallas 2008, no pet.) ...............................38

*Barnett v. Aetna Life Ins. Co.*,
   723 S.W.2d 663 (Tex. 1987) ....................................................26

*Burlington N. & Santa Fe Ry. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*,
   334 S.W.3d 217 (Tex. 2011) ....................................................26

*Carnation Co. v. Borner*,
   610 S.W.2d 450 (Tex. 1980) .................................................30, 38

*Curtis v. Loether*,
   415 U.S. 189, 94 S. Ct. 1005, 39 L.Ed.2d 260 (1974) ...........................38

*Forbau v. Aetna Life Ins. Co.*,
   876 S.W.2d 132 (Tex. 1994) ....................................................47

*Frymire v. Ampex Corp.*,
   61 F.3d 757 (10th Cir. 1995) ...................................................38

*Gemini Ins. Co. v. Idem. Ins. Co. of N. Am.*, No.,
   23-20026, 2024 WL 138596 (5th Cir. Jan. 12, 2024) ...........................25

*Gonzalez v. Mid-Continent Cas. Co.*,
   969 F.3d 554 (5th Cir. 2020) ..................................................24

*GuideOne Elite Ins. Co. v. Fielder Rd. Baptist Church*,
   197 S.W.3d 305 (Tex. 2006) ....................................................26

*Kolb v. Goldring, Inc.*,
   694 F.2d 869 (1st Cir. 1982) ..................................................38

*Loc. Union No. 1992 v. The Okonite Co.*,
   189 F.3d 339 (3rd Cir. 1999) ........................................................ 31

*Lubbock Cnty. Hosp. Dist. v. Nat'l Union Fire Ins. Co.*,
   143 F.3d 239 (5th Cir. 1998) ........................................................ 25

*Massey v. Whittaker Corp., Winters Indus. Div.*,
   661 F. Supp. 1151 (N.D. Ohio 1987) ......................................... 38

*Mid-Continent Cas. Co. v. Bay Rock Operating Co.*,
   614 F.3d 105 (5th Cir. 2010) ....................................................... 26

*OneBeacon Ins. Co. v. T. Wade Welch & Assocs.*,
   841 F.3d 669 (5th Cir. 2016) ....................................................... 50

*OneBeacon Ins. Co. v. T. Wade Welch & Assocs.*,
   Civ. A. No. H-11-3061, 2015 WL 926515 (S.D. Tex. Mar. 4, 2015) ..................... 49

*Playa Vista Conroe v. Ins. Co. of the W.*,
   989 F.3d 411 (5th Cir. 2021) ....................................................... 24

*Ramsay v. Md. Am. Gen. Ins. Co.*,
   533 S.W.2d 344 (Tex. 1976) ......................................................... 25

*Sw. Airlines Co. v. Liberty Ins. Underwriters, Inc.*,
   90 F.4th 847 (5th Cir. 2024) .............................................. 25, 30, 36

*Swicegood v. Med. Protective Co.*,
   No. 3:95-CV-0335-D, 2003 WL 22234928 (N.D. Tex. Sept. 19, 2003) ......... 26, 27

*Vanegas v. Am. Energy Servs.*,
   302 S.W.3d 299 (Tex. 2009) .............................................. 17, 31, 34

*Wells v. Minn. Life Ins. Co.*,
   885 F.3d 885 (5th Cir. 2018) (applying Texas law) ................. 25, 30, 36

*Windermere Oaks Water Supply Corp. v. Allied World Specialty Ins. Co.*,
   67 F.4th 672 (5th Cir. 2023) ....................................................... 24

**Statutes**

28 U.S.C. § 1961(a) ...................................................................48, 49

**Rules**

Federal Rule of Appellate Procedure 32(a)(5)........................................56

Federal Rule of Appellate Procedure 32(a)(6)........................................56

Federal Rule of Appellate Procedure 32(a)(7)(B) ..................................56

Federal Rule of Appellate Procedure 32(f)............................................56

Federal Rule of Civil Procedure 56(a) ...................................................24

Fifth Circuit Rule 32.1...........................................................................56

**Other Authorities**

Joni Hersch and Erin E. Meyers,
    *Employment Practices Liability Insurance and Ex Post Moral Hazard*,
    106 Cornell L. Rev. 947 (2021) ......................................................14, 15

ANTONIN SCALIA & BRYAN A. GARNER,
    READING LAW: THE INTERPRETATION OF LEGAL TEXTS....................................33

L.D. SIMMONS, II & LOWNDES C. QUINLAN,
    NEW APPLEMAN ON INSURANCE LAW................................................................15

JEFFREY W. STEMPLE,
    LAW OF INSURANCE CONTRACT DISPUTES.........................................................15

Case No. 25-10679

# In the
# United States Court of Appeals
# for the Fifth Circuit

---

Jeffrey W. Carpenter,
*Plaintiff – Appellee,*

v.

Twin City Fire Insurance Company,
*Defendant – Appellant,*

---

On Appeal from the United States District Court
for the Northern District of Texas, Dallas Division
Civil Action No. 3:23-cv-00769

---

## Brief of Appellee
## Jeffrey W. Carpenter[1]

---

[1] Unless otherwise noted, Carpenter's attorneys have supplied all emphases, have omitted from quotations all internal quotation marks, internal footnotes, and internal citations, and have omitted from legal citations all citing and quoting references.

This brief is paginated to match ECF document pagination.

TO THE HONORABLE U.S. COURT OF APPEALS FOR THE FIFTH CIRCUIT:

This is a *Stowers* case. The *Stowers* duty involves liability insurers' duty to settle third-party claims against their insureds when it would be reasonably prudent to do so. During the pendency of this case, Twin City admitted liability on all *Stowers* elements other than policy coverage.

This appeal concerns employment practices liability insurance. Twin City does not dispute or appeal core policy coverage — *i.e.*, basic policy coverage before reaching exclusions. It only disputes whether United States District Court Judge David Godbey correctly applied two exclusions. One is an indemnity exclusion for *employment termination severance agreements*. The other is a loss exclusion for salaries, wages, or bonuses, *except as a component of a front or back pay award.*

Judge Godbey correctly rules that neither exclusion applies and grants summary judgment in favor of Carpenter on coverage. Because coverage was the sole remaining issue in this *Stowers* case, Judge Godbey rightly renders final judgment in favor of Carpenter.

## ISSUES PRESENTED

1. Following admitted liability on all elements of the *Stowers* claim except policy coverage as to two exclusions, did the district court correctly grant summary judgment on the *Stowers* claim against Twin City when those policy exclusions do not apply?

2. Did the district court correctly decide that federal post-judgment interest is mandatory on the civil money judgment in this case?

## STATEMENT OF THE CASE

### I.    Employment practices liability insurance covers what many other types of insurance do not.

Most traditional liability insurance policies — like commercial, auto, homeowners, errors and omissions, and directors and officers policies — do not cover things like punitive damages, intentional misconduct, and failure to comply with agreements. *See generally* Joni Hersch and Erin E. Meyers, *Employment Practices Liability Insurance and Ex Post Moral Hazard*, 106 CORNELL L. REV. 947, 966-967 (2021) (discussing punitive damages and intentional conduct).

