Case No. 25-10679

_____

# In the United States Court of Appeals For the Fifth Circuit

_____

JEFFREY W. CARPENTER,

*Plaintiff–Appellee,*

v.

TWIN CITY FIRE INSURANCE COMPANY,

*Defendant–Appellant.*

_____

On Appeal from the United States District Court
for the Northern District of Texas (No. 3:23-CV-769)

_____

## APPELLANT'S REPLY BRIEF

_____

MAYER BROWN LLP

ROBERT S. HARRELL
Texas State Bar No. 09041350
rharrell@mayerbrown.com
700 Louisiana Street, Suite 3400
Houston, Texas, 77002
(713) 238-2700

CHAMBERLAIN, HRDLICKA, WHITE,
WILLIAMS & AUGHTRY, P.C.

STEVEN J. KNIGHT
Texas Bar No. 24012975
steven.knight@chamberlainlaw.com
1200 Smith Street, Suite 1400
Houston, Texas 77002
(713) 658-1818

*Counsel for Defendant–Appellant*

ORAL ARGUMENT REQUESTED

Case No. 25-10679

_____

# In the United States Court of Appeals
# For the Fifth Circuit

_____

JEFFREY W. CARPENTER,

*Plaintiff–Appellee*,

v.

TWIN CITY FIRE INSURANCE COMPANY,

*Defendant–Appellant.*

_____

On Appeal from the United States District Court
for the Northern District of Texas (No. 3:23-CV-769)

_____

## CERTIFICATE OF INTERESTED PERSONS

_____

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case.

**Plaintiff–Appellee:**

Jeffrey W. Carpenter

**Defendant–Appellant:**

Twin City Fire Insurance Company

**Counsel for Plaintiff–Appellee:**

> AMY GIBSON (*trial & appeal*)
> DAVID L. WILEY (*trial & appeal*)
> GIBSON WILEY PLLC
> 1500 Jackson Street
> Dallas, Texas 75292

**Counsel for Defendant–Appellant:**

> STEVEN J. KNIGHT (*trial & appeal*)
> CHRISTINE KIRCHNER (*trial*)
> CHAMBERLAIN, HRDLICKA, WHITE,
> WILLIAMS & AUGHTRY, P.C.
> 1200 Smith Street, Suite 1400
> Houston, Texas 77002

> ROBERT S. HARRELL (*appeal*)
> MAYER BROWN LLP
> 700 Louisiana Street, Suite 3400
> Houston, Texas, 77002

> MICHAEL W. JOHNSTON (*trial*)
> JOHNSTON LEGAL GROUP, P.C.
> 4200 Airport Freeway
> Fort Worth, Texas 76117

> _/s/ Steven J. Knight_
> STEVEN J. KNIGHT
> *Attorney of Record for Defendant-Appellant*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ......................................................... i

TABLE OF CONTENTS ................................................................................... iii

TABLE OF AUTHORITIES ............................................................................... iv

INTRODUCTION ............................................................................................1

ARGUMENTS IN REPLY ................................................................................1

    A.    Carpenter's claim is not within the scope of coverage. ......................2

        1.    Twin City's interpretation of the Policy's definition of "Loss" comports with Texas law governing contract construction because it gives effect to all parts of the definition ..................................................................................2

        2.    Carpenter's interpretation of "Loss" is not reasonable and violates Texas law governing contract construction..................4

            a.    Courts do not construe words and phrases in isolation. ...6

            b.    Courts do not entertain speculative hypotheticals. .........10

        3.    *Contra proferentem* does not apply here. .................................12

        4.    Twin City's construction would not "eviscerate" coverage. ....15

    B.    Carpenter's claim is excluded from coverage. ...................................18

        1.    The reference to "stay" in the jury charge is not dispositive. ...18

        2.    The "more formal severance plan" undermines Carpenter's position. ..............................................................................21

        3.    Carpenter's claim bears all the hallmarks of an employment termination severance payment..................................................22

        4.    The severance payment was triggered by the termination of Carpenter's employment, which resulted from the asset sale...........................................................................................22

CONCLUSION ...........................................................................................23

CERTIFICATE OF SERVICE ........................................................................24

CERTIFICATE OF COMPLIANCE .................................................................25

L.D. Simmons, II & Lowndes C. Quinlan
*New Appleman on Insurance Law § 28.02* ......................................App. A

# TABLE OF AUTHORITIES

**Cases**                                                                                               **Page(s)**

*Ace Am. Ins. Co. v. Freeport Welding & Fabricating, Inc.*,
   699 F.3d 832 (5th Cir. 2012) ........................................................................10, 19

*Am. Mfrs. Mut. Ins. Co. v. Schaefer*,
   124 S.W.3d 154 (Tex. 2003) .......................................................................2, 3, 12

*American Home Assurance Co. v. CAT Tech LLC*,
   660 F.3d 216 (5th Cir. 2011) ..............................................................................14

*Arthur J. Gallagher & Co. v. Dieterich*,
   270 S.W.3d 695 (Tex. App.—Dallas 2008, no pet.) ...........................................5

*Barnett v. Aetna Life Ins. Co.*,
   723 S.W.2d 663 (Tex. 1997) ...............................................................................13

*Bell Helicopter Textron, Inc. v. Burnett*,
   552 S.W.3d 901 (Tex. App.—Fort Worth 2018, pet. denied) .............................7

*Carnation Co. v. Borner*,
   610 S.W.2d 450 (Tex. 1981) .................................................................................5

*Carter v. Shop Rite Foods, Inc.*,
   470 F. Supp. 1150 (N.D. Tex. 1979) ...................................................................8

*D.R. Horton-Tex., Ltd. v. Markel Intern. Ins. Co., Ltd.*,
   300 S.W.3d 740 (Tex. 2009) .............................................................................20

*E.E.O.C. v. Joint Apprenticeship Comm. Of Joint Indus. Bd. of Elec.
   Indus.*,
   164 F.3d 89 (2d Cir. 1998) ..................................................................................8

*Evergreen Indem. Co. v. Tan It All, Inc.*,
   111 S.W.3d 669 (Tex. App.—Austin 2003, no pet.).........................................14

*Fiess v. State Farm Lloyds*,
   202 S.W.3d 744 (Tex. 2006) .........................................................................6, 13

*Forbau v. Aetna Life Ins. Co.*,
   876 S.W.2d 132 (Tex. 1994) ................................................................................6

*Frymire v. Ampex Corp.*,
  61 F.3d 757 (10th Cir. 1995) ...............................................................5

*Gilbane Bldg. Co. v. Admiral Ins. Co.*,
  664 F.3d 589 (5th Cir. 2011) ..............................................................10

*Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*,
  327 S.W.3d 118 (Tex. 2010) .................................................................2

*Gilyard v. Bank of America Corp.*,
  No. 3:09-cv-944-J-20TEM, 2011 WL 13295442 (M.D. Fla. April
  14, 2025) ...............................................................................................8

*Gustafson v. Alloyd Co.*,
  513 U.S. 545 (1995)...............................................................................6

*Hankins v. DataPlex*,
  77 F.3d 477 (5th Cir. 1995) ..................................................................8

*Hartrick v. Great Am. Lloyds Ins. Co.*,
  62 S.W.3d 270 (Tex. App.—Houston [1st Dist.] 2001, no pet.)..........3

*Horton v. Lawrence Cnty. Bd. of Educ.*,
  449 F.2d 793 (5th Cir. 1971) ................................................................3

*Ideal Lease Serv., Inc. v. Amoco Prod. Co.*,
  662 S.W.2d 951 (Tex. 1983) ...............................................................20

*Ironshore Specialty Ins. Co. v. Aspen Underwriting Ltd.*,
  40 F. Supp. 3d 807 (W.D. Tex. 2014), *aff'd*, 788 F.3d 456 (5th Cir.
  2015) ....................................................................................................14

*Jackson v. Host Int'l, Inc.*,
  426 F. App'x 215 (5th Cir. 2011) ..........................................................8

*Kolb v. Goldring, Inc.*,
  694 F.2d 869 (1st Cir. 1982)..................................................................5

*Krueger Int'l Inc. v. Royal Indem. Co.*,
  481 F.3d 993 (7th Cir. 2007) ...............................................15, 16, 19

*Lubbock Cnty. Hosp. Dist. v. National Union Fire Ins. Co.*,
  143 F.3d 239 (5th Cir. 1998) ..............................................................13

*Massey v. Whittaker Corp., Winters Industry Division*,
  661 F. Supp. 1151 (N.D. Ohio 1987) ...................................................5

*In re Millwork*,
  631 S.W.3d 706 (Tex. 2021) ...............................................................6

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pennsylvania v. McMurray*,
  342 F. App'x. 956 (5th Cir. 2009).....................................................23

*Pettway v. ACIPCO*,
  494 F.2d 211 (5th Cir. 1978) ..............................................................8

*Pointe Dallas, LLC v. Underwriters at Lloyd's London*,
  No. 22-11213, 2024 WL 125683 (5th Cir. Jan. 11, 2024) .................11

*Puckett v. U.S. Fire Ins. Co.*,
  678 S.W.2d 936 (Tex. 1984) .............................................................13

*Ramsay v. Md. Am. Gen. Ins. Co.*,
  533 S.W.2d 344 (Tex. 1976) .............................................................13

*Reneau v. Wayne Griffin & Sons, Inc.*,
  945 F.2d 869 (5th Cir. 1991) ..............................................................7

*State Farm Life Ins. Co. v. Beaston*,
  907 S.W.2d 430 (Tex. 1995) ...............................................................6

*Swicegood v. Med. Protective Co.*,
  No. 3:95-CV-0335-D, 2003 WL 22234928 (N.D. Tex. Sept. 19,
  2003) ............................................................................................20, 21

*Tardif v. People for the Ethical Treatment of Animals*,
  No. 2:09-CV-537-FTM-29, 2011 WL 6005280 (M.D. Fla. Dec. 1,
  2011) ....................................................................................................7

*Towers Watson & Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*,
  67 F.4th 648 (4th Cir. 2023)...............................................................13

*Transitional Learning Cmty. at Galveston, Inc. v. U.S. Off. of Pers.
  Mgmt.*,
  220 F.3d 427 (5th Cir. 2000) .............................................................11

*Tyler v. Union Oil Co. of California,*
    304 F.3d 379 (5th Cir. 2002) ...............................................................7

*United States Fid. & Guar. Co. v. Goudeau,*
    272 S.W.3d 603 (Tex. 2008) ..............................................................6

*United States v. Gonzalez,*
    792 F.3d 534 (5th Cir. 2015) ..............................................................8

**Other Authorities**

*Component*, Merriam-Webster, https://www.merriam-
    webster.com/dictionary/component (last visited Jan. 5, 2025) ...........8

Elizabeth Lang-Miers, *Tex. Prac. Guide Employment Practices* § 9:51
    (2025)...................................................................................................3

*Frontpay*, BLACK'S LAW DICTIONARY (12th ed. 2024) ...........................7

https://www.lb5.uscourts.gov/juryinstructions/Fifth/2020civil.pdf .........4

*Ingredient*, Merriam-Webster, https://www.merriam-
    webster.com/dictionary/ingredient (last visited Jan. 5, 2025)............8

**INTRODUCTION**

Time-honored rules of insurance policy interpretation establish that Carpenter's judgment for the unpaid severance bonus is not "a component of a front or back pay award" as contemplated by the Policy's definition of "Loss," and, further, that the severance payment exclusion excludes his claim from coverage. The trial court's decision to the contrary fails to give effect to the Policy's language when construed as a whole and would dramatically expand coverage under an employment practices liability insurance ("EPLI") policy to encompass the insured's basic payroll obligations—the very result the Policy was drafted to preclude. Likewise, Carpenter's interpretation violates multiple contract construction principles under Texas law, producing a fundamentally *un*reasonable interpretation. Therefore, contrary to Carpenter's contention that the Policy must be construed in his favor (*i.e.*, *contra proferentem*), that principle does not apply here. The Court should give effect to the Policy's only reasonable interpretation—the one advanced by Twin City—and reverse and render. Carpenter's remedy is against his former employer, which walked away from the sale with $36 million, not Twin City.

**ARGUMENTS IN REPLY**

Carpenter incorrectly claims "Twin City does not dispute core coverage – *i.e.*, basic policy coverage before reaching exclusions." Appellee's Br. at 16. Presumably, Carpenter takes this position to circumvent Texas law that the *insured*

1

has the burden to establish his claim falls within the policy's grant of coverage. *See* Appellant's Br. at 22 n.8; *see also Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 124 (Tex. 2010) ("Initially, the insured has the burden of establishing coverage."). Here, the limitation as to what constitutes covered "Loss" is not an exclusion. It is part of the Policy's grant of coverage. ROA.25-10679.5221-22.

The only *exclusion* on which Twin City relies is the severance payment exclusion. But Carpenter has the initial burden to establish his claim satisfies the Policy's definition of "Loss" before that exclusion is ever reached. This, he cannot do. And, contrary to Carpenter's repeated claim, Twin City never conceded that he met his burden. *See* Appellant's Br. at 22-38; *see also* ROA.25-10679.5182 (Twin City disputing Carpenter can satisfy the Policy's definition of "Loss").

## A.     Carpenter's claim is not within the scope of coverage.[1]

> 1.     *Twin City's interpretation of the Policy's definition of "Loss" comports with Texas law governing contract construction because it gives effect to all parts of the definition.*

Under Texas law, courts "interpret insurance policies . . . according to the rules of contract construction." *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003). "When construing the policy's language, [courts] must give effect

---

[1]     Notably, Carpenter addresses the "Loss" definition and the severance pay exclusion out of order. Twin City addresses them in the proper order, consistent with the order in which it addressed them in its Opening Brief.

to all contractual provisions so that none will be rendered meaningless." *Id*. Further, courts "construe the terms of the policy as a whole, and consider all of its terms, not in isolation, *but within the context of the policy*." *Hartrick v. Great Am. Lloyds Ins. Co.*, 62 S.W.3d 270, 274 (Tex. App.—Houston [1st Dist.] 2001, no pet.) (emphasis added).

As explained in Twin City's Opening Brief, the EPLI policy's insuring grant only covers "Loss," as the Policy defines that word. The definition makes it clear that "Loss shall not include . . . salaries, wages, or bonuses, except as a component of a front or back pay award." ROA.25-10679.5223. "Front or back pay award" in the context of an EPLI policy means the equitable remedy available in employment cases to make the victim of employment discrimination, harassment, and wrongful termination whole, enabling the victim to recover what would have been paid or become due but for the employer's unlawful conduct. *See* Appellant's Br. at 22-27.

An award of front or back pay includes claims for "lost wages and benefits that accrue from the date of a wrongful termination through trial." Elizabeth Lang-Miers, *Tex. Prac. Guide Employment Practices* § 9:51 (2025); *see also Horton v. Lawrence Cnty. Bd. of Educ.*, 449 F.2d 793, 795 (5th Cir. 1971) ("Back pay is normally an integral part of the equitable remedy of reinstatement used by the federal courts to restore aggrieved litigants to the positions they should have occupied had it not been for the unlawful deprivation of their constitutional rights."); *Pattern Jury*

*Instructions* (*Civil Cases*), United States Ct. Appeals Libr. For the Fifth Cir. (June 2020) (mentioning "back pay" seventeen times—each time in the context of discrimination/wrongful termination claims).[2]

Here, Twin City would only be obligated to indemnify Carpenter if he established that his recovery was a component of a front or back pay award, thus satisfying the Policy's definition of "Loss." But it was not, and he did not. Carpenter—who did not sue his former employer for employment discrimination, harassment, wrongful termination, or anything of the sort—did not recover a front or back pay award. He recovered contract damages for the company's breach of its agreement to pay him a severance bonus after it sold its assets and severed his employment. Through the definition of "Loss," Twin City chose not to cover the moral hazard that would incentivize such a breach. This construction of "Loss" is the *only reasonable* construction—it gives effect to all aspects of the definition so that none will be rendered meaningless.