Employment practices liability insurance ("EPLI") is different. *See id.* Insurers developed and marketed EPLI policies to cover gaps in other types of liability insurance. *See* JEFFREY W. STEMPLE, LAW OF INSURANCE CONTRACT DISPUTES § 21.06, pp. 21-47 to 21-48 (1999). "EPLI did not come on the scene until the early 1990s." *See* Hersch, 106 CORNELL L. REV. at 955.

EPLI policies, including the policy at issue, cover what many other types of liability insurance policies do not — such as intentional misconduct, punitive damages, and breach of contract. *See, e.g.,* L.D. SIMMONS, II & LOWNDES C. QUINLAN, NEW APPLEMAN ON INSURANCE LAW § 28.App., 02[2][g], p. 28-22 (2015) ("Outside of the EPL market, insurance policies typically do not cover breach of contract claims."); ROA.3652 (exhibit cover page for policy), ROA.3675 at § II(D) (covered employment practices wrongful acts including intentional conduct like sexual harassment, discrimination, defamation, and breach of oral or written contract), ROA.3676 (covered loss including punitive and exemplary damages).

## II.    The EPLI policy at issue expressly covers oral agreements.

Twin City sold the EPLI policy at issue. *See* ROA.3652-89 (EPLI policy), ROA.3653, 3656 (identifying Twin City as insurer at top of each page); Appellant's Brief, ECF p. 16. The policy had a $75,000 deductible for EPLI coverage up to $1

million. ROA.3657. It is known as an *eroding* or *wasting* policy because the $1 million limit depletes with costs of defense. *See* ROA.3666 at § V(A); ROA.3641 ¶ 3 (second amended answer admission).

Again, Twin City does not dispute core coverage — *i.e.*, basic policy coverage before reaching exclusions.[2] All defendants in the underlying state-court lawsuit are insureds.[3] The oral agreement at issue in the underlying state-court lawsuit meets basic core coverage requirements.[4]

The EPLI policy expressly covers liability for breach of oral, written, and implied employment agreements:

> **(D)** **"Employment Practices Wrongful Act"** means a **Wrongful Act** involving any:
>
> ***
>
> **(6)** breach of any oral, written, or implied employment contract, including, without limitation, any obligation arising out of any personnel manual, employee handbook, or policy statement; or

ROA.3675 at § II(D)(6).

---

[2] *Compare* ROA.3552, ROA.3569-75 (Carpenter brief seeking summary judgment on core policy coverage) *with* ROA.5162-91 (Twin City response brief not contesting core policy coverage) *and* Appellant's Brief, ECF pp. 13-59 (not appealing core policy coverage).

[3] *See* ROA.3569-70.

[4] *See* ROA.3571-75.

The EPLI policy has indemnity exclusions — a section outlining claims for which it will provide a defense but not indemnity. ROA.3678 at § III(C). That section excludes written employment agreements from indemnity coverage. ROA.3678 at § III(C)(4). That section does not exclude oral employment agreements from indemnity coverage. *See* ROA.3678 at § III(C)(1)-(4).

## III.    Pay-to-stay agreements are normal and used to prevent employee exodus.

When a merger or asset sale is desired, a common concern is the potential for mass exodus of employees. *See* ROA.3886-96 (Towers Watson 2014 Global M&A Retention Survey: *How Companies Use Agreements to Keep Top Talent*). This is especially true for key employees whose performance could affect whether or not a company remains attractive to buyers in the first place or whose work matters to whether the deal gets done. *See* ROA.3890-92, 3894-95.

One common solution is to implement financial incentives for employees to stay. *See* ROA.3890-91, 3894-95. These agreements are often referred to as pay-to-stay. *See, e.g.*, ROA.3889, 3895, 3896. The Texas Supreme Court has noted that "remaining with the company" can itself be valuable consideration supporting such pay-to-stay agreements. *Vanegas v. Am. Energy Servs.,* 302 S.W.3d 299, 304 (Tex. 2009).

## IV.    Conclusive findings in the underlying state-court lawsuit

## A.    The jury finds existence of pay-to-stay agreement.

The jury finds a pay-to-stay agreement in connection with a potential asset sale:[5]

QUESTION 4

Did any of the defendants named below and Jeff Carpenter agree on October 13, 2006 to pay Jeff Carpenter:

1. 3% of the total of: gross asset sale revenue to sellers, less normal closing costs, less sale proceeds bonuses paid to employees
2. if Jeff Carpenter would stay as long as needed on to help make the asset sale happen

\*\*\*

Answer "Yes" or "No" for each:

| | |
|---|---|
| Affordable Housing Construction | YES |
| Southwest Housing Development | YES |
| Southwest Housing Management | YES |
| Brian Potashnik | YES |

ROA.3913-14; *see also* ROA.3903-28 (complete jury charge with verdict and jury notes to judge, but with juror names redacted). In questions submitted during deliberations, the jury calls this pay-to-stay agreement the "3% deal." ROA.3927.

---

[5] The jury found against Carpenter on other claims that are not at issue in this case.

So, the jury finds that each of these defendants had an agreement with Carpenter. It finds that Carpenter's duty in the deal is to "stay as long as needed [] to help make the asset sale happen." It finds that defendants' duty in the deal was to pay certain net proceeds from asset sale revenue *if* Carpenter did so.

The Dallas Court of Appeals previously ruled that this agreement to stay "as long as needed" was sufficiently definite to be enforceable.[6] Nothing in the jury finding makes the deal dependent on employment termination, or staying through closing, or anything at all other than "stay as long as needed [] to help make the asset sale happen."

## B.    The jury finds defendants failed to comply with pay-to-stay agreement.

The jury finds that each of these defendants failed to comply with the pay-to-stay agreement:

---

[6] *See, e.g.*, ROA.3948 (defense position and court ruling), ROA.3948-49 ("That the parties did not have a specific date on which Carpenter's performance would end does not render the agreement too indefinite to be enforceable. Carpenter also testified that when Brian informed him that he was going to sell the business, he told Carpenter that he wanted Carpenter to stay and do his job. Brian specifically told Carpenter that Carpenter would be involved in the due diligence and communication between the teams once a buyer was selected. Based on the evidence, a reasonable jury could have determined that the parties agreed that if Carpenter continued to do his job and perform these other responsibilities until the asset sale closed *or* he was no longer needed, he would be entitled to the three percent bonus. ... Brian and Cheryl confirmed to Carpenter that he sufficiently performed his obligations and would get paid his three percent bonus at closing, when they got paid."); *see also* ROA.3944-49 (complete Dallas Court of Appeals opinion).



ROA.3915. So, the jury necessarily finds that Carpenter did his part — stay as long as needed to help make the asset sale happen. And it finds that these defendants did *not* do their part — pay Carpenter for staying and continuing to work toward the asset sale.