      2.     *Carpenter's interpretation of "Loss" is not reasonable and violates Texas law governing contract construction.*

In formulating his conflicting interpretation of "Loss," Carpenter improperly separates the phrase "back pay" from the definition's remaining terms and maintains

---

[2]     https://www.lb5.uscourts.gov/juryinstructions/Fifth/2020civil.pdf

that it refers to any payment that has become due.[3] *See* Appellee's Br. at 36-37. He then props up various hypothetical situations he claims support his construction without rendering the "Loss" definition meaningless. However, Carpenter's construction violates fundamental rules of contract construction and produces an unreasonable interpretation. Moreover, it finds no support in the out-of-state cases he relegates to a footnote. *See* Appellee's Br. at 38 n.16.[4] Nor are the Texas cases he cites, also in footnotes, on point. *See* Appellee's Br. at 38 n. 17 & 18.[5] And because the Policy is susceptible to only one reasonable interpretation, the *contra proferentem* thumb-on-the-scale Carpenter attempts to invoke does not work to his

---

[3]    Carpenter further points to the jury's answer to Question 7, the damages question, and argues that the jury found "in other words, back pay." Appellee's Br. at 20-21. However, nothing in the jury charge, verdict, final judgment, or the court of appeals' opinion describes his recovery as a front or back pay award or a component of a front or back pay award.

[4]    In *Frymire v. Ampex Corp.*, 61 F.3d 757, 764 (10th Cir. 1995), the court addressed whether the employees' wrongful layoff claim was time-barred and applied a contract limitation period to "further the presumptively important goal of uniformity." In *Kolb v. Goldring, Inc.*, 694 F.2d 869, 871-72 (1st Cir. 1982), the court analogized the employee's age discrimination suit to a contract claim for the limited purposes of assessing the sufficiency of the evidence. In *Massey v. Whittaker Corp., Winters Industry Division,* 661 F. Supp. 1151, 1153 (N.D. Ohio 1987), the court analogized the employee's wrongful discharge claim to a contract claim for purposes of deciding whether to conduct a jury trial.

[5]    In *Arthur J. Gallagher & Co. v. Dieterich*, 270 S.W.3d 695 (Tex. App.—Dallas 2008, no pet.), the court called damages for the employer's reduction in salary "back pay" solely to distinguish it from damages for vacation pay and automobile reimbursement, which were the only two elements of damages the court analyzed. Carpenter also cites in *Carnation Co. v. Borner*, 610 S.W.2d 450 (Tex. 1981), where the court stated that remedies under a collective bargaining agreement were "limited to reinstatement and back pay." *Id*. at 453. But the court neither described what "back pay" entailed nor quoted language from the agreement mentioning "back pay," since the limitation did not apply. In doing so, the court emphasized the difference between "reinstatement and back pay" under the agreement and "reasonable damages" for retaliation under the Workmen's Compensation Act. *Id*.

advantage.

a. *Courts do not construe words and phrases in isolation.*

It is a "long-established rule" that a contractual phrase must not be "isolated from its setting [or] considered apart from [] other provisions." *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 134 (Tex. 1994). Courts therefore must examine a term's "surroundings." *State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 433 (Tex. 1995).

In the same vein, in interpreting an insurance policy, courts "are governed by the traditional canon of construction *noscitur a sociis*—that a word is known by the company it keeps." *Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 751 (Tex. 2006); *see also Gustafson v. Alloyd Co.*, 513 U.S. 545, 575 (1995) (recognizing that the purpose of this canon of construction is "to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words."); *In re Millwork*, 631 S.W.3d 706, 712-13 (Tex. 2021) ("In a similar fashion, the *noscitur a sociis* canon of construction provides that words must be construed in context to comport with the surrounding text."); *United States Fid. & Guar. Co. v. Goudeau*, 272 S.W.3d 603, 606 (Tex. 2008) ("Under the traditional canon of construction *noscitur a sociis* ('a word is known by the company it keeps'), each of the words used here must be construed in context.").

Thus, the phrase "back pay" must be construed with the accompanying words

6

"front pay" and "component."[6] Importantly, the phrase "front pay," which appears alongside "back pay," has but one meaning—"Court-awarded compensation for the postjudgment effects of continuing employment discrimination. Cf. BACKPAY." *Frontpay*, BLACK'S LAW DICTIONARY (12th ed. 2024). This common understanding comports with case law addressing the remedy.

This Court has stated that "front pay is an equitable remedy[.]" *Reneau v. Wayne Griffin & Sons, Inc.*, 945 F.2d 869, 870 (5th Cir. 1991). Its purpose is to give "a wrongfully discharged plaintiff's compensation for future lost wages and benefits." *Bell Helicopter Textron, Inc. v. Burnett*, 552 S.W.3d 901, 919-20 (Tex. App.—Fort Worth 2018, pet. denied); *see also Tyler v. Union Oil Co. of California*, 304 F.3d 379, 402 (5th Cir. 2002) ("A front pay award is intended to compensate the plaintiff for wages and benefits he would have received from the defendant employer in the future if not for the discrimination."). That "back pay" appears alongside "front pay" in the definition of "Loss" demonstrates the equitable nature and ultimate purpose of a back pay award, rendering Carpenter's alternative interpretation (*i.e.*, any payment that has become due) unreasonable and out of the context of the surrounding text.

---

[6]     "Front pay, back pay and constructive termination are terms of art used in the employment context, typically involving discrimination or retaliation claims." *Tardif v. People for the Ethical Treatment of Animals*, No. 2:09-CV-537-FTM-29, 2011 WL 6005280, at *2 (M.D. Fla. Dec. 1, 2011).

Also important, the word "component," which appears alongside "front or back pay," means "a constituent part."[7] Its synonym is "ingredient," which, in turn, means "something that enters into a compound or is a component part of any combination or mixture."[8] This Court recognizes this common meaning. *See United States v. Gonzalez*, 792 F.3d 534, 537 (5th Cir. 2015) (explaining the common meaning of "component" refers to "a part or element of a larger whole.").

Front and back pay awards, as the definition of "Loss" makes clear, have several component parts. *See Pettway v. ACIPCO*, 494 F.2d 211, 263 (5th Cir. 1978) ("[T]he *ingredients* of back pay should include more than straight salary. Interest, overtime, shift differentials, and fringe benefits such as vacation and sick pay are among the items which should be included in back pay." (emphasis added)).[9] Thus, if a front or back pay award included salaries, wages, and bonuses among the

---

[7]    *Component*, Merriam-Webster, https://www.merriam-webster.com/dictionary/component (last visited Jan. 5, 2025).

[8]    *Ingredient*, Merriam-Webster, https://www.merriam-webster.com/dictionary/ingredient (last visited Jan. 5, 2025).

[9]    *See also Carter v. Shop Rite Foods, Inc*., 470 F. Supp. 1150, 1169-70 (N.D. Tex. 1979) (back pay awards should include such things as bonusses, interest, and taxes, which is not an exhaustive list); *E.E.O.C. v. Joint Apprenticeship Comm. Of Joint Indus. Bd. of Elec. Indus.*, 164 F.3d 89, 102 (2d Cir. 1998) (back pay awards typically "include any anticipated raises, step increases, cost of living increases, and other increases necessary to make the plaintiff whole."); *Gilyard v. Bank of America Corp*., No. 3:09-cv-944-J-20TEM, 2011 WL 13295442, at *2 (M.D. Fla. April 14, 2025) (plaintiff may be entitled to recover "allegedly lost bonuses as a component of back pay in the event of a finding of liability."); *Jackson v. Host Int'l, Inc*., 426 F. App'x 215, 217-223 (5th Cir. 2011) (employee recovered a back pay award that included salary and bonuses during the back pay period); *Hankins v. DataPlex*, 77 F.3d 477 (5th Cir. 1995) (affirming a back pay award that included a $50,000 bonus as a component of the back pay award).

ingredients formulating the equitable remedy, the Policy would respond as those items would be a component of a front or back pay award. But here, Carpenter's judgment for the severance bonus is not a "component" of an award. It is simply a judgment for contract damages. Nothing more.

Overall, Carpenter's conflicting interpretation of "Loss" fails to assign *any* meaning to "front pay" or "component." And it would render all claims for unpaid salaries, wages, and bonuses covered "Loss" since the money would be owed as "back pay" if it was earned by the employee and not paid by the employer. On its face, this is not a reasonable interpretation, as it renders the "salaries, wages or bonuses" carve-out from "Loss" meaningless and leads to the absurd result that any employer's failure or refusal to pay wages involves a potentially insured "Loss" under EPLI policies.  To the contrary, the Policy expressly does not insure against this risk unless the non-payment was linked to a fortuitous event—*i.e.*, a claimed wrongful employment act for which the remedy of a front or back pay award (including a salary, wage or bonus component) is available.  It cannot reasonably be read to extend to an insured's deliberate decision to breach a contractual payment obligation.[10]

---

[10]     The moral hazard this presents (discussed *infra*) also lends to the overall context, intent, and reasonable expectations of coverage under which these terms should be interpreted under an EPLI policy.

b.    *Courts do not entertain speculative hypotheticals.*

In seeking to expand the Policy's "Loss" definition beyond the ordinary, unambiguous meaning of its language, Carpenter violates yet another principal of contract construction—the maxim that courts do not "speculate as to factual scenarios that might trigger coverage or create an ambiguity." *Gilbane Bldg. Co. v. Admiral Ins. Co.*, 664 F.3d 589, 596 (5th Cir. 2011); *see also Ace Am. Ins. Co. v. Freeport Welding & Fabricating, Inc*., 699 F.3d 832, 840 (5th Cir. 2012). That is the very exercise in which Carpenter asks this Court to engage. Carpenter devises a series of fanciful hypotheticals he claims still give meaning to the definition of "Loss" in the context of claims for which a back pay award is possible. Appellee's Br. at 40-45. But Carpenter's hypotheticals—unsupported by any actual real case law examples—are unavailing.

To make his examples work, Carpenter posits excluded salary is paid or owed to somebody other than the employee claimant—various third party-type service vendors. However, the Policy responds to an "'Employment Practices Claim' . . . *by or on behalf of an Employee*." ROA.25-10679.5221 (emphasis added). Thus, other than "Defense Costs," which would be paid to or on behalf of the insured, all forms of "Loss" pertain to indemnity dollars that, if owed, must ultimately be paid to the *employee claimant.* These include, as the definition of "Loss" makes clear, "damages, settlements, judgments, and pre- and post-judgment interest," as well as

"punitive and exemplary damages, liquidated damages," associated with statutory employment claims. ROA.25-10679.5223. Reading the Policy to apply to hypothetical non-employee claims makes no sense.

Further, other aspects of the Policy address the third party "salaries" and services Carpenter imagines in his hypotheticals. Among other provisions, the Policy does not cover "non-monetary relief." ROA.25-10679.5223. Nor does it cover "future compensation . . . for any person hired . . . pursuant to a judgment, settlement, order or other resolution of an Employment Practice Claim." ROA.25-10679.5223. Additionally, the Policy does not bind Twin City to any settlement without its consent. ROA.25-10679.5214. Each of these provisions answers the question of whether Twin City would be bound to cover any judgment or settlement involving compensation the employer may have to pay to a third-party (non-claimant) because of a settlement or judgment.[11] But that is not the question this case presents.

The question here is whether Twin City has a duty to indemnify its insured for an unpaid severance bonus owed to a former employee when the judgment

---

[11]     If the Policy's definition of "Loss" was intended to cover the hypotheticals Carpenter imagines, none of these provisions would be necessary. But as the Court knows, "a contract should be interpreted as to give meaning to all of its terms—presuming that every provision was intended to accomplish some purpose, and that none are deemed superfluous." *Transitional Learning Cmty. at Galveston, Inc. v. U.S. Off. of Pers. Mgmt.*, 220 F.3d 427, 431 (5th Cir. 2000); *see also Pointe Dallas, LLC v. Underwriters at Lloyd's London*, No. 22-11213, 2024 WL 125683 at *2 (5th Cir. Jan. 11, 2024) (recognizing "the fundamental rule of contract construction . . . mandates that no policy language be rendered superfluous."). Carpenter's interpretation assigns no meaning to these provisions.

establishing its liability for that unpaid bonus clearly establishes it as a contractual obligation, not a component of an equitable front or back pay award. The Policy clearly and unambiguously provides Twin City has no such duty. Carpenter cannot create a definitional ambiguity by contorting the party entitled to the payment. Doing so misconstrues the entirety of the "Loss" definition, and it is built around speculative scenarios the Court does not entertain. The Policy, when read as a whole, forecloses Carpenter's unreasonable construction.

3.     *Contra proferentem does not apply here.*

Nevertheless, Carpenter urges the Court to adopt his unreasonable interpretation, arguing "'the maxims of contract interpretation regarding insurance policies operate squarely in favor of the insured.'" Appellee's Br. at 25 (quoting *Lubbock Cnty Hosp. Dist. v. National Union Fire Ins. Co.*, 143 F.3d 239, 242 (5th Cir. 1998)). According to him, exceptions and limitations in the Policy must be "'construed liberally in favor of the insured and strictly against the insurer.'" Appellee's Br. at 25 (quoting *Ramsay v. Md. Am. Gen. Ins. Co.*, 533 S.W.2d 344, 349 (Tex. 1976)). These concepts are inapplicable in this case because the Policy is not ambiguous. *See Am. Mfrs. Mut. Ins. Co.*, 124 S.W.3d at 157 ("An ambiguity exists only if the contract language is susceptible to two or more *reasonable* interpretations.") (emphasis added).

As explained by the Supreme Court of Texas, the doctrine Carpenter attempts

to invoke—c*ontra proferentem*—"does not apply . . . when the term in question is susceptible of only one reasonable construction." *Puckett v. U.S. Fire Ins. Co.*, 678 S.W.2d 936, 938 (Tex. 1984); *Cf. Kasler Corp.*, 906 F.2d at 198 ("Significantly, these special rules favoring the insured are only applicable where there is an ambiguity in the policy; if the term in question is susceptible of only one reasonable construction, then these rules do not apply.").[12] And "[a] policy provision is not ambiguous merely because different parties . . . have interpreted it differently." *Fiess*, 202 S.W.3d at 746. Courts should also not strain to create an ambiguity and should resist the temptation to give up searching for plain meaning. *Towers Watson & Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 67 F.4th 648, 653 (4th Cir. 2023). "Otherwise, the *contra proferentem* thumb-on-the-scale would apply to nearly every interpretation of nearly every insurance policy." *Id.*[13]

Indeed, courts have cautioned that *contra proferentem* is a device of last resort. *Ironshore Specialty Ins. Co. v. Aspen Underwriting Ltd.*, 40 F. Supp. 3d 807,

---

[12]   Thus, in *Ramsay*, the court applied *contra proferentem*, not as a matter of course, as Carpenter suggests, but because the court *first* determined that the policy was susceptible to more than one reasonable interpretation. *See Ramsay*, 533 S.W.2d at 349. That was also the case in *Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663, 655-66 (Tex. 1997).