## C.    The jury finds owed compensation

The jury finds that compensation is owed for failure to comply with the pay-to-stay agreement — in other words, back pay:

> If you answered "Yes" to Question 5 for any defendant, then answer the following question. Otherwise, do not answer the following question.
>
> **QUESTION 7**
>
> What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Jeff Carpenter for his damages, if any, that resulted from such failure to comply with such agreement?
>
> ...
>
> Consider the following elements of damages, if any, and none other.
>
> a. 3% of the total of: gross asset sale revenue to sellers, less normal closing costs, less sale proceeds bonuses paid to employees
>
> ...
>
> Answer in dollars and cents for damages, if any:
>
> Answer: ___$928,020.76___

ROA.3917.

## D.    All appeals resolve in Carpenter's favor

The trial court renders judgment on the jury's verdict and its own findings after an attorneys' fees bench trial. *See* ROA.3605-13 (final judgment). The judgment imposes joint and several liability on each liable defendant. ROA.3611. The jury verdict and judgment exceed remaining policy limits. ROA.3641 ¶ 3 (second amended answer: ".... Twin City admits the state court entered an adverse verdict against the defendants in an amount that exceeded the remaining policy limits ....").

All appeals resolve in favor of Carpenter. *See* ROA.3944-49 (Dallas Court of Appeals opinion); ROA.3950-52 (Texas Supreme Court orders).

## V.     Carpenter files a *Stowers* lawsuit against Twin City and wins.

The state trial court turns over to Carpenter the defendant-insureds' *Stowers* claim against the liability insurer Twin City. ROA.3614-17 (turnover order). Carpenter files suit on the *Stowers* claim. ROA.15-16, 18-32 (original petition).

During this lawsuit, Twin City admits liability on all elements of the *Stowers* claim other than policy coverage:

**Twin City Stipulation and Admission**

Based on the foregoing, and to bring the Lawsuit proceedings more expeditiously to final and appealable judgment in the district court, Twin City stipulates and admits in Carpenter's favor on all remaining elements other than insurance coverage — *i.e.*, all remaining elements other than "(1) the third party's claim against the insured is within the scope of coverage." Twin City stipulates and admits (2) Jeff Carpenter's settlement demand in the Prior Case was within policy limits; (3) assuming coverage *arguendo*, the terms of that demand were "such that an ordinarily prudent insurer would accept it, considering the likelihood and degree of the insured's potential exposure to an excess judgment;" and (4) assuming coverage *arguendo*, the *Stowers* violation proximately caused the damages reflected in the attached Final Judgment but reduced as appropriate for the bond that was posted and paid in the Prior Case.

ROA.3602-03; *see also* ROA.3600-17 (complete stipulation with attachments). The stipulation has two attachments: (1) the final judgment in the prior case, and (2) the turnover order in the prior case. ROA.3605-17.

Twin City limits its challenge in this case to the only two pleaded policy coverage exclusions. *See* ROA.3640-41 (exhibit cover page for second amended answer), ROA.3647-49 ¶¶ 56-62 (pleading various iterations of the two policy exclusions as affirmative defenses). United States District Court Judge David Godbey denies the Twin City summary judgment motion on those exclusions. ROA.3512-21. Judge Godbey grants the Carpenter summary judgment motion on coverage. ROA.5476-84. This appeal follows.

## SUMMARY OF THE ARGUMENT

This appeal involves the district court's correct application of long-standing rules of interpretation for insurance policies. There is no coverage dispute other than the only two policy exclusions that Twin City pleaded. One is an indemnity exclusion for *employment termination severance agreements*. ROA.3678 at § III(C)(1). The other is a loss exclusion for salaries, wages, or bonuses, *except as a component of a front or back pay award*. ROA.3676 at § II(I)(5) (defining loss including exclusions).

The district court correctly rules against Twin City and in favor of Carpenter because the two policy exclusions do not apply. ROA.5476-84, ROA.3512-21. After correctly ruling that those exclusions are inapplicable, it also correctly renders judgment including mandatory post-judgment interest.

## STANDARD OF REVIEW

The parties agree: In reviewing the district court's grant of summary judgment, an appellate court applies the same standard as the district court — *i.e.*, *de novo* review. *See Windermere Oaks Water Supply Corp. v. Allied World Specialty Ins. Co.*, 67 F.4th 672, 674 (5th Cir. 2023) ("We review a grant of summary judgment de novo."); Appellant's Brief, ECF p. 32. That standard is stated in Federal Rule of Civil Procedure 56(a): "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

Interpretation of the insurance policy is also *de novo*. *See Playa Vista Conroe v. Ins. Co. of the W.*, 989 F.3d 411, 414 (5th Cir. 2021) ("Our review of the Policy language and the legal standards for insurance coverage also is *de novo*.").

Texas law governs interpretation of the insurance policy. *See Gonzalez v. Mid-Continent Cas. Co.*, 969 F.3d 554, 556 (5th Cir. 2020) ("Because [insured] brings claims under Texas law in this diversity-jurisdiction case, we apply the substantive law of Texas."). Because jurisdiction over the only claim at issue — the state-law *Stowers* claim — is based on diversity. *See* ROA.10-11 ¶¶ 4-8 (removal and jurisdictional facts).

# ARGUMENT

## I.   Applicable Texas law favors insurance coverage.

Policy interpretation is a question of law. *Gemini Ins. Co. v. Idem. Ins. Co. of N. Am.*, No. 23-20026, 2024 WL 138596, at *3 (5th Cir. Jan. 12, 2024) (per curiam). Texas law applies. *Id.*

"Under Texas law, the maxims of contract interpretation regarding insurance policies operate squarely in favor of the insured." *Lubbock Cnty. Hosp. Dist. v. Nat'l Union Fire Ins. Co.*, 143 F.3d 239, 242 (5th Cir. 1998). "It is a settled rule that policies of insurance will be interpreted and construed liberally in favor of the insured and strictly against the insurer, and especially so when dealing with exceptions and words of limitation." *Ramsay v. Md. Am. Gen. Ins. Co.,* 533 S.W.2d 344, 349 (Tex. 1976).

Undefined terms are given their "plain and ordinary meaning" as "commonly understood by the average laymen in preference to a technical meaning as understood by members of a profession." *Wells v. Minn. Life Ins. Co.*, 885 F.3d 885, 890 (5th Cir. 2018) (applying Texas law). And that inquiry begins "with the dictionary." *Sw. Airlines Co. v. Liberty Ins. Underwriters, Inc.*, 90 F.4th 847, 852 (5th Cir. 2024).

Since the insurer normally chooses the policy language, when "the language chosen is susceptible of more than one construction, such policies should be construed

strictly against the insurer and liberally in favor of the insured." *Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663, 666 (Tex. 1987). An "even more stringent construction is required" when addressing "an exception or limitation on [] liability under the policy." *Id.* Courts "must adopt the construction of an exclusionary clause urged by the insured as long as that construction is not itself unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties intent." *Id.*; *accord* ROA.5479 (Apr. 22, 2025 Memorandum Opinion and Order).