[13]   Thus, in *Lubbock*, cited by Carpenter, the Court determined that *contra proferentem* was not applicable. Although the Court credited the insured's novel construction of the policy as adding some alternative meaning and establishing a possible result, the Court deemed the policy unambiguous. *See Lubbock*, 143 F.3d at 244 ("Although certainly a 'possible' result, we refuse to torture the plain terms of the endorsement's coverage provision to reach what seems a more dubious result."). The Court emphasized, "Our task here is to determine the true intent of the parties as expressed in the terms of the policy . . . not simply to seek out and credit any possible meaning those terms might bear." *Id.*

816 (W.D. Tex. 2014), *aff'd*, 788 F.3d 456 (5th Cir. 2015). As one court put it, "It is essentially a tie breaking device used to prevent arbitrary decisions when all other methods of interpretation and construction prove unsatisfactory." *Evergreen Indem. Co. v. Tan It All, Inc.*, 111 S.W.3d 669, 676 (Tex. App.—Austin 2003, no pet.).

*Contra proferentem* is inapplicable here because the Policy is susceptible to only one *reasonable* interpretation—the one offered by Twin City. The Policy is thus unambiguous. As earlier explained, Twin City's interpretation gives meaning and effect to all words in the definition of "Loss," including the essential phrase that "Loss shall not include . . . salaries, wages, or bouses, *except as a component of a front or back pay award*." (emphasis added). In this case, there was no front or back pay award, so the severance bonus is not included in the definition of "Loss."

It is only by seizing upon "back pay" and removing all the surrounding text (and by imagining hypotheticals not before the Court) that Carpenter hopes to create an ambiguity. But his efforts both ignore governing contract construction principles and effectively rewrite the insuring agreement to produce an outcome not contemplated by the Policy. Because Carpenter's alternative interpretation is inherently unreasonable, the Policy must be interpreted "according to its plain meaning and give no deference to the insured's interpretation." *American Home Assurance Co. v. CAT Tech LLC*, 660 F.3d 216, 221 (5th Cir. 2011).

14

4.    *Twin City's construction would not "eviscerate" coverage.*

Lastly, Carpenter maintains that if the Court accepts Twin City's interpretation, all coverage for claims involving breaches of "oral agreements" would be eviscerated. *See* Appellee's Br. at 39, 47. According to him, EPLI policies "cover what many other types of liability insurance policies do not," including "'breach of contract claims.'" Appellee's Br. at 15 (quoting L.D. Simmons, II & Lowndes C. Quinlan, *New Appleman on Insurance Law* § 28.App., 02[2][g], p. 28-22 (2015)); *see also* Appendix A at 8 (2025 version). Carpenter misconstrues the Policy and the law.

Carpenter's quote from the Simmons and Lowndes article is misleading. The section of the article he cites, also found in the updated 2025 version, is focused on a single case—*Krueger Int'l Inc. v. Royal Indem. Co.*, 481 F.3d 993 (7th Cir. 2007). In that case, the insured employer sought indemnification from its EPLI insurer in connection with an underlying judgment obtained by a former employee for breach of an oral promise related to their compensation. *Id.* The district court entered summary judgment for *the insurer*.

On review, Judge Posner, writing for the majority, described the purpose of EPLI policies: "With the growth of employers' liability for discrimination, retaliation, harassment, wrongful termination, and other, similar torts committed against employees . . . demand has grown for 'employment practices liability'

15

insurance." *Id.* at 994. However, because the case presented an ordinary breach of an oral compensation agreement, Judge Posner affirmed the summary judgment in favor of the insurer, explaining "the severe 'moral hazard' problem to which such insurance would often give rise." *Royal*, 481 F.3d at 996. Carpenter's claim presents the same moral hazard.

Based on Judge Posner's opinion, the author of the article Carpenter selectively quotes ultimately concluded, "If a policy affords affirmative coverage for breach of contact claims, the underwriter will typically address the moral hazard issue by limiting *the damages* payable under the policy." Appendix A at 9 (emphasis added). That is precisely what Twin City did here, and it underscores the very purpose of EPLI coverage.

But the elimination of damages payable under the Policy (*i.e.* indemnity) in connection with Carpenter's breach of contract claim did not "eviscerate" all coverage, as Carpenter posits. Carpenter's claim met one aspect of the Policy's definition of "Claim" and "Employment Practices Wrongful Act," ROA.25-10679.5221-22, triggering Twin City's obligation to pay only that which met the Policy's definition of "Loss."[14] ROA.25-10679.5223. The Policy defines "Loss" as

---

[14]     Carpenter misconstrues Twin City's indemnity obligations under the Policy. According to him, "The EPLI policy expressly covers *liability* for breach of oral, written, and implied employment agreements." Appellee's Br. at 16 (emphasis added). Carpenter is incorrect. The Policy responds to covered "Loss," not "liability," and the definition of "Loss" precludes his claim for the unpaid severance bonus. ROA.25-10679.5221. Carpenter also points out the Policy's exclusion for "Loss" associated with a claim for breach of a "written employment contract" and

including "Defense Costs" associated with a "Claim," but not "salaries, wages, or bonuses." *Id*. That definition entitled the insured (not Carpenter) to a complete defense in response to Carpenter's claim (which exhausted the Policy's limit). That coverage saved Twin City's insured $1 million of defense costs, and thus the insured received the full benefit of the bargain for its purchase of the EPLI coverage.

Further, if the oral contract claim was for something *other than* an unpaid salary, wage, or bonus disassociated from a claim that may command a front or back pay award, Twin City may be obligated to pay the judgment, provided the definition of "Loss" is satisfied and an exclusion does not apply. For example, if the employer orally promised an employee that it would make certain accommodations but breached the agreement, resulting in the employee incurring "Loss," the Policy, subject to its terms, may respond.

So, Carpenter's claim of "evisceration" rings hollow. And ultimately, construing the language "salaries, wages, or bonuses, except as a component of a front or back pay award" *in context* leaves but one *reasonable* conclusion. Salaries, wages, and bonuses are beyond the scope of coverage unless they are included as a component of a front or back pay award. Here, the severance bonus was not. It is not covered by the Policy.

---

notes, "That section does not exclude oral employment agreements from indemnity coverage." Appellee's Br. at 17. But that offers Carpenter no lifeline. As noted, he has the initial burden to prove that his claim meets the definition of "Loss," which is a burden he cannot meet.

**B.      Carpenter's claim is excluded from coverage.**

Carpenter's severance bonus is not covered for a second, independent reason—the Policy *excludes* "any Claim . . . for employment termination severance payments." ROA.25-10679-5225; *see also* Appellant's Br. at 38-47. To counter the exclusion, Carpenter offers four explanations, each of which is unpersuasive.

1.      *The reference to "stay" in the jury charge is not dispositive.*

Early in his Brief, Carpenter highlights the jury's answers to Question 4, which mentions the word "stay," and he comments, "The jury finds a pay-to-stay agreement in connection with a potential asset sale," implying the jury *did not find* the existence of a severance bonus payment. Appellee's Br. at 20. Later, he argues that Twin City cannot "relitigate" the issue. Appellee's Br. at 27. Carpenter is mistaken.

"Pay-to-stay" is not mentioned anywhere in the charge, the verdict, or the final judgment. More importantly, the disputed fact the jury decided was whether the oral agreement was formed, not how it functioned or what to call it. Indeed, both parties (and Carpenter's attorney) understood that the oral agreement was "the same thing" as severance. *See* Appellant's Br. at 11-12. Nor was there a dispute about whether Carpenter's entitlement to the severance bonus was triggered by the asset sale and the resulting termination of his employment. *See* Appellant's Br. at 6-8. Thus, Twin City is not "relitigating" that which was agreed to by the parties and not submitted

to the jury.

Further, the description the plaintiff and defendant used in the jury questions in the non-coverage case to which Twin City was not a party is hardly binding on Twin City. As Judge Posner determined in *Royal*, the *evidence at trial* was that the company's agent had authority to bind the company to the oral agreement, giving rise to the uninsurable moral hazard. *See Royal*, 481 F.3d at 998.

Here, the evidence at trial shows the parties agreed that, upon the sale of the company's assets, Carpenter would no longer be employed by the company and would be entitled to the bonus to be "paid as severance because upon the sale . . . the three entity defendants weren't employing anyone anymore." ROA.25-10679.5395; *see also* ROA.25-10679.5447 ("it all means the same thing").

Yet, Carpenter urges the Court to not consider the trial transcript and other evidence, even going so far as to argue that "courts reject the theory that evidence in the underlying trial is admissible to determine coverage." Appellee's Br. at 27 (citing *Swicegood v. Med. Protective Co*., No. 3:95-CV-0335-D, 2003 WL 22234928 (N.D. Tex. Sept. 19, 2003)). Carpenter misrepresents the law.

Under Texas law, "[t]he duty to indemnify . . . is a matter dependent on the facts and circumstances of the alleged injury-causing event, and parties may introduce evidence during coverage litigation to establish or refute the duty to indemnify." *Freeport Welding & Fabricating*, 699 F.3d at 840 (citing *Gilbane Bldg.*

*Co.*, 664 F.3d at 594); *see also D.R. Horton-Tex., Ltd. v. Markel Intern. Ins. Co., Ltd.*, 300 S.W.3d 740, 741 (Tex. 2009) ("In determining coverage, a matter dependent on the facts and circumstances of the alleged injury-causing event, parties may introduce evidence during coverage litigation to establish or refute the duty to indemnify.").

Thus, the Court is not bound solely by the phrasing used in the jury questions in the underlying lawsuit. *See Ideal Lease Serv., Inc. v. Amoco Prod. Co.*, 662 S.W.2d 951, 953 (Tex. 1983) (holding, based on evidence in trial record and language of the indemnity agreement, that injury not covered by indemnity agreement). For example, the undisputed testimony of all the parties, who conceded that the money the company offered Carpenter was pursuant to the company's severance program, is also relevant.[15] *See* Appellant's Br. at 10-13. That Carpenter attempts to shield this evidence from the Court is telling.

The sole case on which Carpenter relies—*Swicegood*—does not support the proposition Carpenter advances. In the subsequent coverage litigation, the court in

---

[15]     It does not include the extraneous material on which Carpenter relies, including the 2014 Towers Watson survey, describing "pay-to-stay" agreements. *See* Appellee's Br. at 17. Regardless, it is notable that a principal feature of those agreements is to encourage the employee to remain employed with the acquiring entity for "many years after" the transaction. *See* ROA.25-10679.3890. Here, it is undisputed that the severance bonus was designed to give the company control over the date of Carpenter's severance because after the sale "the three entity defendants weren't employing anyone anymore." ROA.25-10679.5395. And, from Carpenter's perspective, at the time of his bargain, "it became reasonably clear that [he] would not be retained after closing of that transaction." *See* ROA.25-10679.5457.

that case rejected the notion that the party asserting her claim was within the scope of coverage could offer new evidence not used at trial. The court sided with the insurer and determined that "if the coverage question is one of law that can be decided on the record of the underlying suit, no new evidence is admissible." *Id*. at *14. It further determined that the coverage issue would be decided based on, among other things, the "the pleadings, trial transcript, jury charge, verdict, and judgment in the Underlying Lawsuit." *Id*. at *15. Contrary to Carpenter's argument, Twin City and the Court are not limited to the phrasing used in the jury charge.

## 2.    *The "more formal severance plan" undermines Carpenter's position.*

Carpenter claims he rejected a separate severance plan, implying that the agreement that formed the basis of his recovery must have been something other than a severance agreement. Appellee's Br. at 28. But if Carpenter was entitled to a separate severance payment in addition to his "pay-to-stay," why didn't he claim it? He couldn't because his position was that the company *modified* that agreement orally. That is why Carpenter re-wrote the formal separation agreement the company delivered to him upon terminating his employment to add the terms of the oral promise, including the amounts he claims became due upon his termination and his release of any employment claims he may have against the company. *See* Appellant's Br. at 7; *see also* ROA.25-10679.5457, 5460.

3.    *Carpenter's claim bears all the hallmarks of an employment termination severance payment.*

In characterizing the payment as being something other than an employment termination severance payment, Carpenter toys with semantics. That he had to perform a condition precedent—remain with the company until it sold its assets and terminated his employment—to receive the lucrative version of the severance program he helped create does not change its fundamental character. Carpenter negotiated his severance bonus based on his loyalty and his length of service (even temporarily extending it); it became due when the company sold its assets and ceased being his employer; and he offered his employer a complete release of all employment-related claims in exchange. *See* ROA.25-10679.5457, 5460. As Carpenter concedes, these are the classic hallmarks of an employment termination severance payment. *See* Appellee's Br. at 35.

4.    *The severance payment was triggered by the termination of Carpenter's employment, which resulted from the asset sale.*

Carpenter argues "[n]ot all severance payments are excluded[,] [o]nly those requiring employment termination."[16] Appellee's Br. at 33. But having to perform a condition precedent does not alter the character of the payment. Under Carpenter's construction, if the company never told him about the sale but then paid him the

---

[16]    Carpenter's argument again demonstrates it is built around semantics. He offers the Court no example of where "*severance* payments" exist outside the context of an employment termination.

same severance bonus upon his termination after it occurred, the payment would be excluded from coverage. But because the company told him about the arrangement in advance and imposed a condition precedent, according to Carpenter, it somehow became covered. The Policy's exclusion of coverage for "employment termination severance payments" does not countenance these distinctions for which Carpenter zealously advocates.[17]

## CONCLUSION

Twin City renews its request for oral argument because it will better assist this Court with the proper application of Texas contract interpretation standards, which, when applied correctly, prevent a common EPLI policy from being misconstrued in the expansive manner for which Carpenter advocates. Upon the Court's full consideration, it should reject Carpenter's unreasonable interpretation that the Policy covers the moral hazard clearly and unambiguously written out of the Policy. Carpenter's remedy is against his former employer, which walked away from the sale with $36 million. It is not against Twin City, which issued a basic employment *practices* policy. Any contrary ruling defies the Policy's language when construed as a whole. The judgment below is in error and should be reversed and rendered in

---

[17]    *See Nat'l Union Fire Ins. Co. of Pittsburgh, Pennsylvania v. McMurray*, 342 F. App'x. 956, 958 (5th Cir. 2009) ("The fact of conflicting interpretations . . . does not prove ambiguity. It may only be evidence of zealous advocacy.").

Twin City's favor. Twin City requests this relief and any other relief to which it is justly entitled.

Respectfully submitted,

CHAMBERLAIN, HRDLICKA, WHITE, WILLIAMS & AUGHTRY

By:   */s/ Steven J. Knight*
    STEVEN J. KNIGHT
    Texas Bar No. 24012975
    steven.knight@chamberlainlaw.com
    1200 Smith Street, Suite 1400
    Houston, Texas 77002
    (713) 658-1818

*And*

MAYER BROWN LLP

ROBERT S. HARRELL
Texas State Bar No. 09041350
rharell@mayerbrown.com
700 Louisiana Street, Suite 3400
Houston, Texas, 77002

*Counsel for Defendant-Appellant*

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing has been forwarded to counsel of record by electronic service on January 21, 2026.

*/s/ Steven J. Knight*
STEVEN J. KNIGHT

## CERTIFICATE OF COMPLIANCE

I certify this document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6,030 words. I further that this motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman, with the exception of footnotes, which have been prepared in a 12-point font.