## II.    The jury findings in the prior case are conclusive.

The "facts actually established in the underlying suit control the duty to indemnify."[7] So, facts the jury decided in the prior case are conclusive on the indemnity issue and may not be relitigated. *See, e.g., Swicegood v. Med. Protective Co.*, No. 3:95-CV-0335-D, 2003 WL 22234928, *13 (N.D. Tex. Sept. 19, 2003) ("The court has located no case that suggests that a coverage suit should consist of a retrial of all or even substantial parts of an indemnity suit that has been fully tried.").

---

[7] *GuideOne Elite Ins. Co. v. Fielder Rd. Baptist Church*, 197 S.W.3d 305, 310 (Tex. 2006); *accord Burlington N. & Santa Fe Ry. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 334 S.W.3d 217, 219 (Tex. 2011) (per curiam); *see also Mid-Continent Cas. Co. v. Bay Rock Operating Co.*, 614 F.3d 105, 110-111 (5th Cir. 2010) (ruling that insurer was collaterally estopped).

A "well-settled principle" — *i.e.*, facts actually established in the underlying suit control the duty to indemnify — "would have little meaning if the trial of an indemnity suit served as nothing more than a warm-up match for the coverage trial." *Id.* So, courts reject the theory that evidence in the underlying trial is admissible to determine coverage. *See, e.g., Swicegood*, 2003 WL 22234928, at *13 ("The court also rejects [party]'s contention that [party] is allowed to offer in the instant trial some or perhaps all the evidence introduced in the trial of the Underlying Lawsuit.").

## III.    The *employment termination severance payments* exclusion is inapplicable.

### A.    Twin City ignores the conclusive jury findings.

Twin City seeks to relitigate what the jury found. It selectively cites testimony and argument from an eight-day jury trial. *See, e.g.,* Appellant's Brief, ECF pp. 22-25, 51-53. It then selectively draws on those bits to form its own conclusions contrary to the jury finding that the promised payment was to stay. Like that "the *evidence* in the underlying trial *established* ... a *severance* ...." *See id.* at 51.

Twin City even misstates what the district court here or Carpenter said. Like saying the district court ruled the policy requires a bonus on severance.[8] Or saying

---

[8] *See* Appellant's Brief, ECF p. 4 ("This is an appeal of the district court's determination that an employment practices liability insurance policy provides indemnity coverage for an employer's breach of an oral agreement to pay an employee's bonus compensation upon the sale of the company's assets *and the severance of his employment*.").

Carpenter's claim itself was for an unpaid severance bonus.[9] The district court made no such ruling. Carpenter made no such claim.

Even then, Twin City does not counter or address the fact that (1) the insured-defendants had a formal severance plan in place that paid 6 weeks' salary in exchange for a release, (2) Carpenter rejected the severance and release due to his pay-to-stay agreement, (3) defense argued at trial that Carpenter was limited to 6 weeks' salary under the separate severance plan, and (4) the jury did not buy that argument and found a pay-to-stay agreement.[10]

---

[9] *See id.* at ECF pp. 5, 34, 41, 50, (claiming repeatedly that Carpenter's claim in the prior case was "*for his unpaid severance bonus*").

[10] *See, e.g.*, ROA.4036 (jury trial defense opening) (arguing that Carpenter was only entitled to the company severance — "then it says in the event company terminates employee, employee will receive severance in an amount equal to six weeks' base salary in a lump sum payable upon such termination."); ROA.4036 (defense opening) ("The severance agreement included a check for six weeks' base salary and severance of $150,000, and severance of $150,000 which was in their discretion. And Mr. Carpenter turned it down. He said, no, I'm not doing it. I'm entitled to a bonus from the proceeds of the sale."); ROA.4341 (Brian Potashnik testimony) ("The only thing that would have been paid to anybody over and above what their employment agreement called for would have been a severance."); ROA.4206-07 (Cheryl Geiser Potashnik) ("A. When Jeff left the company I offered him an additional hundred and fifty thousand dollars in exchange for – as severance. He was offered that in exchange for signing a separation agreement. He chose not to sign that and he didn't take the money."); ROA.4332-33 (Brian Potashnik) ("Q. The offer the day after he finished his work toward the asset sale was that he had to release all claims in exchange for salary he had already earned and was owed and some PTO and that's it. A. That's incorrect. He was offered and rejected a hundred and fifty thousand dollars of severance."); ROA.3913-15 (jury finding existence of pay-to-stay agreement and defendant-insureds' failure to comply).

But the shorter answer is none of this kind of selectivity on either side regarding testimony or trial lawyer arguments matter. Because none of this can be relitigated. What matters is what the jury actually found: The agreement was to stay on as long as needed to help make the asset sale happen. ROA.3913. That is all.

This jury finding is about an agreement to stay, not to leave. That is dispositive under this *employment termination severance payments* exclusion. This jury finding is not dependent on whether or not Carpenter kept his job, whether or not Carpenter was terminated, or whether or not Carpenter stayed through the asset sale. This jury finding also shows that payment was not due on termination. *See* ROA.3913. Rather, given the payment formula in this jury finding, payment could only be due once the asset sale happened — since asset sale revenue, normal asset sale closing costs, and sale proceeds bonuses paid to other employees were part of that formula. ROA.3913. The asset sale did not happen until well after Carpenter's employment ended and after Carpenter filed suit in the underlying case.

**B.    The policy leaves the phrase *employment termination severance payment* undefined.**

The policy excludes payment for *employment termination severance payments*:

> (C)   Other than **Defense Costs**, the Insurer shall not pay **Loss** for any **Claim**:
>
>    (1)   for employment termination severance payments, provided that this exclusion shall not apply to the extent that such payments are negotiated with and consented to by the Insurer as part of a settlement;

ROA.3676 at § II(I)(5). The policy leaves the phrase *employment termination severance payment* undefined. *See* ROA.3674-77 at § II (policy definitions). So, plain and ordinary meaning controls as "commonly understood by the average laymen in preference to a technical meaning as understood by members of a profession." *See Wells*, 885 F.3d at 890. This starts with the dictionary. *Sw. Airlines Co.*, 90 F.4th at 852.

**C.    The ordinary meaning of *severance payment* has three usual conditions.**

The Merriam-Webster dictionary defines the word *severance pay* to mean "an allowance usually based on length of service that is payable to an employee on termination of employment."[11] Twin City concedes this definition. ROA.5174 (quoting this definition as part of its own argument). The United States Department of Labor defines it similarly: "Severance pay is often granted to employees upon termination

---

[11] https://www.merriam-webster.com/dictionary/severance%20pay

of employment. It is usually based on length of employment for which an employee is eligible upon termination."[12] It is commonly given in exchange for a release of claims.[13] In sum, its plain and ordinary meaning shows it is usually (1) based on length of service; (2) paid at termination; and (3) in exchange for a release.

The agreement here meets none of these three criteria. Instead, the agreement here is like one the Texas Supreme Court enforced in *Vanegas v. Am. Energy Servs., 302 S.W.3d 299, 300 (Tex. 2009)* ("In this case, we are asked to decide the enforceability of an employer's alleged promise to pay five percent of the proceeds of a sale or merger of the company to employees who are still employed at the time of the sale or merger."). Here, the agreement is only to stay as long as needed to help make an asset sale happen. Similar to *Vanegas*.