_/s/ Steven J. Knight_
STEVEN J. KNIGHT

# APPENDIX A

## *4 New Appleman on Insurance Law Library Edition § 28.02*

*New Appleman on Insurance Law Library Edition  >  NEWAPL Volume 4—Specific Types of Liability Insurance  >  Chapter 28 EMPLOYMENT PRACTICES LIABILITY INSURANCE*

## Author

*L.D. Simmons, II and Lowndes C. Quinlan*[*]

## § 28.02 The Risks Insured Under Employment Practices Liability Insurance

### [1] Consideration of the Key Policy Provisions

As with any insurance policy, the insuring agreement of an EPL policy dictates the risks insured under the policy. Similar to D&O policies, insurers have not reached a consensus on standardized language for EPL policies. Nevertheless, most EPL agreements share some common traits. Most policies provide that the insurer will pay losses resulting from wrongful acts that arise from the employment relationship. For example, one standard insuring agreement provides, "We shall pay those amounts the 'insured' is legally required to pay by reason of a 'claim' arising out of your 'wrongful employment practice' to which this insurance applies."[31]

### [2] The Scope of Wrongful Employment Acts Covered Under Employment Practices Liability Insurance

#### [a] Wrongful Employment Acts Are Generally Defined by Reference to Broadly Worded Offenses

EPL policies generally specify a number of wrongful employment acts or practices against which the insurer will protect. Most insurers define these wrongful acts by reference to a number of broadly worded offenses. These offenses are grouped into a short-hand definition, such as "wrongful employment practice," "wrongful employment act" or another similar term. For convenience sake, this chapter uses the term "wrongful employment acts" to refer to offenses typically covered by EPL policies. Below is a summary of the offenses that typically fall within EPL policies.

#### [b] Coverage for Discrimination Claims

Most EPL policies provide coverage for discrimination, which insurers typically define to include claims arising out of the violation of federal, state, or local employment discrimination laws. These laws may

[*] L.D. Simmons, II is a partner with McGuireWoods LLP. Lowndes C. Quinlan is Counsel with McGuireWoods LLP. Both work in the firm's Charlotte, North Carolina office and handle complex insurance coverage disputes regionally and nationally, with an emphasis on claims involving commercial disputes, professional liability, directors' and officers' liability, employment practices liability and technology errors and omissions. Mr. Simmons has been named as one of The Best Lawyers in America in the area of insurance law, and is a regular speaker and writer on insurance issues, including recent presentations for the American Bar Association, Mealey's, the CPCU Society of the United States, the Defense Research Institute, RIMS, and the North Carolina Association of Defense Attorneys. The views expressed in this chapter are those of the authors only and do not necessarily represent the views of their law firm or clients.

Updates by Publisher's editorial staff and Alexandra Chase. Ms. Chase researches, publishes, and presents on legal and policy issues around the country. She has also co-taught an Adaptive Planning and Resilience professional development course at the University of Louisville. She has worked for the National Sea Grant Law Center and the Center for Land Use and Environmental Responsibility. Ms. Chase is licensed to practice law in Florida.

[31] IL—*West Bend Mut. Ins. Co. v. Rosemont Exposition Servs., Inc., 880 N.E.2d 640, 643 (Ill. App. Ct. 2007).*

prohibit discrimination based on a person's race, color, religion, creed, age, gender, disability, marital status, national origin, pregnancy, HIV status, sexual orientation or preference, or veteran or military status.[32] Typically, a claim may be based on any adverse employment decision, including actual or constructive termination, demotion or refusal to promote, or any other change or modification in the terms of employment. Applicants for employment may also bring discrimination claims if an employer fails to hire them. As explained further below, most EPL policies extend coverage to apply to claims by applicants as well as by employees.[33]

### [c] Coverage for Harassment Claims

EPL policies typically define wrongful employment acts to include claims based on sexual harassment. These claims usually include allegations involving quid-pro-quo harassment, in which an employer makes unwelcome sexual advances, requests for sexual favors, or other conduct of a sexual nature. Quid-pro-quo harassment exists when (a) the employer makes the unwelcome conduct a condition of employment or (b) the unwelcome conduct influences employment decisions.[34] Harassment, as defined by an EPL policy, may also extend to hostile work environment claims, in which unwelcome conduct of a sexual nature interferes with an employee's performance or creates an intimidating, hostile or offensive working environment within the insured organization.[35]

### [d] Coverage for Allegations of Retaliation

EPL policies generally define retaliation to include adverse treatment of an employee by an employer after the employee has taken some lawful action related to his or her employment. Such lawful actions could include filing a discrimination claim, seeking leave under the Family and Medical Leave Act, requesting an accommodation under the Americans with Disabilities Act, or filing a worker's compensation claim. Some policies may also cover retaliation for whistle blower or *qui tam* actions under federal or state false claims statutes.[36]

EPL policies may afford coverage for a retaliation claim, even though the employee's original claim may not be covered. This is an important aspect of coverage, as employers may face a greater exposure from retaliation claims than from the underlying claim.[37] For example, most EPL policies do not insure claims

---

[32] Richard J. Bortnick and Gale White, *Employment Practices: A Liability and Insurance Coverage Primer*, 5–16 MEALEY'S EMERG. INS. DISPS. 17 (2000).

[33] *Suit Against Insurers, Brokers Seeks Defense, Indemnity For Wrongful Employment Acts*, 2-1 MEALEY'S LITIG. REP. EMPL. LIAB. INS. 11 (2003) (noting the insured's policy defined "Wrongful Employment Acts" to include wrongful acts against applicants for employment).

[34] Richard J. Bortnick and Gale White, *Employment Practices: A Liability and Insurance Coverage Primer*, 5–16 MEALEY'S EMERG. INS. DISPS. 17 (2000).

[35] Richard J. Bortnick and Gale White, *Employment Practices: A Liability and Insurance Coverage Primer*, 5–16 MEALEY'S EMERG. INS. DISPS. 17 (2000).

[36] A *qui tam* action permits a whistle blower to bring a civil suit against a government contractor for alleged fraud against the government. Tara L. Ward, Note, *Amending the Qui Tam Intervention Provisions: Setting Debar Higher?*, 38 Pub. Cont. L.J. 297, 298 (2008).

See also **US/CA**—*Ill. Union Ins. Co. v. N. County Ob-Gyn Med. Group, Inc., No. 09cv2123-LAB (JMA), 2010 U.S. Dist. LEXIS 50095 (S.D. Cal. May 19, 2010)* (observing that a *qui tam* suit triggered a duty to defend under an EPL policy).

[37] The Supreme Court has loosened the requirements for filing retaliation suits against employers, which will likely increase the number of retaliation claims brought against employers. *See, e.g.,* **US**—*Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006).*

made under the Americans with Disabilities Act or similar state or local legislation. Nevertheless, many policies will provide coverage for a claim by the employee that the employer retaliated against him or her for making a claim under the ADA.

It is important to note that some federal and state laws criminalize retaliation.[38] In those states criminalizing retaliation, EPL policies may afford only limited coverage. Many EPL policies affirmatively cover retaliation claims, and most EPL policy exclusions have an exception for retaliation claims. If an employer's alleged retaliation resulted in a criminal charge, such a charge would probably fall within a criminal acts exclusion. Insureds, however, would likely be entitled to a defense from their insurers for a claim of criminal retaliation, as most criminal acts exclusions require the insurer to defend until a final adjudication has established that a crime has occurred.

### [e] Coverage for Adverse Employment Decisions

Most EPL policies provide coverage for specified adverse employment decisions by an employer, such as firings or demotions. Some insurers term these offenses "wrongful termination." Other insurers may batch such acts within the definition of a wrongful employment act, or other similar term. For example, one definition provides that a wrongful employment decision includes:

> [a]llegations of wrongful demotion, retaliation, misrepresentation, promissory estoppel and intentional interference with contract, which arise from an employment decision to employ, terminate, evaluate, discipline, promote or demote.[39]

If there is a question about the scope of adverse employment decisions (or other similar terms), the rules of interpretation in most states would apply the common, everyday meaning to the term.[40] Many courts would give the term adverse employment decisions an expansive meaning, and almost any allegation of detrimental action related to an employee's job could fall within coverage.

For example, in *Andrews Transportation, Inc. v. CNA Reinsurance,* the Fifth Circuit held that an EPL insurer had a duty to defend allegations that its insured had wrongfully withheld taxes and unemployment contributions from truckers working for the insured, thereby reversing a district court's ruling.[41] The district court had granted summary judgment to the insurer because, among other reasons, the truckers' wrongful withholding allegations fell outside the definition of "wrongful employment decision." The district court determined that the truckers' allegations did not involve any decision to "employ, terminate, evaluate, discipline, promote or demote"[42] nor did the allegations concern a "breach of an implied employment

---

*See generally* Sherwyn, Heise, and Eigen, *Experimental Evidence that Retaliation Claims are Unlike Other Employment Discrimination Claims,* 44 Seton Hall L. Rev. 455 (2014); Brake, *Tortifying Retaliation: Protected Activity at the Intersection of Fault, Duty, and Causation,* 75 Ohio St. L.J. 1375 (2014).

*Cf.* **US/AR—Pine Bluff Sch. Dist. v. Ace Am. Ins. Co., 402 F. Supp. 3d 548 (E.D. Ark. 2019)** (EEOC claim and subsequent retaliation lawsuit by a teacher against the school district, constituted a single claim because of interrelated wrongful acts, but insured failed to timely report the EEOC claim and court ruled no policy coverage for either claim).

[38] **US**—18 U.S.C. § 1513(e) enacted as part of the Sarbanes-Oxley Act, criminalizes whistle blowing (retaliation against employees for providing truthful information concerning the actual or potential commission of a federal offense);

**LA**—La. Rev. Stat. Ann. § 23:964 (criminalizing retaliation against employees for cooperating in any investigation or enforcement action to enforce Louisiana labor laws).

[39] **US/TX**—Andrews Transp., Inc. v. CNA Reinsurance Co., 166 F. Supp. 2d 516, 519 (N.D. Tex. 2001), rev'd sub nom. Trans v. CNA Reinsurance, No. 01-10510, 2002 U.S. App. LEXIS 9384 (5th Cir. Apr. 22, 2002).

[40] *See* **NC**—C.D. Spangler Constr. Co. v. Indus. Crankshaft & Eng'g Co., 388 S.E.2d 557, 568 (N.C. 1990) (non-EPL case).

[41] **US/TX**—Trans v. CNA Reinsurance, No. 01-10510, 2002 U.S. App. LEXIS 9384 (5th Cir. Apr. 22, 2002).

contract or breach of the covenant of good faith and fair dealing in the employment contract or involve some other employment decision that violates public policy."[43]

On appeal, however, the Fifth Circuit ruled that the allegations against the insured constituted an insured event under the policy. The definition of "wrongful employment decision" included "other employment decisions which violate public policy ... ."[44] The court determined that the insured violated Texas public policy by withholding contributions to the Texas unemployment compensation fund from the truckers' paychecks. The court observed that "Texas expresses its public policy in its statutes," and that withholding contributions to the unemployment fund from employee paychecks violated the Texas Labor Code.[45] By violating the Texas Labor Code, the court concluded that the insured had violated Texas public policy.[46] Accordingly, the Fifth Circuit ruled the claim fell within the policy's insuring agreement.

Although the insuring agreement of most EPL policies affords broad coverage for wrongful employment acts, not every dispute involving an employment relationship will fall within the coverage afforded under an EPL policy. Most reported cases addressing coverage under the insuring agreement of an EPL policy concern situations in which an employee sues an employer for wrongful conduct that occurred during the employment relationship, but the alleged conduct does not fall within the policy's definition of wrongful employment act.

One illustrative case is *Samson v. Apollo Res. Inc.*[47] In *Samson*, the court ruled that an insurer had no duty to defend or indemnify an EPL policyholder against an employee's wage claim under the Fair Labor Standards Act. The court reasoned that the wage claim fell outside of an EPL policy's insuring agreement.[48] The policy's definition of wrongful employment acts did not include wage claims, but did include "employment-related misrepresentation by an insured."[49] The insured employer argued that its failure to pay the claimant constituted an employment-related misrepresentation. The court rejected the insured's argument after determining that a wage claim did not require a showing of a misrepresentation.[50]

Similarly, in *Noxubee County School District v. United National Insurance Co.*,[51] over 100 employees and former employees of Noxubee County School District sued their employer for failing to pay them overtime in violation of the Fair Labor Standards Act. The school district sought coverage under a school board legal liability policy, which included coverage for "wrongful employment acts." The insurer denied coverage and the school board sought declaratory relief.

---

[42] **US/TX**—*Andrews Transp., Inc. v. CNA Reinsurance, 166 F. Supp. 2d 516, 519 (N.D. Tex. 2001), rev'd sub nom. Trans v. CNA Reinsurance, No. 01-10510, 2002 U.S. App. LEXIS 9384 (5th Cir. Apr. 22, 2002).*

[43] **US/TX**—*Andrews Transp.*, 166 F. Supp. 2d at 519, *rev'd sub nom. Trans v. CNA Reinsurance, No. 01-10510, 2002 U.S. App. LEXIS 9384 (5th Cir. Apr. 22, 2002).*

[44] **US/TX**—*Andrews Transp., Inc. v. CNA Reinsurance Co., 166 F. Supp. 2d 516, 519 (N.D. Tex. 2001),* rev'd sub nom., *Trans v. CNA Reinsurance, No. 01-10510, 2002 U.S. App. LEXIS 9384 (5th Cir. Apr. 22, 2002).*

[45] **US/TX**—*Trans., 2002 U.S. App. LEXIS 9384.*

[46] **US/TX**—*Trans., 2002 U.S. App. LEXIS 9384.*

[47] **US**—*Samson v. Apollo Res. Inc., No. 02-30218, 2003 U.S. App. LEXIS 6158 (5th Cir. Mar. 20, 2003),* cert. denied sub nom. **Apollo Res., Inc. v. QBE Int'l Ins., Ltd., 157 L. Ed. 2d 145 (U.S. 2003).**

[48] **US**—*Samson, 2003 U.S. App. LEXIS 6158.*

[49] **US**—*Samson, 2003 U.S. App. LEXIS 6158.*

[50] **US**—*Samson, 2003 U.S. App. LEXIS 6158.*

[51] **MS**—*Noxubee County Sch. Dist. v. United Nat'l Ins. Co., 883 So. 2d 1159 (Miss. 2004).*

The insurer moved for summary judgment, which the trial court granted and the Mississippi Supreme Court affirmed. In doing so, the court found that the claims fell outside the policy definition of "wrongful employment act." The policy defined "wrongful employment act" to include the "refusal to employ," the "termination of employment," or "coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or other employment-related practices, policies, acts or omissions."[52] The court ruled, "It is clear to this Court that Noxubee County's deliberate decision not to compensate its employees for overtime pay is neither a 'wrongful act' nor a wrongful employment act' within the definitions under this policy."[53]

An opinion by the Fourth Circuit Court of Appeals reached a different decision. School board employees claimed that, in violation of the Fair Labor Standards Act ("FLSA"), the board failed to pay them for all the work they had done and failed to pay the overtime rate when they worked over 40 hours in a week. The board's insurer sought a ruling that it was not obligated to defend the board. The policy defined "wrongful act" as "any breach of duty, neglect, error, omission, misstatement, or misleading statement in the discharge of 'educational institution' duties." The insurer argued the board's failure to comply with the FLSA could not be a wrongful act because the board had a *preexisting duty* to comply with it. The court responded that existence of a preexisting duty was relevant to whether the insured was the subject of a claim for a wrongful act. Under the language of the policy, a breach or violation of duty constituted a wrongful act and the board's alleged failures were breaches of the duty imposed by the FLSA and, therefore, wrongful acts.[54]

### [f] Coverage for Workplace Torts

Although less common, insurers sometimes define wrongful employment acts to include a variety of other workplace torts. Torts listed within the definition of wrongful employment acts have included: (a) defamation, libel or slander (including giving negative statements in connection with an employee reference); (b) humiliation, mental anguish, infliction of emotional distress; (c) invasion of privacy; and (d) misrepresentation.[55] Because third parties may bring discrimination claims based on a variety of theories,

---

[52] **MS**—*Noxubee County*, 883 So. 2d at 1164.