## D.     Jury findings are contrary to ordinary meaning of *severance payment*.

The jury finds a pay-to-stay agreement in connection with a potential asset sale:

---

[12] https://www.dol.gov/general/topic/wages/severancepay

[13] *See Loc. Union No. 1992 v. The Okonite Co.*, 189 F.3d 339, 348 (3rd Cir. 1999) ("The requirement that employees sign a release as a condition of receiving severance pay is a common provision in modern severance agreements. 'An employee release is a contract in which a discharged employee abandons claims against a former employer after they have arisen, in exchange for benefits such as severance pay.'").

> **QUESTION 4**
>
> Did any of the defendants named below and Jeff Carpenter agree on October 13, 2006 to pay Jeff Carpenter:
>
> 1. 3% of the total of: gross asset sale revenue to sellers, less normal closing costs, less sale proceeds bonuses paid to employees
> 2. if Jeff Carpenter would stay as long as needed on to help make the asset sale happen
>
> \*\*\*
>
> Answer "Yes" or "No" for each:
>
> Affordable Housing Construction     YES
>
> Southwest Housing Development     YES
>
> Southwest Housing Management     YES
>
> Brian Potashnik     YES

ROA.3913-14. So, Carpenter would be paid if he "would stay as long as needed [] to help make the asset sale happen." ROA.3913.

The jury found no other condition for payment. For example, payment is not in exchange for any release. It is not based on the length of service itself — *e.g.*, so many weeks of pay multiplied by years of service. It is also not made at termination. So, payment meets none of the usual plain and ordinary conditions of a *severance payment*. Payment was instead, as a jury found, only to stay. As the Texas Supreme

Court noted in *Vanegas*, 302 S.W.3d at 304, just "remaining with the company" can itself be valuable consideration supporting such pay-to-stay agreements.

**E.    The modifier *employment termination* requires termination as a condition.**

> If possible, every word and every provision is to be given effect (*verba cum effectu sunt accipienda*). None should be ignored. None should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence.
>
> —Antonin Scalia & Bryan A. Garner,
> Reading Law: The Interpretation of Legal Texts 174 (2012).

In the indemnity exclusion here, use of the phrase *employment termination* modifies the phrase *severance payment*. A modifier is "a word or phrase that is used with another word or phrase to limit or add to its meaning."[14] Here, use of this additional phrase expressly limits which severance payments are excluded: Not all severance payments are excluded. Only those requiring employment termination are excluded.

Interpreting the exclusion otherwise renders the additional phrase *employment termination* mere surplusage — having no consequence. It would change the clause by reading out part of it as being meaningless: "~~employment termination~~ severance payment." The only way the modifier used is meaningful is for it to have consequence. The plain and ordinary meaning of the phrase *severance payment* is that it is usually

---

[14] https://dictionary.cambridge.org/us/dictionary/english/modifier

paid following termination. But the additional modifying phrase *employment termination* means termination is a required condition of the exclusion — not just usual but required.

Here, the agreement was not dependent on whether Carpenter would have a job with the asset purchaser or seller. Or anyone else. Had he continued in his job with the asset purchaser or seller [or not], he was still owed compensation if he met his end of the deal. A jury found the agreement was to pay him if he stayed as long as needed to help sell an asset — he stayed but was not paid. That is all.[15]

### F.     Twin City misstates the import of the cases it cites.

Twin City cites cases — *Catalanotto, Stout*, *Goldman*, *Claybrook*, *Baker*, *Jennings*, *Drake*, *Heidgerd*, *Kostrzewski*, and *AMAX* — for an unremarkable notion: Sometimes companies put money owed into a severance agreement. But companies can put almost any owed amount of money into a severance agreement. Like money for paid time off. Or wages. Or alleged damages for some wrongful firing. Or some pay-to-stay bonus. Any number of things. To extract some exchange for some of the usual terms of a severance agreement. Like releases. That does not mean that every bonus

---

[15] *See generally Vanegas v. Am. Energy Servs.,* 302 S.W.3d 299, 304 (Tex. 2009) ("By remaining with the company, the employees gave valuable consideration.").

ever promised is now a severance agreement. Or that every damage ever suffered for some wrongful firing is a severance agreement. Or that every pay-to-stay bonus is a severance agreement. Any more than putting a hat into a box now makes the hat a box. The agreement here was to pay for staying to help make an asset sale happen — as the jury's verdict shows. That is it.

**G.    The *employment termination severance payments* exclusion is inapplicable.**

In sum, a reasonable interpretation is that pay here is for staying — not for going. The agreement and payment here meet none of the three plain and ordinary meanings of a *severance payment*: usually (1) based on length of service; (2) paid at termination; and (3) in exchange for a release. They also fail to meet the express requirement of an *employment termination severance payment*: (4) termination. So, the district court correctly rules that the insurer fails its burden to prove the *employment termination severance payment* exclusion applies. ROA.5480-82; ROA.3517-19.

**IV.    The exclusion for *salaries, wages, or bonuses, except as a component of front or back pay award* is inapplicable.**

**A.    The policy leaves the phrase *back pay* undefined.**

The policy states that loss shall not include:

> **(5)**  salaries, wages, or bonuses, except as a component of a front or back pay award.

ROA.3676 at § II(I)(5). It does not define the phrase *back pay*. *See* ROA.3674-77 at § II (policy definitions). It has no cabining language on what a *back pay award* includes or does not include. ROA.3676 at § II(I)(5).

So, plain and ordinary meaning controls as "commonly understood by the average laymen in preference to a technical meaning as understood by members of a profession." *See Wells*, 885 F.3d at 890. This again starts with the dictionary. *Sw. Airlines Co.*, 90 F.4th at 852.

**B.      The ordinary meaning of *back pay* is just owed but unpaid compensation.**

A variety of dictionary definitions show that *back pay* is simply owed but unpaid compensation.



For example, the Oxford University Press dictionary defines the phrase *back pay* as "[p]ayment for work done in the past that was withheld at the time, or for work that

could have been done had the worker not been prevented from doing so." ROA.3577. The Macmillan dictionary defines *back pay* to mean "money that is owed to someone who works for a company but has not yet been paid." ROA.3861 (from coverage analysis provided to Twin City in underlying state-court lawsuit). In short, a reasonable interpretation of *back pay* just means owed but unpaid compensation — and that is enough.

**C.    The meaning of *back pay* does not vary by the violation of law it remedies.**

What a *back pay award* can and cannot remedy does not change what *back pay* means. Any more than whether a mop can clean up milk or water — or is more often used to clean up one or the other — changes it from being a mop. A back pay award can remedy failure to comply with an oral agreement, discrimination, and retaliation.

None of the ordinary meanings of the phrase *back pay* limit it to violation of statutory anti-discrimination employment laws. At base, Twin City's contention is that a back pay award *can* remedy violation of those statutory employment laws. Therefore, it *cannot* remedy breach of an agreement to pay an employee. This is illogical. That it can remedy one violation of law does not mean it cannot also remedy another.