[53] **MS**—*Noxubee County*, 883 So. 2d at 1164.

[54] **US/VA**—*Republic Franklin Ins. Co. v. Albemarle County School Board, 670 F.3d 563 (4th Cir. 2012)* (interpreting Virginia law; finding that the insured's failure to comply with the FLSA was a wrongful act and that, while a judgment awarding unpaid wages would not be a covered loss under the policy—because payment of those wages was a preexisting duty—any obligation to pay liquidated damages and attorneys' fees would cause the insured a loss from a wrongful act, which was covered by the policy. In short, because the underlying FLSA complaint demanded not only back wages, but also liquidated damages and attorneys' fees from the insured's failure to comply with the FLSA, any judgment against the insured, to the extent it would include liquidated damages and attorneys' fees, would amount to a loss under the insurance policy resulting from a claim for a wrongful act.

*See also* **US/MA**—*Kittansett Club v. Phila. Indem. Ins. Co., No. 11-1385-DJC, 2012 U.S. Dist. LEXIS 127939 (D. Mass. Sept. 10, 2012)* where employees of the insured employer alleged it added a gratuity to food and beverage bills, but, in violation of state law, did not remit the proceeds to employees who served the food or beverage. The employees also claimed a breach of an implied contract, interference with contractual and/or advantageous relations and *quantum meruit*/unjust enrichment. The court, citing *Republic Franklin*, held that even though the employer's conduct may have violated a preexisting statutory duty, it nonetheless met the definition of "wrongful conduct" under the policy.

[55] Robert Bregman and Donald A. Phin, *EPLI: A Primer & Coverage Checklist*, EMPLOYMENT PRACTICES LIABILITY CONSULTANT NEWSLETTER (International Risk Management Institute, Inc. Fall 2000).

some insurers have begun to offer expanded coverage, which insures against discrimination claims brought by third parties.[56]

Insuring agreements generally extend coverage for such workplace torts only to the extent they are "employment related."[57] Because EPL insurers often neglect to define "employment related," this area is ripe for dispute. If, for example, one employee defames another outside the workplace, would this be employment related? If one employee stalks or harasses another employee away from the office, is this employment related? Because insurers have failed to define this term, courts will likely look to their jurisdiction's canons of interpretation to resolve these questions.[58] Courts likely will find that most torts with some causal or logical connection to the employment relationship will be "employment related."

---

➧➧ **Cross Reference:**

For a discussion of the canons of interpretation, see *Section 5.03* above.

---

However, not all torts with a causal or logical connection to the employment relationship will be deemed employment related. For example, in *Woo v. Fireman's Fund Insurance Co.,*[59] an employee of a dentist quit after the dentist played a practical joke on her. The dentist had agreed to perform dental surgery on his employee. While the employee was under general anesthesia, the dentist placed false teeth, which resembled a boar's tusk, in the employee's mouth, and took pictures. Upon learning of the joke, the employee quit and later sued the dentist for, among other things, assault, outrage, battery, invasion of privacy, false light, nonpayment of overtime wages, lack of informed consent, and negligent infliction of emotional distress.

The dentist had professional liability, employment practices liability, and CGL coverage with the same insurer. The dentist tendered the lawsuit under all three policies but the insurer refused to defend. The dentist then settled with his former employee and sued the insurer for breach of contract and bad faith.

The trial court granted the dentist's motion for summary judgment on the duty to defend, and the insured obtained a jury verdict on the bad faith claim. On appeal, the Washington Court of Appeals reversed the trial court's grant of summary judgment on the duty to defend.

Under the EPL policy, the appellate court noted that the policy afforded coverage for damages because of sexual harassment, discrimination or wrongful discharge that arises out of a wrongful employment practice. The parties agreed that the only coverage available under the EPL policy at issue was wrongful discharge arising out of a wrongful employment practice. The policy defined "wrongful discharge" as:

---

[56] Joan Dolinsky and Barbara O'Donnell, *Employment Practices Liability Coverage,* 31 THE BRIEF 48, 53 (2001) (noting "EPLI does not generally provide coverage against discrimination, harassment, or other similar claims brought by customers, vendors, or other third parties unless specific third-party coverages are purchased.").

[57] Noel A. Kemprowski, *Checklist for Managing Claims Covered by EPLI: from Claim Filing to Resolution, New York Employment Law Letter* (2004).

[58] The failure to define a word in a policy does not automatically result in an ambiguity. *See* **US/NC**—*Harleysville Mut. Ins. Co. v. Packer, 60 F.3d 1116, 1121 (4th Cir. 1995).*

Courts look to the forum's canons of interpretation, which frequently instruct courts to give words their "natural, plain, and ordinary meaning." *See* **US/PA**—*Women's Christian Alliance v. Exec. Risk Indem., Inc., No. 02-2594, 2003 U.S. Dist. LEXIS 12188, at \*12–13 (E.D. Pa. 2003)* (resorting to a dictionary to determine the meaning of a word).

[59] **WA**—*Woo v. Fireman's Fund Ins. Co., 114 P.3d 681 (Wash. Ct. App. 2005),* rev'd on other grounds, *164 P.3d 454 (Wash. 2007).*

> [T]he unfair or unjust termination of an employment relationship which: breaches an implied agreement to continue employment; or inflicts emotional distress upon the employee, defames the employee, invades the employee's privacy or is the result of fraud.[60]

The dentist argued that the complaint set out a claim for wrongful discharge, based on the ex-employee's allegation that she left upon learning of the practical joke and never returned. The court disagreed, observing that the practical joke caused the ex-employee's injury, rather than her decision to quit. More importantly, the ex-employee had not pleaded a cause of action for wrongful termination. "There is no wrongful termination tort based on boorish behavior by one's employer, unless such behavior violates an employment contract, discrimination statutes, the constitution or public policy."[61] Because the insured had not committed a wrongful employment act, the insurer had no obligation under the EPL policy. The court also found no duty to defend under the professional liability or CGL policies.

Later, the Washington Supreme Court reversed the Court of Appeal's holding regarding coverage under the professional liability and CGL policies. The court agreed, however, that the insurer had no duty to defend under the EPL policy.[62]

Coverage for employment-related torts under an EPL policy may also overlap with coverage afforded under other types of policies, such as CGL policies. For example, defamation and invasion of privacy torts typically fall within the "personal and advertising injury" offenses under commercial general liability policies. CGL policies generally exclude claims by employees, so situations involving overlap are likely to be rare. When former employees, applicants, or customers bring claims, an overlap in coverage may occur.

If a claim potentially falls within the coverage of two different types of liability policies, such as an EPL policy and a CGL policy, insurers may dispute which carrier must defend and indemnify their common insured. Resolution of such a dispute will be made by reference to each policy's other insurance clauses.

---

�death ➤ **Cross Reference:**

The resolution of other insurance disputes is discussed in *Section 28.06[3]*, below.

---

### [g] Coverage for Criminal Acts

In one federal court case,[63] an insured corporation was charged with violating the federal Employee Eligibility Verification Act. The insured argued its criminal act was a "wrongful employment practice." The court, however, pointed out that the insured ignored the language of the policy that said wrongful employment practices were covered only if employment-related and claimed by or on behalf of an employee, former employee, or applicant for employment. The criminal action brought against the insured was not "by or on behalf of" an employee, former employee, or applicant, but was brought by the United States Attorney on behalf of the United States of America.[64] The court concluded that if the clear language of the policy were not enforced it would defeat the purpose of EPL coverage, which is limited to acts claimed by employees, former employees and prospective employees.

---

[60] **WA**—*Woo*, 114 P.3d at 683–684.

[61] **WA**—*Woo*, 114 P.3d at 687.

[62] **WA**—*Woo v. Fireman's Fund Ins. Co., 164 P.3d 454, 464 (Wash. 2007)*.

[63] **US/KS/IL**—*McCalla Corp. v. Certain Underwriters at Lloyd's, 2014 U.S. Dist. LEXIS 60309 (D. Kan. May 1, 2014)*.

[64] *See also* **LA**—*Bilyeu v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 184 So. 3d 69, 79 (La. Ct. App. 2015)* (letter and subpoena from United States Department of Labor advising recipient that it was conducting investigation to determine whether any person had violated any provision of ERISA constituted notice of claim under Employee Benefit Plan Fiduciary Liability policy).

Another court considering the criminal act of an employee—a hotel desk clerk who sexually assaulted a guest in her room—looked at the "scope of employment" to find the insurer had no duty to defend or indemnify because the acts were not within the assigned duties.[64.1] But the Alaska Supreme Court has noted that "even crimes and intentional torts may be within the scope of employment if they serve the employer's interests."[64.2]

## [3] Coverage for Breach of Employment Contracts

Most employees work without the benefit of employment agreements; they operate as at-will employees. Employment agreements often are reserved for key employees, upper management, or other highly compensated employees. Consequently, litigation involving employment agreements often presents higher stakes.

Insurers have taken widely divergent approaches towards the underwriting risks posed by employment contracts. Some insurers provide affirmative coverage for breach of employment contracts. Of these insurers, some limit coverage to written employment contracts; others expressly afford coverage for the breach of oral or implied contracts of employment, but not for written employment contracts.

Other insurers seek to avoid coverage for employment contracts altogether. Insurers within this category will usually leave the insuring agreement silent with respect to contract claims, but may add an exclusion for breach of contract claims.

---

➧➧ **Cross Reference:**

Breach of contract exclusions are *considered in Section 28.04[2][m]* below.

---

Outside of the EPL market, insurance policies typically do not cover breach of contract claims. As explained by the Seventh Circuit in *Krueger Int'l Inc. v. Royal Indem. Co.*,[65] coverage for breach of contract claims involves "severe moral hazard." Moral hazard is the temptation created by insurance to commit the act insured against.[66] The incentive to burn down one's house if the house is insured for more than its value to the owner is an example of moral hazard provided by Judge Posner.[67] With respect to contracts, policyholders may be more willing to breach a contract if such a breach may be covered by insurance.

The EPL policy at issue in *Krueger* provided coverage for the breach of an oral contract, but not a written contract. The court observed that employers generally can control their written contracts, but not necessarily

---

[64.1] **AK—***DWJ v. Wausau Business Ins. Co., 192 F. Supp. 3d 1014, 1021 (D. Alaska 2016)* (holding that the crime was "too little actuated by a purpose to serve the master").

*Cf.* **US/AK—***Lauria v. United States, 542 F. Supp. 3d 926 (D. Alaska 2021)* (criticizing *DWJ* for being too broad).

*See also* **AK—**Lane v. City of Juneau, *421 P.3d 83, 94 (Alaska 2018)* (FTCA employment determinations are made by applying the *respondent superior* theory of the state where the alleged tort took place. In Alaska, the scope of employment is largely a jury question. The inquiry will determine if the employee performs the work he was hired to do, acts within the time and space limits of the employer, and whether he acts to further the employer's interests. Crimes and intentional torts that further the employer's interests may fall within the scope of employment.).

[64.2] **AK—***Lane v. City of Juneau, 421 P.3d 83, 94–95 (Alaska 2018)*.

[65] **US/WI—***Krueger Int'l Inc. v. Royal Indem. Co., 481 F.3d 993, 996 (7th Cir. 2007)* (Posner, J.).

[66] **US/WI—***Krueger Int'l*, 481 F.3d at 996.

[67] **US/WI—***Krueger Int'l*, 481 F.3d at 996.

the oral contracts entered into by their employees. The moral hazard element is avoided because the breach of an oral contract is typically an unavoidable accident from the employer's point of view.[68]

Despite the potential moral hazard, however, some underwriters affirmatively insure against the breach employment contracts, although even these insurers usually exclude coverage for breach of a collective bargaining agreement. If a policy affords affirmative coverage for breach of contract claims, the underwriter will typically address the moral hazard issue by limiting the damages payable under the policy. A policy affording affirmative coverage for employment contracts usually will bar indemnification for future pay, severance pay, or penalties payable under the contract.

One likely area of dispute with respect to coverage for employment contracts concerns contracts that are ancillary to employment, such as partnership or shareholder agreements. Such a dispute also arose in *Krueger*, and the Seventh Circuit concluded that the breach of a shareholder agreement fell outside the coverage of an EPL policy.[69] Several Krueger managers received stock from the company, although a shareholder agreement permitted Krueger to repurchase the stock if the managers left the company. When the managers left Krueger, the company repurchased the stock at a lower price than what the managers claimed they were entitled to receive. The managers alleged that the company CFO had orally modified the stock purchase agreement and that the modification required the company to redeem their stock at a higher price. The managers sued Krueger and a jury sided with the managers, awarding them the difference between the purchase price and the higher price under the modified stock purchase agreement.

Krueger sought indemnification for the judgment from its EPL insurer, Royal. The EPL policy afforded coverage for the breach of an oral employment contract, but Royal argued the shareholder agreement modified by Krueger's CFO was not an employment contract. Royal and Krueger litigated the issue, and Royal obtained summary judgment at the trial court level, which the Seventh Circuit affirmed, finding that the oral modification of the contract did not fall within the policy's coverage.[70]

Whether the insuring agreement carves out the breach of an employment agreement from the definition of a wrongful employment act, or excludes breach of employment contract claims, is important. Although either formula ostensibly achieves the same end—(the absence of coverage for contract claims)—the manner used by the insurer has consequences. How a term is characterized affects the burden of proof. Insureds have the burden of proof with respect to clauses granting coverage, such as the insuring agreement; Insurers have the burden of proof under clauses that limit coverage, such as exclusions.[71]

> **➥ Cross Reference:**
>
> For more information on shifting burdens of proof, see *New Appleman Insurance Law Practice Guide § 4.05[5]*.

## [4] Coverage for Cyber Liability

### [a] Overview

---

[68] **US/WI—***Krueger Int'l*, 481 F.3d at 996.

[69] **US/WI—***Krueger Int'l*, 481 F.3d at 995.

[70] **US/WI—***Krueger Int'l*, 481 F.3d at 995.

[71] *See, e.g.,* **IL—***W. Bend Mut. Ins. Co. v. Rosemont Exposition Servs., 880 N.E.2d 640, 647 (Ill. App. Ct. 2007)* (noting, "[i]t is the insurer's burden to show that a claim falls within a provision of the policy that excludes coverage …").

4 New Appleman on Insurance Law Library Edition § 28.02

Like most other forms of commercial liability, cyber risks can be classified into two main risk groups: first-party risks and third-party risks. First-party risks are threats to the policyholder; third-party risks involve damages to others for which the policyholder has potential liability. Importantly, unlike other manifestations of commercial liability, cyber liability usually implicates both first-party and third-party losses.

First-party coverage extends to the loss of electronic data, software, hardware, intellectual property infringement, lost earnings, expenses attributable to business interruption costs, reputational damage, loss of business relationships or partnerships, and many other policyholder injuries caused by inadequate information security. In addition to privacy injuries, third-party risks may include costs associated with the notification of privacy breaches, fees associated with maintaining a call center to respond to consumer questions and concerns, and the expenses of operating a credit monitoring program.[71.1]

### [b] Coverage for Data Privacy Laws

Increasing concerns surrounding cyberattacks and data security have led to states developing laws to protect consumer information. The Illinois Biometric Information Privacy Act (BIPA) was enacted in 2008 to regulate how private entities store and collect biometric data.[71.2] Recently there have been several BIPA class action suits. The majority deal with workplace privacy issues, but there have also been high-profile social media cases that raise concerns over facial recognition technology.[71.3]

The Illinois Supreme Court unanimously held that a plaintiff has standing under BIPA without having to allege an actual or threatened injury.[71.4] In *Rosenbach,* the plaintiff's son had a season pass to Six Flags theme park. To use his season pass, Rosenbach was required to scan his thumbprint at the entrance of the park. The teenager's mother alleged that Six Flags collected the minor's biometric data in violation of BIPA's requirements and that she would not have purchased the pass for her son if she had been aware of the biometric requirement.[71.5] The court held that a BIPA violation is an actionable injury, and may allow standing to sue for statutory damages.