In fact, courts note that a back pay remedy for breach of an employment agreement mirrors the remedy for violating statutory employment laws.[16] The difference being that a back pay award is a legal remedy for breach of an employment agreement and an equitable one for violation of a statutory employment law.[17]

Twin City claims it is unaware of any Texas court characterizing a back pay award as an available remedy for breach of a contract. *See* Appellant's Brief, ECF p. 46. But those exist too.[18] In contrast, Twin City cites no court opinions for its contention that

---

[16] *See, e.g., Frymire v. Ampex Corp.*, 61 F.3d 757, 764 (10th Cir. 1995) ("WARN remedy of *back pay mirrors the type of remedy afforded those who fall victim to an implied contract breach*—giving individuals what they would have been entitled to had there been no breach."), *cert. denied,* 116 S. Ct. 1588 (1996); *Kolb v. Goldring, Inc.,* 694 F.2d 869, 871-72 (1st Cir. 1982) ("… [I]n its 'essential nature' an ADEA action *is identical to a common law suit for back wages for breach of contract.* … Thus cases like this one call for a simple tabulation of 'items of pecuniary or economic loss such as wages, fringe, and other job-related benefits.'").

[17] *See Massey v. Whittaker Corp., Winters Indus. Div.*, 661 F. Supp. 1151, 1153 (N.D. Ohio 1987) ("The plaintiff has requested a remedy in the form of backpay on the breach of contract issue. Back pay is a legal remedy because it will compensate the plaintiff for the wages he would have earned if the defendant had not breached the employment agreement and terminated the plaintiff's employment. Although back pay is an equitable remedy for the purposes of Title VII of the Civil Rights Act of 1964, the characterization of back pay as an equitable remedy is based on the specific statutory language in Title VII. *See Curtis v. Loether,* 415 U.S. 189, 196-97, 94 S. Ct. 1005, 1009-10, 39 L.Ed.2d 260 (1974). In the absence of such specific statutory language, back pay that forms part of an award for compensatory damages in a § 301 [breach of collective bargaining agreement] action is more properly classified as legal relief and not as equitable relief.").

[18] *See Arthur J. Gallagher & Co. v. Dieterich,* 270 S.W.3d 695, 698 (Tex. App.—Dallas 2008, no pet.) ("The Company appeals the trial court's judgment following a jury trial in which the jury found that the Company breached its contract with [its employee] and *awarded him back pay*, vacation pay, automobile reimbursement, interest, attorney fees, and costs. We affirm."); *see also Carnation Co. v. Borner*, 610 S.W.2d 450, 453 (Tex. 1980) ("The remedies provided by the collective bargaining agreement and Article 8307c differ in that under the agreement [employee] *is limited to*

*back pay* is only a remedy for certain [unnamed] statutory violations and never a remedy for breach of contract. Nor is undersigned aware of any such cases.

## D.    Twin City's interpretation would eviscerate oral agreement coverage.

Under Twin City's proposed interpretation of *back pay*, a covered breach of an oral agreement would cover nothing. The policy would not cover *salaries, wages, or bonuses*. Because, under Twin City's theory, *back pay awards* are — by some unwritten definition — only for statutory employment claims. *See* Appellant's Brief, ECF pp. 34-40. Never breach of oral employment agreements. The policy already excludes employee *benefits* that are not salaries, wages, or bonuses. ROA.3678 (excluding loss "for Benefits, provided that this exclusion shall not apply to any Employment Practices Claim for wrongful termination, dismissal or discharge of employment"); ROA.3674 (defining "benefits" as "any form of compensation other than salaries, wages, bonuses, or Stock Benefits"); ROA.3676 (excluding stock benefits from covered loss). So, the expressly promised indemnity for breach of an oral employment agreement would be empty.

Moreover, Twin City knew how to use discrimination or wrongful termination

---

*reinstatement and back pay* while under Article 8307c [employee] can also recover his 'reasonable damages.'").

claims as limiting language. It did so with another exclusion. ROA.3678 (excluding loss for any claim "for Benefits, provided that this exclusion shall not apply to any Employment Practices Claim for wrongful termination, dismissal or discharge of employment"). It did *not* do so with respect to the undefined phrase *back pay*. And Texas law governing interpretation of policies, referenced above, forbids writing-in any of this now.

### E.    The exclusion and exception have meaning—they are not coterminous.

Carpenter provides the trial court hypotheticals showing that the exception for *salaries, wages, and bonuses*, still has meaning when not part of a *back pay award* — *i.e.*, the two phrases are not coterminous. *See* ROA.3578-81 (Carpenter summary judgment brief). This context also shows his interpretation of the exclusion and its exception are reasonable. The trial court found it unnecessary to address the hypotheticals. Clearly, because Carpenter's interpretation was already reasonable. And that ends the matter. Still, Twin City seeks to distinguish these hypotheticals. The distinctions are incorrect.

### 1.    example: wages for new consent decree training are excluded.

The policy defines *employment practices claim* to include formal administrative and regulatory proceedings. Imagine Jill files a charge of discrimination for race-based

pay discrimination with the Equal Employment Opportunity Commission. The EEOC finds cause to believe a pattern or practice of discrimination has occurred. The case settles for (1) $8.4 million in back pay for all affected employees and (2) a consent decree mandating significant nationwide training, monitoring, and reporting intended to stop the discrimination. The employer must hire numerous trainers and additional personnel to meet its consent decree obligations. ✔The policy covers the back pay subject to relevant limits. The policy excludes salaries, wages, and bonuses for new hires needed to meet consent decree obligations, because those salaries, wages, and bonuses are not a component of back pay or front pay.

Twin City says they are not covered because the training itself is non-monetary relief excluded from the definition of covered loss. *See* Appellant's Brief, ECF pp. 42-43. This misses the point: Any *salaries, wages, or bonuses* to provide new training—whether monetary or non-monetary relief—cannot be a *back pay award*. Because they just do not meet the definition of *back pay*. This shows *salaries, wages, or bonuses* are not coterminous with a *back pay award*.

### 2.    example: salary paid another to help mitigation is excluded.

A wrongfully terminated employee usually has a duty to mitigate damages. He usually must use reasonable diligence to find substantially equivalent work. Imagine

Jack is a company executive and is wrongfully terminated. He has trouble finding substantially equivalent work and accepts a much lower paying job. He is now too busy to continue to search for substantially equivalent work. So, he hires Mitt at an annual salary of $125,000 to work full-time to help him find substantially equivalent work. A wrongful termination lawsuit is filed. A jury finds (1) $500,000 in back pay for what Jack would have earned in the past if the employer had not unlawfully terminated him and (2) $125,000 for the salary paid to Mitt to help mitigate damages.

✓The policy covers the back pay subject to relevant limits. The policy excludes the salary paid to Mitt to help mitigate damages, because that salary is not a component of back pay or front pay.

Without citation, Twin City says the payment to Mitt would be covered. Because they are damages resulting from a claim—and so, are a covered loss. *See* Appellant's Brief, ECF p. 43. Twin City just ignores the exclusion altogether. As before, *salaries, wages, or bonuses* are not coterminous with a *back pay award*. Because the payment to Mitt might be *salaries, wages, or bonuses* but are not *back pay*.