---

[71.1] Press Release, FTC, Equifax to Pay $575 Million as Part of Settlement with FTC, CFPB, and State Related to 2017 Data Breach: Settlement Includes Funds to Help consumers Recover from Data Breach (July 22, 2019), *available at* *https://www.ftc.gov/news-events/press-releases/2019/07/equifax-pay-575-million-part-settlement-ftc-cfpb-states-related.*

[71.2] **IL**—Biometric Information Privacy Act *740 ILCS14/1 et seq.; amended* S.B. 2979, Public Act 103-0769 (2024) (amended to clarify that unlawful collection of biometric data from the same person on multiple occasions using the same method counts as one violation eligible for recovery, not multiple violations for each instance of data collection);

**TX—*Tex. Bus. & Com. Code Ann. § 503.001*** (no private party action);

**WA**—Wash. Rev. Code. Ann. § 19.375 (no private party action).

[71.3] *See:*

**IL**—*Monroy v. Shutterfly, Inc., No. 16 C 10984, 2017 U.S. Dist. LEXIS 149604 (N.D. Ill. Sept. 15, 2017); Rivera v. Google Inc., 238 F. Supp. 3d 1088 (N.D. Ill. 2017);*

**CA**—*Patel v. Facebook Inc., No. 3:15-cv-03747-JD, 2018 U.S. Dist. LEXIS 30727 (N.D. Cal. Feb. 26, 2018);*

**IL**—Rogers v. BNSF Railway Company, No. 1:2019cv03083 (N.D. Ill. 2022) (truck driver sued on behalf of a class of over 45,000 drivers whose fingerprints were scanned for identity when visiting the BNSF rail yard to pick up and drop off truck loads. The truck drivers alleged the fingerprint scans were collected without permission or notice, in violation of BIPA requirements. A federal jury awarded a $228 million verdict for the truck drivers.).

[71.4] **IL**—*Rosenbach v. Six Flags Entm't Corp., 2019 IL 123186, 2019 Ill. LEXIS 7 (Ill. Jan. 25, 2019).*

[71.5] **IL**—*Rosenbach v. Six Flags Entm't Corp., 2019 IL 123186, 2019 Ill. LEXIS 7 (Ill Jan. 25, 2019).*

4 New Appleman on Insurance Law Library Edition § 28.02

Future BIPA suits are expected to focus on employers' collection of employee and customer biometric data, maintaining the data, dissemination to third parties, following proper guidelines for disclosure of biometric protocols, and finally destruction of the data. These issues are especially important in determining what qualifies as adequate notice requirements and consent.[71.6]

Another BIPA issue that has been certified involves the nature and timing of a BIPA claim.[71.7] In *Cothron*, the plaintiff argued that her employer violated BIPA by scanning her fingerprint without her written consent. She had to scan her fingerprint to gain access to the computer system. The certified question is whether her claim accrued on the date of the first scan, or if each scan was a new claim entitled to damages. This case, and others, highlight the importance of employers maintaining written consent for the collection of any biometric data.

This is especially important as insurers have indicated they will continue to insert BIPA exclusions into policies. This practice is expected to expand to include BIPA exclusions in employment, cyber, and other policies.

On June 28, 2018, California enacted the California Consumer Privacy Act (CCPA), which went into effect on January 1, 2020, with full enforcement by July 1, 2020.[71.8] The CCPA protects the data privacy of California consumers by expanding the definition of personal information, creating a disclosure right where residents have a right to know how and what personal information will be used, a right to be deleted, and an opt out option for consumers to opt out of the sale of their personal information. The CCPA imposes special rules pertaining to the consumer data of minors, and allows the California attorney general to enforce civil penalties per violation.[71.9] The CCPA only applies to companies that are (1) doing business in California, are for-profit, and generate a majority of company income through personal data sales, or (2) have an annual revenue exceeding $25 million, or (3) have the personal information of at least 50,000 Californians.

Although the CCPA is a California law, all 50 states (and most territories) have enacted breach notice legislation requiring organizations to notify consumers if cyber breaches expose their data. These privacy laws have resulted in greater protections for consumers, and improved reporting by organizations. The new regulations have created greater visibility for the need and value of cyber insurance. Notification costs are higher in the U.S. than anywhere else in the world. These costs entail creating databases, hiring experts, ensuring compliance with regulatory requirements, notification to individuals and agencies, mail costs, and sometimes credit monitoring. The average notification cost is $740,000 per cyber breach.[71.10] In 2018, the cost of a data breach in the U.S. averaged $8 million per incident.[71.11] More companies are seeking cyber insurance coverage to offset the growing liabilities.

This is especially true for small to midsize companies that are less able to absorb the costs of a cyber breach. These companies are a growing demographic in the cyber insurance market. To respond to consumer demand for cyber coverage, there has been an increase in the number of insurers who issue cyber policies. In 2018, 528 insurers were writing policies. The insurance industry is still learning how to

---

[71.6] **IL**—*Rosenbach v. Six Flags Entm't Corp., 2019 IL 123186, 2019 Ill. LEXIS 7 (Ill. Jan. 25, 2019)* (plaintiff's son had a season pass that required him to use his thumbprint to enter the park, plaintiff alleged no actual injury, but would not have purchased the pass for her minor son if she had been aware of the biometric requirement).

[71.7] **US/IL**—*Cothron v. White Castle Sys., 20 F.4th 1156 (7th Cir. 2021)*, aff'd, *Cothron v. White Castle Sys., 79 F.4th 894 (7th Cir. 2023)* (subsequent legislation following *Cothron* amended statute to clarify that the unlawful collection of biometric data, from the same person, using the same method, counts as one violation eligible for recovery, not multiple violations for each instance of data collection).

[71.8] California Consumer Privacy Act of 2018 ("CCPA"), *Cal. Civ. Code §§ 1798.100–1798.199*.

[71.9] *Cal. Civ. Code §§ 1798.100–1798.199*.

[71.10] Ponemon Inst. at 9.

[71.11] *Id.*

4 New Appleman on Insurance Law Library Edition § 28.02

best assess cyber risks. Expect policy coverages, exclusions, and endorsements to continue to evolve, especially in the event of federal legislation.

### [c] Coverage for Cybersecurity Claims

Large cyberattacks compromise the digital security of millions of individuals and often come with significant liability exposure for the victim company. In 2018, the average total cost of a data breach in the U.S. reached a high of $7.91 million per incident.[71.12] The global cost of cyberattacks is predicted to be upwards of $3 trillion by the end of 2020.[71.13] As the costs and risks of ineffective cybersecurity exponentially increase, the need for companies to protect information in the digital world is critical. Cyber criminals target all sizes and variety of companies. Organizations with ineffective cybersecurity are at risk of adverse financial consequences, theft of intellectual property, damage to client relationships, and long-lasting exposure to loss.

To adequately combat cyber risk and comply with government guidelines, a company must have a robust cybersecurity system and adequate cyber insurance. Cybersecurity protects individuals from identity theft, fraud, and the loss and exposure of personal data. Information loss is one of many cyber risks individuals and corporations face. In addition to direct loss from exposure of company information, a company may also be liable to customers, vendors, and employees. Computer crime coverages may encompass injury such as loss of money and property caused by criminal acts of third parties, fraudulent fund transfers, or loss resulting from employee dishonesty.[71.14] Generally, insurance policies exclude coverage for third-party

---

[71.12] PONEMON INST., *2018 Cost of a Data Breach Study: Global Overview* (July 2018), *available at* https://www.ibm.com/downloads/cas/861MNWN2.

[71.13] Danielle Gilmore & David Armillei, *The Future is Now: The First Wave of Cyber Insurance Litigation Commences, and the Groundwork is Laid for the Coming Storm*, INSURANCE LAW 2016: TOP LAWYERS ON TRENDS AND KEY STRATEGIES FOR THE UPCOMING YEAR, 23–24 (2016).

[71.14] ISO CR 00 22 05 06; ISO CR 00 07 10 90.

**US/IN—*Am. Tooling Ctr., Inc. v. Travelers Cas. & Sur. Co. of Am.*, 895 F.3d 455 (6th Cir. 2018)** (computer fraud when insured received fraudulent email and transferred funds to party impersonating its Chinese vendor);

**US/GA—**Principle Solutions Group v. Ironshore Indem., Inc., 2016 U.S. Dist. LEXIS 194245 (N.D. Ga. Mar. 22, 2016);

**US/NJ—**Childrens Place, Inc. v. Great Am. Ins. Co., 2019 U.S. Dist. LEXIS 70109 (D.N.J. Apr. 25, 2019) (hacker gained direct access to computer system by infiltrating the web email service and intercepting and redirecting emails);

**US/NY—**Medidata Sols. Inc. v. Fed. Ins. Co., 729 Fed. Appx. 117 (2d Cir. 2018) (losses originating from an email "spoofing" attack were covered under a computer fraud provision of insured's policy).

*Cf.* **US/CA—**Taylor & Lieberman v. Fed. Ins. Co., 681 Fed. Appx. 627 (9th Cir. 2017) (losses were not covered under a policy requiring unauthorized "entry into" a computer system because sending an email does not equate direct access).

**US/MN—**SJ Computs., LLC v. Travelers Cas. & Sur. Co. of Am., 621 F. Supp. 3d 962 (D. Minn. 2022) (purchasing manager at SJ Computers received spoofed email from a "vendor" asking her to check the transfer account information for some new invoices, the Hacker then broke into her email act and sent fake invoices and wiring instructions to CEO, who paid the fake invoices. SJ Computers had an insurance policy with provisions that defined computer fraud as an "intentional, unauthorized and fraudulent entry or change of data or computer instructions into a computer system." The policy excluded transfers made by employees or authorized personnel who rely on fraudulent instruction. The court ruled in favor of the insurer).

*Compare* **US/MN—**Interstate Removal, LLC v. Nat'l Specialty Ins. Co., 2024 U.S. Dist. LEXIS 55663 (D. Minn. Mar. 28, 2024) (no coverage under Social Engineering Endorsement or Computer and Funds Transfer Fraud Endorsement, because insured failed to allege compliance with condition precedent to coverage, follow an established and documented verification procedure; and exclusion for cyber incident from hacker).

4 New Appleman on Insurance Law Library Edition § 28.02

risks such as loss of confidential information, intellectual property, or fines/penalties arising from related loss. Key provisions in crime policies that provide computer-related coverage include the definition of "computer" (which may or may not address devices such as smartphones) and "computer fraud."[71.15] Insurers may also deny a duty to defend or indemnify, leaving the insured responsible for proving the losses are or are potentially covered.

Policyholders tend to seek coverage for cyber liability claims under existing CGL, EPLI, E&O and related policies. The best way to ensure adequate coverage is through a separate cyber insurance policy that clearly states coverage unique to the insureds needs.

New cyber risks are continuously emerging and insurers and policyholders need to work together to ensure adequate coverage. Employers need to communicate with carriers about policy needs and conduct a comprehensive cyber risk assessment. As a condition to coverage, many insurers are requiring policyholders to maintain internal cyber risk assessment protocols to identify and mitigate risk. Failing to follow company procedures can preclude coverage.

In *Interstate Removal*, a company was tricked into making a wire transfer by a fraudster impersonating one of the company's vendors.[71.16] The fraudster also tricked Interstate's bank into making a second wire transfer from the company's account. Interstate had a cyber insurance policy through National Specialty Insurance that contained two relevant endorsements, a Computer and Funds Transfer Fraud Endorsement and a Social Engineering Endorsement. Although the Computer and Funds Transfer Fraud Endorsement initially could have covered the claim because the loss resulted from a fraudulent email, the endorsement contained an exclusion for employees who acted on the fraudulent instruction. National did not cover the first wire transfer but did cover the second one made by the bank. The Social Engineering Endorsement required the insured to follow an "established and documented verification procedure" before following the emailed payment instructions. Since Interstate did not have or follow a verification procedure the claim was denied.[71.17]

---

US/NV—*Sanderina, LLC v. Great Am. Ins. Co., 2019 U.S. Dist. LEXIS 154760 (D. Nev. Sept. 11, 2019)* (policy had a "direct access" requirement, and emails did not satisfy direct access to the computer system).

Cf. US/CA—*Aqua Star (USA) Corp. v. Travelers Cas. & Sur. Co. of Am., 719 Fed. Appx. 701 (9th Cir 2018)* (fraud coverage precluded because claims limited to "direct hacking," policy contained an exclusion: "will not apply to loss or damages resulting directly or indirectly from the input of Electronic Data by a natural person having the authority to enter the Insured's Computer System").

US/CA—*Pestmaster Servs. v. Travelers Cas. & Sur. Co. of Am., 656 Fed. Appx. 332 (9th Cir. 2019)* (judgment for the insurer, court interpreted policy language "fraudulently cause a transfer" to require an unauthorized transfer of funds; Pestmaster authorized the transfer of funds);

US/CA—*Ernst & Haas Mgmt. Co. v. Hiscox, Inc., 23 F.4th 1195 (9th Cir. 2022)* (loss was covered under the commercial crime insurance policy because the loss resulted from the fraudulent actor's email instruction, not the employee's transfer of funds);

US/MS—*Miss. Silicon Holdings. L.L.C. v. Axis Ins. Co., 843 Fed. Appx. 581 (5th Cir. 2021)* (A company that suffered a ransomware attack agreed with the insurer to rescind the policy after the insurer alleged the company misrepresented the degree to which it utilized multi-factor authorization (MFA) on its insurance application. On the application, the CEO said that the company required MFA to gain entry to many of its systems, including endpoints, servers, network infrastructure, directory services, and for employees, as well as, third parties to access email and to remotely access the company's network. In reality, MFA was only required to access the firewall.).

[71.15] **US/MN**—ISO CR 00 22 05 06; ISO CR 00 07 10 90.

[71.16] **US/MN**—Interstate Removal, LLC v. Nat'l Specialty Ins. Co., _2024 U.S. Dist. LEXIS 55663 (D. Minn. Mar. 28, 2024)_.

[71.17] **US/MN**—Interstate Removal, LLC v. Nat'l Specialty Ins. Co., _2024 U.S. Dist. LEXIS 55663 (D. Minn. Mar. 28, 2024)_.

➧ ◈ **Cross Reference:**

For more information on Cyber Insurance, see NEW APPLEMAN INSURANCE LAW Chapter 29, *Cyber Insurance.*

### [5] Who Is Insured Under Employment Practices Liability Insurance

The employer, under whatever business form it operates, is usually the named insured under an EPL policy. Insurers typically define the term "named insured" to prevent the coverage extending to parents, subsidiaries, affiliates, etc., of the named insured.[72] Joint ventures or other business combinations would also fall outside of the policy's coverage. If the policyholder requires the coverage extended to other legal entities, it should ensure the underwriter has amended the policy to include these entities.

Most EPL policies include directors, officers and other management personnel within the definition of insureds.[73] The definition of insured often, but not always, includes employees.[74] The manner in which the policy defines "employees" or other insured agents obviously delineates who is afforded protection under the policy. For example, a contract employee may not be covered by an EPL policy that covered full-time, part-time, temporary, and seasonal employees, but specifically excluded independent contractors.[74.1]

### [6] Issues Arising Under Clauses Limiting Coverage to Acts in the Course and Scope of Employment

Coverage for directors, officers, employees or other agents is typically conditioned on their committing any wrongful employment act within their capacity as an agent for the company.[75] If the employee is doing some act in furtherance of the employer's business, that act will be within the scope of employment.[76] On the other hand, if the employee acts for some independent purpose of his or her own, wholly disconnected from the furtherance of his employer's business, that conduct will likely fall outside the scope of employment.