### 3.    example: paying temporary workers to meet legal duties is excluded.

The policy defines employment practices claim to include a demand letter. Imagine Julia is an Apache helicopter pilot in the U.S. National Guard. She receives

orders for 60 days of active duty to assist in search and rescue efforts after a disaster. Her private-sector employer says it cannot do without her and has to let her go. It receives a demand letter that explains the Uniformed Services Employment and Reemployment Rights Act. The case settles. Among other settlement terms, the employer agrees to restore Julia to her position upon return from active duty. But the employer must hire a temporary worker to temporarily fill her position in order to have her position available upon return. ✔The policy excludes wages that will be paid to the temporary worker, because those wages are not a component of back pay or front pay.

Twin City again says Julia is only seeking reinstatement and that is non-monetary relief which is not a loss. Again, this misses the point: Payment of *salaries, wages, or bonuses* to new temporary employees is not already owed but unpaid compensation. So, they cannot be *back pay*. As before, this shows *salaries, wages, or bonuses* are not coterminous with a *back pay award*.

### 4.    example: paying interpreters as disability accommodations is excluded.

Imagine Josh is on active military duty and suffers total hearing loss due to an explosion. He starts work years later with a company that provides interpreters to diplomats and military forces. He requests a sign language interpreter for meetings.

The employer says it cannot afford to take an interpreter out of service at lost revenue of about $700 per hour. It says he should find an outside interpreter and offers a small stipend to help offset costs. He files a charge of discrimination with the EEOC for failure to provide a reasonable accommodation to an otherwise qualified individual with a disability. The case settles. Among other settlement terms, the employer hires an outside sign language interpreter at an annual salary of $50,000 to provide services for Josh and other employees with severe hearing impairments. ✔The policy excludes the interpreter salary, because it is not a component of back pay or front pay.

Twin City again says this accommodation is non-monetary relief which is not a loss. Again, this misses the point: Any *salaries, wages, or bonuses* to provide interpreters — whether monetary or non-monetary relief — cannot be a *back pay award*. This again shows *salaries, wages, or bonuses* are not coterminous with a *back pay award*.

### 5.    example: some wages paid are not back pay and so, excluded.

Imagine Jane is an executive assistant for a construction company. She openly opposes the president's sexual harassment of young women who work at the company. The president reacts with a campaign of retaliation against her, including vandalism of her home and thinly veiled physical threats. So she hires Bob as a full-time,

live-in bodyguard at an annual salary of $35,000. The company ignores her requests

that the retaliation stop. Her working conditions become so intolerable that she feels

compelled to resign. A retaliation lawsuit is filed. A jury finds constructive discharge

and awards (1) $237,000 in back pay for what Jane would have earned in the past if

the employer had not constructively discharged her and (2) $35,000 for the salary

paid to Bob the bodyguard. ✔The policy covers the back pay subject to relevant lim-

its. The policy excludes the salary paid to Bob the bodyguard, because it is not a

component of a back pay or front pay award.

Without citation, Twin City again says the payment to the bodyguard may also be

covered. Because they are damages resulting from a claim — and so, are a covered

loss. *See* Appellant's Brief, ECF p. 43. Twin City again just ignores the exclusion

altogether. The point, as before, shows *salaries, wages, or bonuses* are not coterminous

with a *back pay award*.

### 6.    conclusion: these examples show meaning in the exclusion and exception.

All these examples show the exclusion for *salaries, wages, or bonuses* has meaning

separate and apart from when those same things become a component of a *front or

back pay award*. That interpretation is reasonable because it gives meaning to the dif-

ference between *salaries, wages, or bonuses* in the exclusion — and those within the

exception. So, one phrase does not wholly swallow the other. The exclusion and its exception are not coterminous. They have separate boundaries.

**F.    The jury finds owed but unpaid compensation.**

Again, the jury finds the defendant-insureds breached the pay-to-stay agreement:



ROA.3915 (failure to comply), 3913-14 (pay-to-stay agreement finding). And the jury finds owed compensation as a result of that breach. ROA.3917.

The state trial court awarded the amount the jury found for failing to pay Carpenter owed but unpaid compensation — owed for staying as long as needed to help with the asset sale. *See* ROA.3611. The appellate court affirmed. *See* ROA.3945-49 (Dallas Court of Appeals opinion). So, it is a *back pay award* under the policy.

### G.     Twin City arguments would eviscerate oral agreement coverage.

> This court is bound to read all parts of a contract together to ascertain the agreement of the parties. Moreover, each part of the contract should be given effect.
>
> — Justice John Cornyn,
> *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133–34 (Tex. 1994)

Twin City sold a policy that expressly covers breach of oral agreements. ROA.3675 at § II(D)(6). Twin City does not contend or argue that Texas law prohibits the insurance coverage it sold — coverage for breaching oral agreements. *See generally* Appellant's Brief. So, there is no moral hazard to address. The mere existence of the possibility that moral hazard may exist somewhere in the ether has no bearing on interpretation or application of the exclusions at issue here.

Treating as a moral hazard express coverage for breach of an oral agreement would eviscerate that express coverage. Twin City knew what it was doing. It excluded from indemnity, but not the duty to defend, failure to comply with *written* agreements. ROA.3678 at § III(C)(4). It excluded overtime and all Fair Labor Standards Act claims other than retaliation. ROA.3678 at § III(B)(4). But it expressly covered breach of an oral agreement[19] and did not exclude oral agreement claims under

---

[19] ROA.3675 at § II(D)(6).

either (1) exclusions from both defense and indemnity or (2) exclusions from indemnity but not defense. ROA.3677-78 (policy sections III(A)-(B) identify claims excluded from defense and indemnity; policy section III(C) identifies claims excluded from indemnity but not defense).

## H.  The *back pay award* exception to the exclusion fits.

In sum, as the district court correctly rules: (1) Carpenter's interpretation that back pay just means owed but unpaid compensation is a reasonable one; (2) that alone suffices; (3) the phrase does not vary its meaning depending on which legal violation it remedies; (4) courts, including Texas courts, have expressly ruled it is a remedy for breach of contract; and (5) context also supports the trial court's ruling.

## V.  The district court correctly applies interest.

The applicable post-judgment interest statute requires post-judgment interest on the final judgment. "Interest shall be allowed on any money judgment in a civil case recovered in a district court." 28 U.S.C. § 1961(a).

Twin City stipulated to the damages that any *Stowers* violation would proximately cause:

> potential exposure to an excess judgment;" and (4) assuming coverage *arguendo*, the *Stowers* violation proximately caused the damages reflected in the attached Final Judgment but reduced as appropriate for the bond that was posted and paid in the Prior Case.

ROA.3603; *see also* ROA.3600-17 (complete stipulation including attachments).

So, the damages reflected in the state-court final judgment are the "money judgment" on which post-judgment interest runs under 28 U.S.C. § 1961(a). And those damages — the "money judgment" — include state-law interest. ROA.3611.

Section 1961 makes post-judgment interest mandatory on those damages. Even if those damages include some interest.