The authors of this chapter are not aware of any EPL cases in which a court considered whether a wrongdoer's acts were committed within the scope and capacity of employment. The issue has frequently arisen in connection with sexual abuse claims, and these cases may be persuasive with respect to whether an employee's actions were within the course and scope of employment.[77] If an employee acts outside the scope of his or her employment, then he or she will likely fall outside the policy's definition of an "insured."

---

[72] Bob Bregman, *EPLI Policy Conditions: Frequently Overlooked, Always Important, Employment Practices Liability Consultant Newsletter* (International Risk Management Institute, Inc. Fall 2004).

[73] Joan Dolinsky and Barbara O'Donnell, *Employment Practices Liability Coverage,* 31 THE BRIEF 48, 54 (2001).

[74] Joan Dolinsky and Barbara O'Donnell, *Employment Practices Liability Coverage,* 31 THE BRIEF 48, 54 (2001).

[74.1] *See, e.g.,* **US/MS**—*Isom v. Valley Forge Ins. Co., 2016 U.S. Dist. LEXIS 172139 (S.D. Miss. Dec. 13, 2016)* (rejecting assignee-contractor's claim against the EPL insurer for $4 million on the grounds that he was not a covered party).

[75] Joan Dolinsky and Barbara O'Donnell, *Employment Practices Liability Coverage,* 31 THE BRIEF 48, 54 (2001).

[76] **SC**—*S.C. State Budget & Control Bd. v. Prince, 403 S.E.2d 643, 646 (S.C. 1991).*

*See also* **US/AR**—*American Railcar Ind., Inc. v. Hartford Ins. Co. of the Midwest, 2017 U.S. App. LEXIS 2147 (8th Cir. Feb. 7, 2017)* (no coverage under employer's liability insurance because employee was injured while on break).

[77] *See, e.g.:*

**CA**—*Rita M. v. Roman Catholic Archbishop, 232 Cal. Rptr. 685, 690 (Cal. Ct. App. 1987)* (priest acted outside scope of his employment by engaging in sexual relations with parishioners);

**[7] Employment Practices Liability Policies' Limitation on Who May Bring a Claim**

Obviously, an insurer must respond only to claims that fall within the insuring agreement.[78] Some risks covered by EPL policies, such as discrimination claims, may also be brought by third parties such as independent contractors, applicants for employment, customers or invitees of the policyholder. Most EPL insurers seek to limit coverage to disputes arising out of a master/servant relationship.[79] Insurers generally limit their liability for such claims by specifying a class or classes of persons whose claims will fall within the policy's coverage. EPL coverage may be limited to claims made by either employees or "claimants."[80] The term claimant typically includes employees or applicants for employment.[81] Thus, insurers may limit claims brought by third persons.[82]

In *Andrews Transport*, the definition of "employee" helped determine the insurer's duty to defend.[83] The policy at issue limited coverage to claims brought by "claimants." The policy defined "claimants as employees or applicants for employment." The policy defined employee as:

> An individual whose labor or service is engaged by and directed by an insured entity. This includes but is not limited to part-time, seasonal, volunteer, temporary and leased Employees as well as any individual employed in a supervisory, managerial or confidential position. Independent contractors who claim to be an Employee of an insured entity will be Claimants but only with respect to the conduct of any insured entity's business.[84]

In the underlying matter, truck drivers working for Andrews Transport claimed that the company had improperly withheld taxes and unemployment insurance assessments from their taxes. The truckers' initially denied that

---

**SC**—*Doe v. S.C. State Budget & Control Bd., 494 S.E.2d 469, 472–473 (S.C. Ct. App. 1997)* (police officer's coercion of sex from woman during traffic stop was outside the scope of employment);

**WV**—*W. Va. Reg'l Jail & Corr. Facility Auth. v. A. B., 766 S.E.2d 751 (W. Va. 2014)* (alleged sexual assault fell manifestly outside scope of authority and duties as correctional officer).

*See also* **CA**—*State Farm Fire & Cas. Co. v. Century Indem. Co., 69 Cal. Rptr. 2d 403. 408 (Cal. Ct. App. 1997)* (molestation of a student could not occur within the scope of the teacher's duties and thus, the school district's insurer had no duty to defend the teacher unless the complaints alleged nonsexual tortious conduct that was "separable from and unrelated to the alleged molestation");

[78] **US**—*Samson v. Apollo Res. Inc., 2003 U.S. App. LEXIS 6158 (5th Cir. Mar. 20, 2003)*, *cert. denied sub nom.* **Apollo Res., Inc. v. QBE Int'l Ins., Ltd., 157 L. Ed. 2d 145 (U.S. 2003)**.

[79] *See*:

**US/PA**—*Clarendon Nat'l Ins. Co. v. City of York, 290 F. Supp. 2d 500, 506 (M.D. Pa. 2003)*, aff'd, *2005 U.S. App. LEXIS 2011 (3d Cir. Feb. 8, 2005)*;

**US/VI**—*Gen. Star Indem. Co. v. V.I. Port Auth., No. 2001-188, 2007 U.S. Dist. LEXIS 4444, at *10 (D.V.I. Jan. 5, 2007)*.

[80] *See, e.g.,* **OK**—Poteau *Ford Mercury, Inc. v. Zurich Am. Ins. Co., No. 104,162, 2009 Okla. Civ. App. LEXIS 140 (Okla. Civ. App. May 8, 2009)* (limiting coverage by indemnifying for damages only if, the 'damages' result from 'claims' made by former employees).

[81] *See* **US/TX**—*Trans v. CNA Reinsurance, 2002 U.S. App. LEXIS 9384 (5th Cir. Apr. 22, 2002)*.

[82] Of course, the insurance market is dynamic and the authors have seen endorsements to EPL policies expanding coverage to any persons alleging discriminatory conduct against a policyholder.

[83] *See* **US/TX**—*Trans v. CNA Reinsurance, 2002 U.S. App. LEXIS 9384 (5th Cir. Apr. 22, 2002)*.

[84] **US/TX**—*Trans.*, 2002 U.S. App. LEXIS 9384.

they were employees, although they had also plead in the alternative that, had they been employees, Andrews Transport's withholding of unemployment insurance assessments would have been improper.

CNA argued that it had no duty to defend because the truckers had alleged they were not employees, and therefore were not "claimants." The district court agreed and granted CNA summary judgment. The Fifth Circuit, however, reversed. Because the truckers had argued in the alternative that they were employees, the court held that they fell within the definition of claimants under the CNA policy because they were independent contractors claiming status as employees.[85]

The definition of claimant in *Andrews Transport* expressly included independent contractors who alleged they were employees. Other EPL insurers have taken a variety of approaches towards insuring claims by independent contractors. Under some policies, the definition of employee expressly excludes independent contractors. Whether a particular employee qualifies as an independent contractor or other agent of the insured will often be an issue of fact and should be determined by reference to common law or state statute.

For example, in *Crescent River Port Pilot's Ass'n v. Chubb Group of Ins. Cos.*,[86] an applicant to a port pilot apprentice program run by the Crescent River Port Pilot's Association sued the association for age discrimination after he was denied entry into the program. The Association sued both Chubb and its broker after Chubb denied coverage under an EPL policy. Chubb argued that the policy responded only to claims by employees.[87] The claimant's suit fell outside the EPL policy's coverage because, as an applicant or independent contractor, the claimant did not qualify as an employee.[88] The broker sought summary judgment by arguing, among other things, that the claim fell within Chubb's EPL policy.[89] The court denied the broker's motion for summary judgment, finding the plaintiff had raised issues of fact concerning the applicant's status as an employee.[90]

Another area ripe for dispute is whether directors, officers, or other management personnel qualify as "employees" for the purposes of making a claim. The authors of this chapter are aware of no reported decisions on this issue. Some EPL policies, however, fail to state expressly whether "executive" positions, such as directors, officers, managers, or partners are within the class of persons that may make covered claims. Some case law suggests that owners or other persons holding executive power may not be "employees."[91]

---

⌖ **Expert Insight:**

---

[85] **US/TX**—*Trans.*, *2002 U.S. App. LEXIS 9384*.

[86] **US/LA**—Crescent River Port Pilot's Ass'n v. Chubb Group of Ins. Cos., No. 05-5491 SECTION: "S" (3), *2008 U.S. Dist. LEXIS 89221 (E.D. La. Nov. 4, 2008)*.

[87] **US/LA**—*Crescent River*, 2008 U.S. Dist. LEXIS 89221, at *6.

[88] **US/LA**—*Crescent River*, 2008 U.S. Dist. LEXIS 89221, at *6.

[89] **US/LA**—*Crescent River*, 2008 U.S. Dist. LEXIS 89221, at *2–3.

[90] **US/LA**—*Crescent River*, 2008 U.S. Dist. LEXIS 89221, at *6–7.

[91] *See* **US/GA**—Fountain v. Metcalf, Zima & Co., P.A., *925 F.2d 1398, 1400 (11th Cir. 1991)* (noting partners, unlike employees, share in profits, losses and expenses, are compensated based on a share of the firm's profits; and have a vote on the management in the firm).

**US/KY**—*Bowers v. Ophthalmology Group, LLP, No. 5:12-CV-00034-JHM, 2012 U.S. Dist. LEXIS 118761 (W.D. Ky. Aug. 21, 2012)* (plaintiff's status did not change from partner to employee simply because she was out-numbered and found herself in minority position among other partners). *Remanded on other grounds, Bowers v. Ophthalmology Grp., 733 F.3d 647 (6th Cir. 2013)*.

Under these cases, insurers may argue that an owner or executive is not an employee, and a claim by such an individual does not fall within an EPL policy. This argument may be bolstered when the definition of employee or claimant does not include directors, officers, or claimants.

[92] *See* Bob Bregman, *EPLI Policy Exclusions: It's Not What They Exclude, It's What They "Except,"* EMPLOYMENT PRACTICES LIABILITY CONSULTANT NEWSLETTER (International Risk Management Institute, Inc. Winter 2008) (observing that coverage for actions by executives is sometimes barred by exclusions for employment contracts).

On the other hand, insurers easily could exclude claims by executives, but often do not.[92] This may lead to arguments by policyholders that a policy is vague or ambiguous with respect to whether coverage is afforded for executives. It certainly would be in insurers' best interest to clarify coverage for executives, managers and partners. In closely held companies, limited liability companies, and partnerships, claims by owners/executives often concern fights over ownership, control, and profits. These are business risks insurers generally seek to avoid, so it would benefit insurers to clarify under what circumstances claims by executives may fall within an EPL policy's coverage.

➤⧫ **Cross Reference:**

For a discussion on the advantages for employers obtaining directors and officers insurance, see *Section 26.01*, above.

**[8] Evaluating "Loss" Insured Under Employment Practices Liability Insurance**

**[a] The Definition of Damages**

EPL insuring agreements use language similar to that found in other policies to describe the scope of damages covered. Insurers will agree to pay "loss" that the insured becomes legally obligated to pay due to covered claims. Insurers define "loss" to include amounts the insured becomes legally obligated to pay as the result of a covered claim or claims … for wrongful employment acts, including but not limited to damages (including back pay and front pay), judgments (including an award of pre-judgment and post-judgment interest) and settlements.[93] Defense costs may also fall within the definition of "loss."[94]

[93] **MN**—*Royal Indem. Co. v. C. H. Robinson Worldwide, Inc., No. A08-0996, 2009 Minn. App. Unpub. LEXIS 772, at *7–8 (July 21, 2009)*, review denied, *No. A08-0996, 2009 Minn. LEXIS 673 (Minn. Sept. 29, 2009)*.

*Consider* **US/VA**—*Republic Franklin Ins. Co. v. Albemarle County School Board, 670 F.3d 563 (4th Cir. 2012)* where the policy defined "loss" as any amount an insured was legally obligated to pay as damages and the federal court, interpreting Virginia law, found that while a judgment awarding unpaid wages would not be a covered loss because payment of those wages was preexisting duty of the insured, any obligation to pay liquidated damages and attorneys' fees would cause the insured a loss from wrongful act covered by the policy.

*See also* **US/MA**—*The Kittansett Club v. Philadelphia Indemnity Ins. Co., No. No. 11-1385-DJC, 2012 U.S. Dist. LEXIS 127939 (D. Mass., Sept. 10, 2012)* where the complaint in the underlying action sought restitution, injunctive relief, statutory treble damages and attorney's fees and costs. Citing *Republic Franklin* the court said that the restitution sought arose not from the insured's wrongful act, but its pre-existing duty under state law and was not covered. However, the treble damages allowed by the state law were compensatory, not punitive and attorney's fees and costs were inherently compensatory. Thus, the non-restitutionary component of a financial settlement of the underlying action would not be excluded as "penalties" from the definition of "loss" and would be covered under the policy provided no exclusion applied.

4 New Appleman on Insurance Law Library Edition § 28.02

EPL policy definitions of loss often are more elaborate, as insurers seek to carefully delineate the scope of coverage available. For example, a policy affording affirmative coverage for employment contracts may bar payment for future pay, severance pay or penalties payable under the contract.[95] In the alternative, insurers add exclusions for particular types of damages. Because courts place the burden of proof on insurers to prove the applicability of exclusions, and place the burden of proof on insureds to establish a claim falls within the coverage provided under the insuring agreement, it is often to an insurer's advantage to include exceptions to coverage within policy definitions.[96] A few courts have caught onto this slight-of-hand and place the burden of proof on insurers whenever language has an exclusionary effect, regardless of whether the insurer has labeled the language as an exclusion, a definition, or part of the insuring agreement.[97]

The court in *Royal Indem. Co. v. C. H. Robinson Worldwide, Inc.*[98] clarified what payments fall within the definition of loss in an EPL policy. In *C. H. Robinson* a dispute arose between Royal and its insured after the insured paid severance in order to settle an employment dispute. The policy obligated Royal to indemnify the insured for settlements, but not for severance pay. Royal argued that it had no obligation to pay for severance paid to the claimants. Robinson countered that because the severance was part of the *settlement*, the payment should be covered as a settlement.

C. H. Robinson faced a nationwide class action lawsuit alleging, among other things, gender discrimination and hostile work environment. C. H. Robinson owned a primary EPL policy and two excess EPL policies. After C. H. Robinson exhausted the $10 million primary policy through payment of defense costs, it demanded the two excess carriers fund a $15 million settlement.

Both excess carriers, including Royal, agreed to fund the settlement.[99] Royal, however, settled under a reservation of rights to recover amounts it paid in settlement and later filed a declaratory judgment action seeking to recoup its share of the settlement.[100] The Royal policy followed the form of the primary EPL policy, which defined loss, in relevant part as: "any amount which an Insured becomes legally obligated to pay as the result of a covered Claim or Claims … for Wrongful Employment Acts, including but not limited to damages … and settlements."[101]

Royal relied on two main points. It argued that severance payments made to the three named plaintiffs in the class action did not qualify as loss. The definition of loss also excluded taxes, and Royal therefore claimed it should receive a credit for the portion of the settlement that went to pay employees' taxes.[102]

Robinson made the severance payments to the named plaintiffs in exchange for their voluntary agreement to sever their employment with Robinson.[103] According to Royal, Robinson had not made the payments as the result of a claim for a wrongful employment act.[104]

---

[94] **MN**—*Royal Indem. Co., 2009 Minn. App. Unpub. LEXIS 772, at *7–8.*

[95] *See* **US/WI**—*Krueger Int'l Inc. v. Royal Indem. Co., 481 F.3d 993, 996 (7th Cir. 2007).*

[96] *See, e.g.,* **CA**—*Dart Indus., Inc. v. Commercial Union Ins. Co., 52 P.3d 79, 87 (Cal. 2002).*

[97] **CA**—*Dart Indus.,* 52 P.3d at 87.