This is the issue faced in *OneBeacon Ins. Co. v. T. Wade Welch & Assocs.*, Civ. A. No. H-11-3061, 2015 WL 926515 (S.D. Tex. Mar. 4, 2015), also a *Stowers* case. The court determines that the federal post-judgment interest statute *requires* post-judgment interest on the entire underlying state-court judgment. *See id.* at *4. This specifically includes the still-accruing state post-judgment interest reflected in that underlying state-court judgment:

> Additionally, since [28 U.S.C.] § 1961 *requires* the court to award statutory post-judgment interest on the damages, the final award will include statutory post-judgment interest on the entire award, *including the [state court post-judgment interest of] $1720.70 per day*.

*Id.* at *4.[20] Such interest is both appropriate and mandatory under Section 1961—just as it was in *OneBeacon*.

The district court provided reasoned analysis and authority on the interest issue. ROA.5523-26. In contrast, Twin City cites no authority for its contention that the district court misapplied the interest statute or other precedent. *See* Appellant's Brief, ECF pp. 59-61.

## VI.    Carpenter objects to certain kinds of statements, labeling, and spin.

Carpenter objects to statements, labeling, and spin that (1) lack citations to the record, (2) are unsupported by the record, or (3) are not accurate. Here are examples.

Twin City often omits important terms when describing policy exclusions. For example, it claims in issue 1 that an unpaid bonus is not covered because the policy excludes "salaries, wages, and bonuses."[21] But it omits important language in that exclusion: "except as a component of a front or back pay award."[22]

---

[20] This Court affirmed *OneBeacon*, though without anyone specifically raising any post-judgment interest issue. *See OneBeacon Ins. Co. v. T. Wade Welch & Assocs.*, 841 F.3d 669, 672 (5th Cir. 2016).

[21] Appellant's Brief, ECF p. 12 (issue 1).

[22] ROA.3676 at § II(I)(5) (policy definition of loss including loss exclusions).

Twin City also repeatedly describes an exclusion as an exclusion of "severance payments."[23] But it omits important qualifying language: *employment termination* severance payments.[24] Again, the agreement here was to stay, not to leave. It was binding even if Carpenter had kept his job after the asset sale. And it was not payable on termination under the payment formula.

Twin City describes the prior lawsuit as one "for breach of an oral agreement to pay him bonus compensation upon the sale of the [companies'] assets and the resulting severance of his employment."[25] It similarly describes the suit as one for "unpaid severance bonus."[26] Those and similar statements are not accurate. The pleaded claim for stay compensation never mentions severance or any payment triggered due to termination of employment.[27] The pleaded claim speaks of staying to help effectuate a potential asset sale and a promised sales proceeds payment as the incentive

---

[23] *See, e.g.,* Appellant's Brief, ECF pp. 12 (issue 2), 13 (introduction).

[24] ROA.3678 at § III(C)(1) (indemnity exclusions for which only defense costs will be paid).

[25] *See, e.g.,* Appellant's Brief, ECF pp. 13-14.

[26] *See, e.g.,* Appellant's Brief, ECF p. 18.

[27] *See* ROA.3725-31 at highlighted text (background) & ROA.3735-38 at highlighted text (second claim for relief — oral agreement) & ROA.3736 (describing need for Carpenter to "stay on and help make the asset sale happen" and "stay on as long as needed to help make the asset sale happen"). *See also* ROA.5142, 5144 ¶ 8 (declaration showing that second amended petition just cited was operative petition at time of *Stowers* offer).

to do that.[28] The jury found that the agreement was to pay certain compensation if Carpenter would "stay as long as needed on to help make the asset sale happen."[29] Not through termination, not through the end of his employment, not even through the asset sale, but just as long as needed to help make the asset sale happen.

Twin City says it "reserved its right to deny indemnity coverage since the policy does not provide coverage ... for any claim for severance payments."[30] That statement is not accurate. The reservation of rights letter does not mention severance or the *employment termination severance payment* exclusion.[31] Twin City raised the exclusion for the first time during this *Stowers* litigation. This is one reason its attacks on counsel — about trying the underlying case to evade this exclusion — makes no sense. Twin City never raised that exclusion during the prior lawsuit.

Per Twin City, the insureds never disputed lack of policy coverage based on the same exclusion.[32] That claim is not accurate. Twin City knows that (1) counsel for

---

[28] *See, e.g.*, ROA.3736 (describing need for Carpenter to "stay on and help make the asset sale happen" and "stay on as long as needed to help make the asset sale happen").

[29] ROA.3913-14.

[30] Appellant's Brief, ECF p. 14.

[31] *See* ROA.5303-08 (reservation of rights letter does not mention severance).

[32] *See* Appellant's Brief, ECF p. 26.

defendant-insureds requested that it accept the *Stowers* offer[33] — so indicating a belief in coverage, (2) its insureds pursued policy coverage through coverage counsel Blake Evans, and (3) it raised the severance exclusion for the first time in this lawsuit — *after* claims against Twin City were turned over to Carpenter.[34]

## CONCLUSION

Carpenter respectfully requests that the Court affirm the district court's correct grant of summary judgment in his favor.

---

[33] ROA.3645 ¶ 34 (second amended answer).

[34] *See* ROA.5303-08 (reservation of rights letter does not mention severance).

Respectfully submitted,

*s/ Amy Gibson*

_____
Amy E. Gibson
Texas Bar No. 00793801
amy@gwfirm.com

David L. Wiley
Texas Bar No. 24029901
david@gwfirm.com

Gibson Wiley PLLC
1500 Jackson Street #109
Dallas, Texas 75201-4923
T: (214) 522-2121
F: (214) 522-2126

*Counsel for Plaintiff-Appellee*

## CERTIFICATE OF SERVICE

I certify that, on December 17, 2025, I filed the foregoing document with the Fifth Circuit Court of Appeals, through the CM/ECF Document Filing System, such that the foregoing document should be served on all parties through their counsel of record, who are registered CM/ECF users, as follows:

**Via CM/ECF**

Mr. Steven J. Knight
Ms. Amy J. Foreman
CHAMBERLAIN, HRDLICKA, WHITE, WILLIAMS & AUGHTRY, P.C.
1200 Smith Street, Suite 1400
Houston, Texas 77002

*Counsel for Defendant-Appellant*

*s/ Amy Gibson*

_____

Amy E. Gibson

**CERTIFICATE OF COMPLIANCE**

With Type-Volume Limitation, Typeface Requirements,
and Type Style Requirements

I certify that:

1.  This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B). This brief contains 10,018 words, *including* portions exempted under Federal Rule of Appellate Procedure 32(f) and Fifth Circuit Rule 32.1. I relied on the word count function in Microsoft Word for Mac 2025 version 16.103.4.

2.  This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and Fifth Circuit Rule 32.1 and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6). This brief was prepared in a proportionally spaced typeface using Microsoft Word for Mac 2025 version 16.103.4 in 14-point Equity A typeface for the body and in 12-point Equity A typeface for footnotes. The cover page and headings include font size larger than 14-point. The cover page includes one instance of Old English Text MT for the name of this Court.

*s/ Amy Gibson*

——————————————————
Amy E. Gibson