[98] **MN**—*Royal Indem. Co. v. C. H. Robinson Worldwide, Inc., No. A08-0996, 2009 Minn. App. Unpub. LEXIS 772, at *7–8 (July 21, 2009), review denied, No. A08-0996, 2009 Minn. LEXIS 673 (Minn. Sept. 29, 2009).*

[99] **MN**—*Royal Indem. Co., 2009 Minn. App. Unpub. LEXIS 772, at *3.*

[100] **MN**—*Royal Indem. Co.,* 2009 Minn. App. Unpub. LEXIS 772, at *3.

[101] **MN**—*Royal Indem. Co.,* 2009 Minn. App. Unpub. LEXIS 772, at *7.

[102] **MN**—*Royal Indem. Co.,* 2009 Minn. App. Unpub. LEXIS 772, at *4.

[103] **MN**—*Royal Indem. Co.,* 2009 Minn. App. Unpub. LEXIS 772, at *13–14.

4 New Appleman on Insurance Law Library Edition § 28.02

The court of appeals rejected Royal's argument. The three named plaintiffs had received settlement monies beyond what the other class members had received. In approving this arrangement, the court in the underlying case required the named plaintiffs to provide additional consideration for the severance payments, namely, their voluntary termination of employment.

The court agreed that severance payments, by themselves, would not normally fall within the insuring agreement of an EPL policy.[105] Nevertheless, in the case before it, Robinson agreed to the severance as part of a settlement. As the court stated, "It is simply implausible to suggest that the severance agreements are not the result of the covered claims that were settled in the settlement agreement."[106]

Royal also sought credit for the part of the settlement that went to pay the class members' tax obligations. The definition of loss excluded taxes.[107] The trial court ruled that the tax exclusion applied only to taxes imposed directly upon the insured.[108] Before the court of appeals, Royal argued that nothing in the policy limited the tax exclusion. However, the appellate court affirmed the lower court's ruling. Because the settlement fund went to pay tax obligations of the settling class members, and not Robinson's taxes, the court found the exclusion inapplicable.[109]

### [b] Limitations on Punitive Damages, Fines, Penalties and Trebled Damages

Defendants in EPL cases reaching a jury occasionally face punitive damage awards.[110] Fortunately for policyholders, the majority of EPL policies include some coverage for punitive damages.[111] The authors of this chapter are not aware of any significant decisions considering coverage for punitive damages under an EPL policy. A considerable number of decisions exist that discuss punitive damages in relation to insurance coverage. These cases are likely to be at least persuasive with respect to most issues that might arise with respect to punitive damage coverage under an EPL policy.

The most common issue related to punitive damages and insurance coverage is the insurability of punitive damages.[112] A substantial minority of jurisdictions bars coverage for punitive damages on public policy

---

[104] **MN**—*Royal Indem. Co.*, 2009 Minn. App. Unpub. LEXIS 772, at *13–14.

[105] **MN**—*Royal Indem. Co.*, 2009 Minn. App. Unpub. LEXIS 772, at *14.

[106] **MN**—*Royal Indem. Co.*, 2009 Minn. App. Unpub. LEXIS 772, at *14.

[107] **MN**—*Royal Indem. Co.*, 2009 Minn. App. Unpub. LEXIS 772, at *10.

[108] **MN**—*Royal Indem. Co.*, 2009 Minn. App. Unpub. LEXIS 772, at *10.

[109] **MN**—*Royal Indem. Co.*, 2009 Minn. App. Unpub. LEXIS 772, at *11.

[110] Donald A. Phin, *Work Force Risk Management for the New Millennium*, p. 43, EMPLOYMENT PRACTICES LIABILITY CONSULTANT NEWSLETTER (International Risk Management Institute, Inc. Fall 2008).

[111] Donald A. Phin, *Work Force Risk Management for the New Millennium*, p. 43, EMPLOYMENT PRACTICES LIABILITY CONSULTANT NEWSLETTER (International Risk Management Institute, Inc. Fall 2008) (noting, however, that, carriers often limit their indemnity exposure for punitive damages by charging additional premiums for punitive damage coverage or including sublimits for punitive damage awards).

*See e.g.* **US/VA**—*Republic Franklin Ins. Co. v. Albemarle County School Board, 670 F.3d 563 (4th Cir. 2012)* (noting that policy definition of "loss" provided coverage for punitive damages "where insurable by law").

[112] *See generally* French, *Debunking the Myth That Insurance Coverage Is Not Available or Allowed for Intentional Torts or Damages, 8 Hastings Bus. L.J. 65 (2012)* (although some courts have held that policyholder cannot insure against punitive damages, majority of courts have held that policyholder can obtain coverage for punitive damages unless they are expressly excluded under policy at issue).

4 New Appleman on Insurance Law Library Edition § 28.02

grounds.[113] Accordingly, most policies include a caveat that punitive damages fall within the definition of loss, unless the public policy of controlling law prohibits their insurability.

Even where public policy bars coverage for punitive damages, some exceptions exist. For example, in some jurisdictions, public policy may allow punitive damages based on vicarious liability.[114] Further, if the forum law bars coverage for punitive damages based on public policy, courts may sometimes use choice of law principles to apply the law of another state with more advantageous laws to the policyholder.[115]

Insurers frequently exclude coverage for fines, penalties, and treble damages. It does not appear any courts have interpreted these exclusions under an EPL policy.[116] Cases have dealt with these limitations on damages in relation to other types of policies.[117] Disputes over fines and penalties typically concern whether a particular damage award falls within the definition of fine or penalty.[118] In most cases, treble damages are not a remedy in employment liability claims, so this should have little application in insurance coverage cases.

### [c] Limitations on Equitable Relief

---

[113] *See, e.g.,* **US/OH**—*Lumbermens Mut. Cas. Co. v. S-W Indus., 39 F.3d 1324, 1329 (6th Cir. 1994)* (applying Ohio law).

*See also* Darryll A. Buford, *Insurability of Damages in Employment Litigation Cases,* NEW YORK EMPLOYMENT LAW LETTER (Jan. 2004).

[114] For example, under Oklahoma law, punitive damages are generally insurable as a matter of public policy. *See* **US/OK**—*Magnum Foods, Inc. v. Cont'l Cas. Co., 36 F.3d 1491 (10th Cir. 1994)* (claims against food chain for hiring dangerous employee). If, however, punitive damages are based on vicarious liability of insured, coverage may be afforded. *See* **OK**—*Dayton Hudson Corp. v. Am. Mut. Liab. Ins. Co., 621 P.2d 1155 (Okla. 1980)*.

*See also:*

**CO**—*Lira v. Shelter Ins. Co., 913 P.2d 514, 517–518 (Colo. 1996)*;

**NY**—*Soto v. State Farm Ins Co., 635 N.E.2d 1222, 1224–1225 (N.Y. 1994)* (court held that since coverage for a punitive damage award against an insured was against public policy, the insurer did not have to pay the award even when it was part of the excess judgment that resulted from the insurer's breach of duty to settle).

[115] **US/MI**—*Meijer, Inc. v. General Star Indem. Co., No. 94-1152, 1995 U.S. App. LEXIS 19951 (6th Cir. 1995)* (determining Michigan law (which permits insurers to cover punitive damages) governed a coverage dispute over a punitive damage award made by an Ohio court; Ohio public policy bars insurance for punitive damages).

[116] *But see* **US/KS**—*McCalla Corp. v. Certain Underwriters at Lloyd's, 2014 U.S. Dist. LEXIS 60309 (D. Kan. May 1, 2014)*. In *McCalla* the insured was the subject of a criminal investigation for violation of the federal Employee Eligibility Verification Act. A judgment against the insured ordered a $300,000 fine and a $100,000 forfeiture to the federal government. The policy said that "loss" did not include fines, penalties, or taxes. The court ruled the forfeiture was excluded as a fine or penalty.

[117] **US/MO**—*Universal Underwriters Ins. Co. v. Lou Fusz Auto. Network, Inc., 401 F.3d 876, 881 (8th Cir. 2005)* (ruling that statutory damages under the Telephone Consumer Protection Act did not constitute fines or penalties).

*See also* **MO**—*Columbia Cas. Co. v. Hiar Holding, L.L.C., 411 S.W.3d 258 (Mo. 2013)* (Telephone Consumer Protection Act ("TCPA") statutory damages of $500 per occurrence were not damages in nature of fines or penalties and, thus, trial court did not err in rejecting contentions that "property damage" and "advertising injury" coverage was inapplicable on basis that TCPA awards could not result in "damages" covered under policy).

[118] **US/MO**—*Universal Underwriters, 401 F.3d at 881*.

4 New Appleman on Insurance Law Library Edition § 28.02

Often, employees with a grievance will seek injunctive relief.[119] This is particularly true under the Americans with Disabilities Act ("ADA"), which expressly affords equitable remediation to make facilities accessible to those with disabilities.[120] Employees also may ask a court to force an employer to disgorge unpaid wages. Insurers usually seek to limit their liability for equitable remedies. Insurers also include exclusions for equitable relief in their policies. (*See* Section 28.04[2][l] below.) In the alternative, insurers may carve out equitable remedies from the definition of loss or damages.

Frequently, insurers limit their obligation to pay to "damages" or "money damages." The majority of courts have ruled that the terms "damages" or "money damages" refers to an insurer's obligation to indemnify an insured for legal damages (*e.g.* monetary judgments), and not equitable relief.[121]

Along these lines, most courts agree that restitutionary amounts fall outside the definition of damages.[122] The purpose of equitable remedies, such as disgorgement, is to return the parties to the status quo before the alleged wrongdoing.[123] In contrast, damages are meant to compensate the victim for harms suffered.[124] Most courts agree that equitable claims for restitution or disgorgement are not covered.[125] A growing

---

[119] Diana P. Scott, *Latest Developments in Sexual Discrimination and Harassment, ALI-ABA Course of Study Materials* (July 2000).

[120] **US—**42 U.S.C. § 12188(a)(1).

[121] *See, e.g.,* **MA—**Hazen Paper Co. v. U.S.F.&G. Co., 555 N.E.2d 576, 582 (Mass. 1990) (finding costs to comply with injunctive relief falls outside the definition of damages).

*See also*:

**US/SC—**Ellett Bros., Inc. v. U.S. Fid. & Guar. Co., 275 F.3d 384, 387 (4th Cir. 2001), *cert. denied,* **537 U.S. 818 (2002)** (applying South Carolina law);

**MA—**116 Commonwealth Condominium Trust v. Aetna Cas. & Sur. Co., 742 N.E.2d 76, 79 n.4 (Mass. 2001) (stating "We note also that a complaint for purely equitable relief that includes counts seeking costs or attorneys fees is not a complaint seeking money damages").

[122] *See* Barry R. Ostrager & Thomas R. Newman, HANDBOOK ON INSURANCE COVERAGE DISPUTES § 10.03(c) (9th ed. 1998); Allan D. Windt, INSURANCE CLAIMS & DISPUTES §§ 6.42, 11.06 (3d ed. 1998).

[123] See Barry R. Ostrager & Thomas R. Newman, HANDBOOK ON INSURANCE COVERAGE DISPUTES § 10.03(c) (9th ed. 1998); Allan D. Windt, INSURANCE CLAIMS & DISPUTES §§ 6.42, 11.06 (3d ed. 1998).

[124] **US—**Carey v. Piphus, 435 U.S. 247, 254 (1978) (observing that compensatory damages are awarded in discrimination actions to "compensate persons for injuries caused by the deprivation of constitutional rights").

[125] *See* Windt at § 6.42 n.422.

*See also*:

**US/HI—**Executive Risk Indem., Inc. v. Pac. Educ. Servs., Inc., 451 F. Supp. 2d 1147 (D. Haw. 2006) (ruling that D&O carrier had no obligation to indemnify insured college for damages that were in effect rebates of tuition; the court found that the relief sought was restitutionary and therefore not damages).

**US/IL—**Level 3 Communs., Inc. v. Fed. Ins. Co., 272 F.3d 908, 910–911 (7th Cir. 2001) (ruling that payment made to settle claims that insureds made fraudulent statements to induce buyers to purchase corporation was restitutionary and therefore fell outside the definition of loss");

**US/FL—**Phila. Indem. Ins. Co. v. Sabal Ins. Grp., Inc., 786 Fed. Appx. 167 (11th Cir. 2019) (D&O coverage did not extend to restitution of ill-gotten gains payments, a charitable donation that was clearly a penalty, or the costs of investigation).

4 New Appleman on Insurance Law Library Edition § 28.02

minority of courts, however, refuse to recognize that the term "damages" in an insurance policy by itself is sufficient to distinguish between legal and equitable remedies.[126] Under the minority line of cases, policyholders have a strong argument that amounts they are forced to disgorge, such as back wages, falls within the coverage of an EPL policy (and assuming wage claims are not otherwise excluded). Some courts, outside the insurance context, have refused to characterized wage claims as involving equitable relief.[127] If an award of unpaid wages is deemed a legal remedy, then insureds also have a strong claim that such relief falls within an EPL policy's definition of damages.

New Appleman on Insurance Law Library Edition
Copyright 2025, Matthew Bender & Company, Inc., a member of the LexisNexis Group.

**End of Document**

---

**CA**—Bank of West v. Superior Court, *10 Cal. Rptr. 2d 538, 554 (Cal. 1992)* (noting the term "damages," as used in a general liability policy, does not include "costs incurred in disgorging money that has been wrongfully acquired").

Compare **US/MN**—United States Bank N.A. v. Indian Harbor Ins. Co., 2014 U.S. Dist. LEXIS 173485 (D. Minn. Dec. 16, 2014) (under policy with final-adjudication requirement, mere allegations are insufficient; if allegations of unlawful activity are never determined to be true, payment to dispose of those allegations is not restitution because restitution can only occur if that which is being returned was wrongfully taken);

**IL**—Astellas US Holding, Inc. v. Starr Indem. & Liab. Co., 566 F. Supp. 3d 879 (N.D. Ill. 2021) ($50 million restitution payment covered), aff'd, 66 F.4th 1055 (7th Cir. 2023);

**DE**—**RSUI Indem. Co. v. Murdock, 248 A.3d 887, 900–01 (Del. 2021)** (after being found liable for fraud and misrepresentations in a shareholder suit, Dole settled for $148.2 million, the Delaware Supreme Court held the full value of the excess policy applied to the settlement. Delaware does not ban insurance coverage for fraudulent conduct);

**DE**—Sycamore Partners Mgmt., L.P. v. Endurance Am. Ins. Co., No. N18C-09-211 AML CCLD, 2021 Del. Super. LEXIS 584 (Super. Ct. Sept. 10, 2021) (disgorgement or restitution from ill-gotten gains may be insurable).

[126] See, e.g.:

**US/GA**—International Ins. Co. v. Johns, 874 F.2d 1447, 1454–1455 (11th Cir. 1989) (ruling that return of golden parachute benefits by directors to settle allegations of corporate waste was a detriment to the insured, and therefore constituted a loss under a D&O policy);

**CA**—AIU Ins. Co. v. Superior Court, 799 P.2d 1253, 1268–1269 (Cal. 1990) (finding the term damages encompasses both legal and equitable remedies).

[127] See, e.g., **CA**—Olson v. Cory, 673 P.2d 720, 728 (Cal. 1983) ("Amounts recoverable as wrongfully withheld payments of salary or pensions are damages").